No. 15-1874

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

_____

PRO-FOOTBALL, INC.,

Plaintiff-Appellant,

v.

AMANDA BLACKHORSE; MARCUS BRIGGS-CLOUD;
PHILLIP GOVER; JILLIAN PAPPAN; COURTNEY TSOTIGH,

Defendants-Appellees,

UNITED STATES OF AMERICA,

Intervenor-Appellee.

_____

On Appeal from the United States District Court
for the Eastern District of Virginia, Alexandria Division
No. 1:14-cv-01043 (Hon. Gerald Bruce Lee)

_____

## PAGE-PROOF OPENING BRIEF OF APPELLANT
_____

Robert L. Raskopf
Todd Anten
Jessica A. Rose
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
(212) 849-7000
robertraskopf@quinnemanuel.com

Lisa S. Blatt
Robert Alan Garrett
ARNOLD & PORTER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
lisa.blatt@aporter.com

*Counsel for Appellant Pro-Football, Inc.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. <u>15-1874</u>    Caption: <u>Pro-Football, Inc. v. Blackhorse</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Pro-Football, Inc.</u>
(name of party/amicus)

_____

 who is _____<u>appellant</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?  ☑ YES ☐ NO
       If yes, identify all parent corporations, including all generations of parent corporations:
       Pro-Football, Inc. is wholly owned by WFI Group, Inc., which in turn is wholly owned by Washington Football, Inc.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
       If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Lisa S. Blatt                         Date:   October 30, 2015

Counsel for: Pro-Football, Inc.

## CERTIFICATE OF SERVICE
*****************************

I certify that on   October 30, 2015   the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/ Lisa S. Blatt                                     October 30, 2015
          (signature)                                         (date)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iii

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF ISSUES ........................................................................1

INTRODUCTION .....................................................................................2

STATEMENT OF THE CASE....................................................................5

    A.    The Lanham Act .........................................................5

    B.    Factual Background .....................................................8

    C.    Proceedings Below .....................................................9

SUMMARY OF ARGUMENT ................................................................11

STANDARD OF REVIEW .....................................................................13

ARGUMENT ..........................................................................................13

I.    Section 2(a)'s Content and Viewpoint Restrictions Violate the First Amendment........................................................................13

    A.    Section 2(a) Fails Strict Scrutiny...............................14

    B.    Section 2(a) Fails Intermediate Scrutiny ...................20

    C.    Registered Trademarks Are Not "Government Speech".........................27

    D.    Registration Is Not a Government Subsidy.................29

II.    Section 2(a) Is Unconstitutionally Vague................................33

    A.    Section 2(a) Fails To Provide Fair Notice..................34

    B.    Section 2(a) Fosters Arbitrary Enforcement ..............39

III.    The Government's Delay Violates Due Process ......................42

i

IV.    The Redskins Trademarks Were Properly Registered ......................................45

       A.    Section 2(a) Applies Only to Identifiable Persons ..................................46

       B.    The District Court Applied the Wrong Test for Disparagement............48

       C.    Petitioners Failed to Show That the Redskins Marks Disparaged
             a Substantial Composite of Native Americans ......................................51

V.    Laches Bars the Petition ..................................................................................62

CONCLUSION .........................................................................................................64

STATEMENT IN SUPPORT OF ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
133 S. Ct. 2321 (2013)................................................................30, 32

*Almendarez-Torres v. United States*,
523 U.S. 224 (1998)......................................................................46

*Altman v. Bedford Cent. Sch. Dist.*,
245 F.3d 49 (2d Cir. 2001) ...........................................................36

*Application of Nat'l Distillers & Chem. Corp.*,
297 F.2d 941 (C.C.P.A 1962) .......................................................23

*Autor v. Pritzker*,
740 F.3d 176 (D.C. Cir. 2014).......................................................30

*B&B Hardware, Inc. v. Hargis Indus.*,
135 S. Ct. 1293 (2015)....................................................6, 14, 27

*Barker v. Wingo*,
407 U.S. 514 (1972)......................................................................45

*Barry v. Barchi*,
443 U.S. 55 (1979)........................................................................42

*Bd. of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972)......................................................................44

*Bd. of Trustees of the State Univ. of N.Y. v. Fox*,
492 U.S. 469 (1989)......................................................................21

*Bell v. Burson*,
402 U.S. 535 (1971)................................................................42, 43

*Berger v. Battaglia*,
779 F.2d 992 (4th Cir. 1985) ........................................................48

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983)........................................................................26

*In re Boulevard Entm't, Inc.*,
　　334 F.3d 1336 (Fed. Cir. 2003) ...........................................................49

*Bullfrog Films, Inc. v. Wick*,
　　847 F.2d 502 (9th Cir. 1988) ..........................................................30, 35

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
　　447 U.S. 557 (1980)...............................................................20, 21, 22

*Citizens United v. Fed. Election Comm'n*,
　　558 U.S. 310 (2010)..........................................................................14

*City of Lakewood v. Plain Dealer Pub. Co.*,
　　486 U.S. 750 (1988)...................................................................33, 34

*Cleveland v. United States*,
　　531 U.S. 12 (2000).............................................................27, 33, 34

*Coates v. City of Cincinnati*,
　　402 U.S. 611 (1971).........................................................................34

*Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*,
　　527 U.S. 666 (1999).........................................................................43

*Dambrot v. Cent. Mich. Univ.*,
　　55 F.3d 1177 (6th Cir. 1995) ...........................................................35

*Davenport v. Washington Ass'n*,
　　551 U.S. 177 (2007)...................................................................30, 31

*Dep't of Tex., Veterans of Foreign Wars of the U.S. v. Tex. Lottery
　　Comm'n*,
　　760 F.3d 427 (5th Cir. 2014) ...........................................................30

*Edenfield v. Fane*,
　　507 U.S. 761 (1983)..........................................................................22

*FCC v. Fox Television Stations, Inc.*,
　　132 S. Ct. 2307 (2012)............................................................33, 34, 38

*FCC v. League of Women Voters of Col.*,
　　468 U.S. 364 (1984)...................................................................14, 26

iv

*Forsyth Cnty. v. Nationalist Movement*,
 505 U.S. 123 (1992)........................................................................17

*Friedman v. Rogers*,
 440 U.S. 1 (1978)......................................................................21, 22

*In re Geller*,
 751 F.3d 1355 (Fed. Cir. 2014) .......................................................58

*Grayned v. City of Rockford*,
 408 U.S. 104 (1972)........................................................................34

*Greater New Orleans Broad. Ass'n v. United States*,
 527 U.S. 173 (1999)........................................................................25

*Harris v. McCrae*,
 448 U.S. 297 (1980)........................................................................30

*Holder v. Humanitarian Law Project*,
 561 U.S. 1 (2010)..............................................................34, 37, 39

*Hustler Magazine, Inc. v. Falwell*,
 485 U.S. 46 (1988)..........................................................................26

*In re Int'l Flavors and Fragrances Inc.*,
 183 F.3d 1361 (Fed. Cir. 1999) .......................................................43

*J.C. Eno (U.S.) Ltd. v. Coe*,
 106 F.2d 858 (D.C. Cir. 1939)........................................................43

*Johnson v. Morris*,
 903 F.2d 996 (4th Cir. 1990) ..........................................................44

*Johnson v. United States*,
 135 S. Ct. 2551 (2015)......................................................37, 38, 51

*Kolender v. Lawson*,
 461 U.S. 352 (1983)........................................................................37

*Lee v. Ventura Cnty. Superior Court*,
 11 Cal. Rptr. 2d 763 (Cal. Ct. App. 1992).......................................20

*Legal Services Corp. v. Velazquez*,
    531 U.S. 533 (2001)................................................................27, 29, 31

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (1996)..........................................................................22

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)..........................................................................42

*In re Mavety Media Grp. Ltd.*,
    33 F.3d 1367 (Fed. Cir. 1994) ................................................50, 52, 53

*McAirlaids, Inc. v. Kimberly-Clark Corp.*,
    756 F.3d 307 (4th Cir. 2014) ............................................................43

*In re McGinley*,
    660 F.2d 481 (C.C.P.A. 1981) ....................................................16, 43

*Miller v. California*,
    413 U.S. 15 (1973)............................................................................50

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983)..........................................................................18

*Mishawaka Rubber and Woolen Co. v. S.S. Kresge Co.*,
    316 U.S. 203 (1942)..........................................................................13

*Morissette v. United States*,
    342 U.S. 246 (1952)....................................................................47, 48

*N.C. Right to Life, Inc. v. Leake*,
    525 F.3d 274 (4th Cir. 2008) ............................................................37

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002)..........................................................................62

*NEA v. Finley*,
    524 U.S. 569 (1998)....................................................................31, 33

*N.Y. Times v. Sullivan*,
    374 U.S. 254 (1964)..........................................................................21

*Norris v. United States*,
 257 U.S. 77 (1921) .................................................................62

*P.A.B. Produits et Appareils de Beaute v. Satinine Societa in Nome
 Collettivo di S.A.e.M. Usellini*,
 570 F.2d 328 (C.C.P.A. 1978) ...............................................43

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
 469 U.S. 189 (1985) .............................................................5, 6

*Paul v. Davis*,
 424 U.S. 693 (1976) ................................................42, 43, 44

*Perry v. New Hampshire*,
 132 S. Ct. 716 (2012) ...........................................................37

*Pitt News v. Pappert*,
 379 F.3d 96 (3d Cir. 2004) ...................................................17

*Pro-Football, Inc. v. Harjo*,
 284 F. Supp. 2d 96 (D.D.C. 2003) ...............................*passim*

*Pro-Football, Inc. v. Harjo*,
 415 F.3d 44 (D.C. Cir. 2005) .............................................9, 64

*Pro-Football, Inc. v. Harjo*,
 565 F.3d 880 (D.C. Cir. 2009) ....................................9, 45, 63

*Pro-Football, Inc. v. Harjo*,
 567 F. Supp. 2d 46 (D.D.C. 2008) ...................................9, 45

*Qualitex Co. v. Jacobson Prods. Co.*,
 514 U.S. 159 (1995) .............................................................13

*R.A.V. v. City of St. Paul*,
 505 U.S. 377 (1992) .............................................................15

*Reed v. Town of Gilbert*,
 135 S. Ct. 2218 (2015) ........................................................14

*Regan v. Taxation With Representation of Wash.*,
 461 U.S. 540 (1983) ......................................................30, 31

*Reno v. American Civil Liberties Union*,
  521 U.S. 844 (1997)........................................................36, 37

*Ridley v. Mass. Bay Transp. Auth.*,
  390 F.3d 65 (1st Cir. 2004)..........................................16, 36

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
  515 U.S. 819 (1995)........................................................17, 31

*Rust v. Sullivan*,
  500 U.S. 173 (1991)........................................................29

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*,
  502 U.S. 105 (1991)........................................................17, 18

*Smith v. Goguen*,
  415 U.S. 566 (1974)........................................................34

*Snyder v. Phelps*,
  131 S. Ct. 1207 (2011)....................................................26

*Sorrell v. IMS Health Inc.*,
  131 S. Ct. 2653 (2011)...........................................*passim*

*Stuart v. Camnitz*,
  774 F.3d 238 (4th Cir. 2014) ........................................13

*Swatch AG v. Beehive Wholesale, LLC*,
  739 F.3d 150 (4th Cir. 2014) ........................................13

*Taylor v. Louisiana*,
  419 U.S. 522 (1975)........................................................50

*Test Masters Educ. Servs. v. Singh*,
  428 F.3d 559 (5th Cir. 2005) ........................................16

*Tough Traveler, Ltd. v. Outbound Prods.*,
  60 F.3d 964 (2d Cir. 1995) ...........................................62

*Town of Greece v. Galloway*,
  134 S. Ct. 1811 (2014)....................................................36

*United States v. Eight Thousand Eight Hundred & Fifty Dollars*
  *($8,850) in U.S. Currency,*
  461 U.S. 555 (1983)................................................................44

*United States v. Stevens,*
  559 U.S. 460 (2010)...............................................................22

*Univ. of Notre Dame Du Lac v. J.C. Gourmet Food Imports Co.,*
  703 F.2d 1372 (Fed. Cir. 1983) ..........................................47

*Variable v. Nash,*
  190 P.3d 354 (N.M. Ct. App. 2008) ....................................20

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA,*
  944 F.2d 870 (Fed. Cir. 1991) ............................................63

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
  455 U.S. 489 (1982)...............................................................33

*W.D. Byron & Sons, Inc. v. Stein Bros Mfg. Co.,*
  377 F.2d 1001 (C.C.P.A 1967).............................................49

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.,*
  135 S. Ct. 2239 (2015)....................................................27, 28

*Ysursa v. Pocatello Educ. Ass'n,*
  555 U.S. 353 (2009)...............................................................31

**Trademark Trial and Appeal Board Decisions**

*Boswell v. Mavety Media Grp. Ltd.,*
  1999 WL 1040108 (TTAB 1999) ........................................40

*In re Condas S.A.,*
  1975 WL 20869 (TTAB 1975) .............................................40

*Harjo v. Pro-Football, Inc.,*
  1999 WL 375907 (TTAB 1999) ..........................................35

*In re Heeb Media, LLC,*
  2008 WL 5065114 (TTAB 2008) ...................................39, 58

*In re Hines,*
   1994 WL 456841 (TTAB 1994) ........................................................39

*In re In Over Our Heads,*
   1990 WL 354546 (TTAB 1990) ...................................................35, 40

*In re Lebanese Arak Corp.,*
   2010 WL 766488 (TTAB 2010) .......................................................51

*In re Squaw Valley Dev. Co.,*
   2006 WL 1546500 (TTAB 2006) ................................................39, 58

**Statutes**

7 U.S.C. § 1906 ...............................................................................47

15 U.S.C. § 1051 .........................................................................7, 31

15 U.S.C. § 1052(a) ................................................................*passim*

15 U.S.C. § 1052(b) ..........................................................................6

15 U.S.C. § 1052(c) ..........................................................................6

15 U.S.C. § 1057(a) ........................................................................25

15 U.S.C. § 1057(b) ........................................................................18

15 U.S.C. § 1060 .............................................................................43

15 U.S.C. § 1064 ...............................................................................7

15 U.S.C. § 1065 .........................................................................6, 18

15 U.S.C. § 1067 ...............................................................................7

15 U.S.C. § 1067(a) ...........................................................................7

15 U.S.C. § 1067(b) ...........................................................................7

15 U.S.C. § 1069 .............................................................................64

15 U.S.C. § 1071 .............................................................................10

15 U.S.C. § 1071(b) ........................................................................1, 7

15 U.S.C. § 1072 ...................................................................6, 18

15 U.S.C. § 1114 ...................................................................6, 43

15 U.S.C. § 1115 .......................................................................18

15 U.S.C. § 1115(a) .....................................................................6

15 U.S.C. § 1115(b) ...................................................................18

15 U.S.C. § 1116(d) ...................................................................18

15 U.S.C. § 1117 .........................................................................6

15 U.S.C. § 1117(b) ...................................................................18

15 U.S.C. § 1124 ...................................................................6, 18

15 U.S.C. § 1125(a) ...................................................................19

15 U.S.C. § 1125(c)(6) ............................................................6, 18

15 U.S.C. § 1127 .......................................................................46

15 U.S.C. § 1141b .......................................................................6

15 U.S.C. § 1157(b) .....................................................................6

28 U.S.C. § 1291 .........................................................................1

35 U.S.C. § 153 .........................................................................25

Act of Feb. 20, 1905, ch. 592, 33 Stat. 724 .................................6

**Other Authorities**

A. Taube, *15 Racist Brand Mascots and Logos that Make the
Redskins Look Progressive*, Business Insider, June 19, 2014 ............41

Brief for United States, *In re Tam*,
No. 2014-1203 (Fed. Cir. July 16, 2015) ........................................19

Brief for United States, *Nike, Inc. v. Kasky*,
No. 02-575 (U.S. Feb. 28, 2003) ...................................................41

xi

I. Shapira, *In Arizona, a Navajo High School Emerges as a Defender of the Washington Redskins*, Wash. Post, Oct. 26, 2014 ...................................60

J. McCarthy, Trademarks and Unfair Competition (4th ed. 2014)....................18, 19

*Hearings on H.R. 4744 Before the Subcomm. on Trademarks of the H. Comm. on Patents*, 76th Cong. (1939) ..........................................................35, 47

Merriam-Webster's Collegiate Dictionary (11th ed. 2003)...............................48, 50

M.M. Manring, *Slave in a Box: the Strange Career of Aunt Jemima* (1998).........................................................................................................41, 47

Muriel H. Wright, Oklahoma Historical Society, *Contributions of the Indian People to Oklahoma* (1936), http://digital.library.okstate.edu/Chronicles/v014/v014p156.html ...................60

NCAI, *Ending the Legacy of Racism in Sports & the Era of Harmful "Indian" Sports Mascots* (Oct. 2013) ...............................................................56

PTO, *Performance and Accountability Report* (2014) ...........................................31

PTO, *Trademark Manual of Examining Procedure* (2015)................................8, 40

PTO, *TTAB Manual of Procedure* (2015) ............................................................41

Restatement (First) of Torts (1938) .......................................................................47

S. Rep. No. 1333 (1946) ........................................................................................32

T. Vargas, *President Obama Says, "I'd Think About Changing" Name of Washington Redskins*, Wash. Post, Oct. 5, 2013............................................26

U.S. Copyright Office, Sample Certification of Registration, http://www.copyright.gov/docs/certificate_sample-1-21-05.pdf .......................25

# JURISDICTIONAL STATEMENT

The U.S. Patent and Trademark Office (PTO) cancelled six trademark registrations of Appellant Pro-Football, Inc. (Redskins or Team) under § 2(a) of the Lanham Act, 15 U.S.C. § 1052(a).  Section 2(a) prohibits registration of trademarks that "may disparage … persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute"—hereinafter, the "disparagement clause."  The District Court had jurisdiction under 15 U.S.C. § 1071(b).  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.      Whether § 2(a)'s disparagement clause violates the First Amendment.

2.      Whether § 2(a)'s disparagement clause is impermissibly vague, in violation of the First and Fifth Amendments.

3.      Whether the government's decades-long delay between registering and cancelling the Redskins marks violates due process.

4.      Whether the Redskins marks were disparaging when registered, starting in 1967.

5.      Whether laches barred the cancellation petition.

# INTRODUCTION

This case involves the cancellation of six trademark registrations of the NFL's Washington Redskins, one of the most storied franchises in sports, on the ground that the Team's name supposedly "disparaged" Native Americans under § 2(a) of the Lanham Act. To our knowledge, of the over three million trademarks registered since 1870, no registration has ever been retroactively cancelled for being disparaging. The Redskins are the first and only. The name is over 80 years old, and the registrations nearly 50. The PTO initially registered the Redskins marks in 1967, and again in 1974, 1978, and 1990. Each time, no one objected. Each time, the PTO did not suggest that the marks disparaged anyone.

This was no oversight. By 1967, the Redskins had won two NFL championships. Native Americans, like all Americans, presumably knew of the Team, as did the PTO examiners who registered the Redskins marks. Yet in an extraordinary about-face, the PTO in 2014 scheduled the cancellation of the registrations—not because the Redskins marks are disparaging today, but because the PTO thought they disparaged a "substantial composite" of Native Americans in 1967 and thus should never have been registered in the first place.

The District Court erred in granting summary judgment against the Team. The five Native Americans who sought cancellation did not show any consensus by a "substantial composite" of Native Americans. By contrast, the Team

presented extensive evidence of widespread Native American support for the Redskins name in 1967 and thereafter. Many Native Americans named their own sports teams the "Redskins," and no Native American opposed registration in 1967 or sought cancellation for another 25 years. On a virtually identical record, the D.C. district court in 2003 held that the Team was entitled to summary judgment.

The PTO's unprecedented cancellation also violated the First and Fifth Amendments to the Constitution. Section 2(a)'s disparagement clause is hopelessly vague. The PTO endeavored in 2014 retrospectively to discern whether an undefined, unquantifiable "substantial composite" of Native Americans in 1967 was insulted by the term "redskins." And the PTO forced the Team to defend its marks in 2014 even though the passage of time was highly prejudicial, including because key witnesses were long deceased.

There are extraordinary free speech principles at issue far beyond the Redskins trademarks. Cancelling a registration based on the government's disapproval of a trademark discriminates against speech based on content and viewpoint. The District Court nonetheless declared the PTO's action exempt from any First Amendment scrutiny because registered trademarks are all "government speech" and registration is a government subsidy "program."

The notion that all two million currently-registered marks are government speech is astounding. It is equally disturbing. The PTO has registered hundreds if

not thousands of marks that the Team believes *are* racist, or misogynistic, vulgar, or otherwise offensive. By way of example only, the following marks are registered today: TAKE YO PANTIES OFF clothing; DANGEROUS NEGRO shirts; SLUTSSEEKER dating services; DAGO SWAGG clothing; DUMB BLONDE beer; TWATTY GIRL cartoons; BAKED BY A NEGRO bakery goods; BIG TITTY BLEND coffee; RETARDIPEDIA website; MIDGET-MAN condoms and inflatable sex dolls; and JIZZ underwear. These are not isolated instances. The government routinely registers pornographers' marks: TEENSDOPORN.COM, MILFSDOPORN.COM, THUG PORN, GHETTO BOOTY, and BOUND GANGBANGS are but a few.[1]

None of this is government speech. Nor is the government subsidizing these marks. Registration of trademarks, like copyrights and patents, is not akin to a government loan, grant, or other type of gift. Rather, the government, acting as a regulator, finds that because trademarks meet statutory criteria (namely, being distinctive), they are entitled to legal protection against interference from other private parties. And because trademark registration constitutes government regulation, this case is easy. A ban on registering "disparaging" trademarks unconstitutionally burdens speech based on content and viewpoint, just as would a ban on registering copyrights for "disparaging" books.

---

[1] Federally-registered trademarks are denoted in small caps throughout, and are available by searching the "Trademark Electronic Search System," http://www.uspto.gov/trademarks-application-process/search-trademark-database.

It does not matter, as the District Court concluded, that cancellation leaves mark-owners like the Redskins free to use their names, hoping other laws might protect against infringement, counterfeiting, and illegal imports. Whether cancellation deprives a mark of every last cent of its value is not the First Amendment test. The government cannot turn the lights off at a Redskins night game because the government disfavors the name, and defend the action because the Redskins can still play in the dark. Registration confers indispensable legal protections, and the government cannot condition those protections on a trademark-owner's agreement to forgo disfavored speech.

A professional football team's name, like all sports-team names, is a subject of popular discourse and, sometimes, strong feelings and opinions. But withdrawing trademark protection is not a legitimate means for the government to weigh in on the matter. This Court should reverse the decision below.

## STATEMENT OF THE CASE

### A.     The Lanham Act

"Congress enacted the Lanham Act in 1946 in order to provide national protection for trademarks used in interstate and foreign commerce." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 193 (1985). The Act "secure[s] to the owner of the mark the goodwill of his business and … protect[s] the ability of

consumers to distinguish among competing producers." *Id.* at 198 (quoting S. Rep. No. 1333, at 3, 5 (1946)).

The Act permits trademark owners to "register" marks with the PTO. *B&B Hardware, Inc. v. Hargis Indus.*, 135 S. Ct. 1293, 1299-1300 (2015). "Registration is significant"—it confers "important legal rights and benefits," including many "procedural and substantive legal advantages." *Id.* at 1300 (quotation marks omitted). Those protections include a cause of action for infringement, 15 U.S.C. § 1114; evidentiary advantages and remedies in litigation, §§ 1065, 1072, 1115(a), 1117, 1125(c)(6), 1157(b); U.S. Customs' assistance to prevent illegal imports, § 1124; and enhanced protection overseas, § 1141b.

The Lanham Act permits registration of trademarks unless an exception in § 2 provides otherwise. Section 2 bars registration of some marks for reasons related to the functions of trademark law, including to avoid confusion with existing marks, or with flags, official insignia, or the names of living persons. § 1052(b)-(c).

But § 2 also bars registration for reasons entirely unrelated to consumer confusion. Section 2(a) bars registration of "immoral" or "scandalous" marks, § 1052(a), like its 1905 predecessor statute, Act of Feb. 20, 1905, ch. 592, § 5(a), 33 Stat. 724, 725. And since 1946, § 2(a)'s disparagement clause has barred registration of marks that "may disparage … persons, living or dead, institutions,

6

beliefs, or national symbols, or bring them into contempt, or disrepute."  15 U.S.C. § 1052(a).[2]

To obtain registration, trademark owners apply to the PTO.  Unless an examiner finds prima facie evidence that a mark is un-registrable under § 2, the PTO publishes the mark in the "Official Gazette."  § 1051.  Then, "[a]ny person who believes that he would be damaged by the registration" may "file an opposition."  § 1067(a), (b).  If the PTO registers the mark, "any person who believes that he is or will be damaged" may petition the PTO to cancel the registration.  § 1064.  If the registration was "obtained … contrary to the provisions of" § 2(a), a petitioner can seek cancellation "[a]t any time."  *Id.*  The PTO's Trademark Trial and Appeal Board (TTAB) hears appeals of examiner registration decisions and reviews cancellation petitions.  § 1067.  If the TTAB cancels a registration, the owner may sue the petitioner in federal court.  § 1071(b).

In determining whether a proposed or existing mark violates § 2(a)'s disparagement clause, the PTO applies a two-part test:

> (1) What is the likely meaning of the matter in question, taking into account not only dictionary definitions, but also the relationship of the matter to the other elements in the mark, the nature of the goods or services, and the manner in which the mark is used in the marketplace in connection with the goods or services; and

---

[2] Hereafter, "§ 2(a)" refers to the disparagement clause, unless otherwise specified.

> (2) If that meaning is found to refer to identifiable persons, institutions, beliefs or national symbols, whether that meaning may be disparaging to a substantial composite of the referenced group.

PTO, *Trademark Manual of Examining Procedure* (*TMEP*) § 1203.03(b)(i), (c) (2015). Drawing from precedent under other parts of § 2, the PTO held in this case that the question is whether each mark was disparaging when registered, not whether it is disparaging today. JA__[TTAB8-9].

### B.    Factual Background

For 82 years, since 1933, the Team has been known as the Redskins. In 1967, the PTO registered the mark THE REDSKINS for entertainment services. *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 104-05 (D.D.C. 2003). Over the next 23 years, in 1974, 1978, and 1990, the PTO registered five additional Redskins marks. "[T]he six marks at issue were published and registered without opposition from Native Americans or anyone else on *twelve* different occasions"—six publications accompanying six registrations. *Id.* at 136 n.34.

The Team has since invested tens of millions of dollars in advertising and promoting its brand. JA__, __, __[D.E.58;D.E.100;A318-24]. According to public reports, as of August 2014, the Team was valued at $2.4 billion, approximately $214 million of which is attributable to the Redskins brand. JA__[D.E.60-16]. For the 25-year period from 1967 to 1992, not a single person sought to cancel the Redskins' registrations.

8

In 1992, Suzan Harjo and six other Native Americans successfully petitioned the PTO to cancel the Redskins' registrations on the ground that they disparaged Native Americans. The D.C. district court reversed, holding that laches barred the petition, and that the PTO lacked substantial evidence to find the marks "disparaging" at the times of registration. *Harjo*, 284 F. Supp. 2d at 144-45. The D.C. Circuit vacated and remanded, instructing the district court to reassess laches based on the date the youngest petitioner turned 18. *Pro-Football, Inc. v. Harjo*, 415 F.3d 44, 49-50 (D.C. Cir. 2005). The district court again found laches, *Pro-Football, Inc. v. Harjo*, 567 F. Supp. 2d 46, 62 (D.D.C. 2008), and the D.C. Circuit affirmed on that ground without reaching the district court's disparagement holding, *Pro-Football, Inc. v. Harjo*, 565 F.3d 880 (D.C. Cir. 2009).

## C.    Proceedings Below

In 2006, while *Harjo* was pending, Harjo asked friends to identify younger Native Americans to refile her petition, and recruited the five Petitioners here. *E.g.*, JA__[A7549-63]; JA__[A8111-14]; JA__[A8440-66]; JA__[A8579-80]; JA__[A8854-57]. On August 11, 2006, they petitioned the TTAB to cancel the Redskins' registrations. JA__[A1-A4]. The matter was suspended pending *Harjo*, then re-opened after the D.C. Circuit ruled for the Team.

In 2014, a divided TTAB again cancelled the registrations. JA__[A13977/TTAB1] (available at 2014 WL 2757516). The majority concluded

9

that Petitioners had shown by a preponderance of the evidence that a "substantial composite" of Native Americans found the Team's name disparaging between "1967-1990." JA__[TTAB72]. "[A] 'substantial composite' of the referenced group," the TTAB held, "is not necessarily a majority." JA__[TTAB9]. The cancellation will take effect only if the TTAB's decision is affirmed.

Judge Bergsman dissented, concluding that the "evidence submitted by [Petitioners] can most charitably be characterized as a database dump"; that Petitioners did not "introduce any evidence or argument as to what comprises a substantial composite of [the Native American] population"; and that Petitioners failed to show that the term Redskins was disparaging in 1967, 1974, 1978, or 1990. JA__[TTAB83-84].

The Team sued Petitioners under 15 U.S.C. § 1071, challenging the cancellations on constitutional and statutory grounds. JA__[D.E.1]. The United States intervened to defend § 2(a)'s constitutionality, but did not defend the TTAB's determination that the marks were "disparaging." JA__[D.E.46].

On July 8, 2015, the District Court entered summary judgment for Petitioners and the government and denied the Team's summary judgment motion. JA__[D.E.161/Op.1-4] (available at 2015 WL 4096277). The court held that § 2(a) "does not implicate the First Amendment" because "cancellations do not burden, restrict or prohibit" speech. JA__[Op.14-17]. The court further held that

10

registration is "government speech" or a government-subsidized "program," "exempt from First Amendment scrutiny." JA__[Op.18-30]. The court then rejected the Team's vagueness and other due process claims, JA__[Op.30-35], concluded that the marks were "disparaging" when registered, JA__[Op.35-65], and held that the "public interest" and the pendency of *Harjo* barred the Team's laches defense, JA__[Op.66-67].

## SUMMARY OF ARGUMENT

Section 2(a)'s disparagement clause violates the First Amendment because it facially discriminates based on content and viewpoint. Trademarks are expressive, and the purpose of registration is to protect mark-owners from interference by private parties who could otherwise infringe or dilute the communicative value of the marks. Section 2(a) substantially burdens protected speech by withdrawing registration of trademarks that convey messages the government disfavors. Section 2(a) thus fails both strict scrutiny and the intermediate scrutiny applicable to commercial speech.

Nor are registered trademarks "government speech" or a government subsidy "program." No one associates registration with government endorsement, and registering trademarks is no more a subsidy than registering copyrights or real estate titles. Registration is a legal protection the government cannot condition on the mark-owner's agreement to forgo speech the government dislikes.

The disparagement clause is also unconstitutionally vague. Whether a trademark "disparages" a "substantial composite" of a group like Native Americans is wholly subjective. Enforcement of § 2(a) is entirely arbitrary, as illustrated by the unprecedented cancellation in this case. And the PTO's invitation to 300 million Americans to challenge any mark they disfavor guarantees chaos and unpredictability. Section 2(a)'s focus on the mark's message at the time of registration compounds the vagueness and independently violates due process: the Redskins were forced to defend their marks today against charges that the marks disparaged Native Americans a half-century ago, in 1967. Historical records no longer exist, and key witnesses are long dead.

Regardless, the PTO lacked the statutory authority to cancel these registrations. First, the disparagement clause applies to disparagement of only specific, identifiable "persons," not groups. Second, if the clause applies to groups, it applies only when at least a representative majority of the referenced group perceived the mark as actually disparaging—standards the District Court did not apply. Third, even under the District Court's standard, Petitioners did not satisfy their burden. A preponderance of the evidence did not show that the Redskins marks, in connection with professional football, were disparaging in 1967, 1974, 1978, or 1990. Finally, the petition was barred by laches.

## STANDARD OF REVIEW

This Court reviews the District Court's grant of summary judgment *de novo*. *Stuart v. Camnitz*, 774 F.3d 238, 244 (4th Cir. 2014). No deference is owed to the PTO; the District Court's review was *de novo*. JA__[Op.9]; *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 155 (4th Cir. 2014).

## ARGUMENT

### I. Section 2(a)'s Content and Viewpoint Restrictions Violate the First Amendment

Trademarks reflect core expressive activity by communicating to the public the name and identity of the producer of a good or service. Their very "function" is "psychological," *Mishawaka Rubber and Woolen Co. v. S.S. Kresge Co.*, 316 U.S. 203, 205 (1942)—to "carry[] meaning," *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 162 (1995). Countless marks speak for themselves: GLOBAL WARMING SUCKS and I HATE MY TEENAGE DAUGHTER. But all marks are inherently expressive: HERSHEY'S and MERCEDES-BENZ signal a certain quality of chocolate or automobile. THE NEW YORK TIMES and FOX NEWS CHANNEL signal a certain type of news. THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, MARCH OF DIMES, NATIONAL RIFLE ASSOCIATION, and REPUBLICAN NATIONAL COMMITTEE communicate certain religious, charitable, or political missions. HARVARD UNIVERSITY signals the source and quality of educational services. And marks like THE REDSKINS, NEW YORK CITY BALLET, THE BEATLES, and THE LION

13

KING signal the source and quality of entertainment services.  Registration is not a government handout, but rather confers "procedural and substantive legal advantages" specified by statute.  *B&B Hardware*, 135 S. Ct. at 1300.  The government cannot, consistent with the First Amendment, deny marks those legal protections based on their content or viewpoint.

### A.    Section 2(a) Fails Strict Scrutiny

1.  "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015).  "Government discrimination among viewpoints … is a more blatant and egregious form of content discrimination."  *Id.* at 2230 (quotation marks omitted).  The First Amendment "stands against attempts to disfavor certain subjects or viewpoints." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010).

Section 2(a)'s bar on registering disparaging marks is *content*-based because the law "'on its face' draws distinctions based on the message a speaker conveys." *Reed*, 135 S. Ct. at 2227.  Section 2(a) is *viewpoint*-based because it regulates speech based on a "particular point of view," *FCC v. League of Women Voters of Col.*, 468 U.S. 364, 383-84 (1984), and "because of disagreement with the message [the speech] conveys," *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2664 (2011).

The law permits registration of marks that express a *positive* view of a person, but bars registration of marks that express a *negative* view of the same person. If the government "may not prohibit … commercial advertising that depicts men in demeaning fashion," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388-89 (1992), the government likewise cannot prohibit registration of trademarks that demean men or any other group.

The PTO singled out the Redskins marks for disfavored treatment solely based on disapproval of the Team's name, reasoning that some Native Americans found it a "racial slur," "negative," and "offensive." JA__, __, __, __[TTAB32,36-37,54,75]. The PTO devoted 57 pages of its opinion to consulting dictionaries, linguists, media articles, and Native Americans to discern the "meaning" of redskins and whether that "meaning" was "disparaging" in 1967. JA__[TTAB15-72] (using word "meaning" over 50 times). The PTO deemed the marks critical of and demeaning to Native Americans. Criticizing and demeaning something is a viewpoint.

The government argues that § 2(a) is viewpoint-neutral because it "does not turn on the views *held* by a trademark applicant." JA__[D.E.110at18] (emphasis added). But § 2(a) does turn on the views *expressed* by the applicant, as perceived by the referenced group. The government does not cure viewpoint discrimination by ignoring the speaker's motives. Section 2(a) regulates speech because of a

"disagreement with the message [the mark] conveys" to the referenced group.
*Sorrell*, 131 S. Ct. at 2664.

Although a divided First Circuit held that a regulation banning "disparaging" advertisements in city subways was not viewpoint-based, "[b]y its very nature, a prohibition against ads that are 'hostile' to an individual or a group of individuals is viewpoint based." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 100 (1st Cir. 2004) (Torruella, J., dissenting). The government's asserted interest in disassociating itself from marks it finds disparaging to Native Americans only underscores the government's hostility to the message conveyed by the marks.

 "In the ordinary case it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory." *Sorrell*, 131 S. Ct. at 2667. Section 2(a) cannot satisfy strict scrutiny. No one has argued otherwise.

2.  Citing *In re McGinley*, 660 F.2d 481 (C.C.P.A. 1981), the District Court held that § 2(a) "does not implicate the First Amendment as the cancellations do not burden, restrict, or prohibit [the Team's] ability to use the marks." JA__[Op.15]; *accord Test Masters Educ. Servs. v. Singh*, 428 F.3d 559, 578 n.9 (5th Cir. 2005). The en banc Federal Circuit is reconsidering *McGinley* in a case challenging the PTO's refusal to register a musical band's mark, "The Slants." *In re Tam*, No. 2014-1203 (Fed. Cir.) (en banc) (oral argument held Oct. 2, 2015).

16

Cancellation obviously "burdens" the ability to use a mark, and the First Amendment prohibits regulatory burdens as well as outright bans on speech. The "government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). "[T]he distinction between laws burdening speech is but a matter of degree and the Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Sorrell*, 131 S. Ct. at 2664 (quotation marks omitted). "Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Id.*; *accord Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992). "The threat to the First Amendment arises from the imposition of financial burdens that may have the effect of influencing or suppressing speech, and whether those burdens take the form of taxes or some other form is unimportant." *Pitt News v. Pappert*, 379 F.3d 96, 111-12 (3d Cir. 2004) (Alito, J.).

*Sorrell* invalidated a state law that did not ban speech but nonetheless burdened pharmaceutical marketing by denying manufacturers information that made their marketing more effective. After referencing burdens *over 30 times*, *Sorrell* held that "the State has burdened a form of protected expression," while leaving "unburdened those speakers whose messages are in accord with its own views." 131 S. Ct. at 2672. The same is true here. *See also Simon & Schuster,*

17

*Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991);

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582-83 (1983).

Here are just a few of the burdens that result from cancellation.  U.S. Customs may not stop importation of goods that bear infringing marks.  15 U.S.C. § 1124.  Mark-owners lose constructive nationwide notice of ownership, § 1072, as well as prima facie evidence of their marks' validity, ownership, and exclusive use, § 1057(b).  They cannot pursue counterfeiting claims and remedies, including treble damages.  §§ 1116(d), 1117(b).  And they become subject to dilution claims by owners of other marks.  § 1125(c)(6).

If the PTO cancels a registration after more than five years, as occurred here, the owner loses the benefits of owning an "incontestable" mark, including conclusive evidence of key elements of an infringement claim.  §§ 1115(b), 1065. The owner also loses the right to exclusive nationwide use of the mark.  §§ 1115, 1072.  The owner may retain rights under state common law, but only in regions where the mark is used.  5 J. McCarthy, Trademarks and Unfair Competition § 26:32 (4th ed. 2014).

*Ex ante*, § 2(a) chills protected speech.  Faced with the prospect of being denied registration—or worse, cancellation after decades of investment—people will eschew potentially controversial names.  And rejected applicants often

18

abandon their chosen marks rather than bear the costs of using unregistered marks or litigating the denial.  This is precisely what the First Amendment was intended to prevent.

The government argues that unregistered marks retain limited protections under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  Brief for United States at 20-21, *Tam*, No. 2014-1203 (Fed. Cir. July 16, 2015).  But while the Team believes § 43(a) may protect its marks in certain contexts regardless of the outcome here, the government cites no authority extending § 43(a) to marks denied or cancelled under § 2(a).  Petitioners argue that owners retain state law protection, but the government says common law historically denied protection to offensive marks.  JA__[D.E.110at11-13].  And at least 46 States follow the Lanham Act and thus deny registration to "disparaging" marks.  3 McCarthy §§ 22:5 & n.1, 22:8.

Whatever legal protections remain, cancellation deprives owners of all legal rights and advantages attendant to *registration*.  Withdrawing those protections makes marks less effective in communicating information.  The government says that is the point:  § 2(a) "prevent[s] federal registration from magnifying the impact of disparaging trademarks or [] encouraging the use of such marks."  JA__[D.E.110at20].  The government cannot credibly maintain that the First Amendment does not apply, but if it does apply, § 2(a) passes muster because it will be effective at suppressing speech the government does not like.

The District Court found persuasive the assumption that denying "name change[s]" does not trigger First Amendment review because people "can continue to call themselves whatever they please." JA__[Op.17 n.5]. The court cited two state intermediate court decisions that have so held, but they involved unprotected fighting words, *Lee v. Ventura Cnty. Superior Court*, 11 Cal. Rptr. 2d 763, 768 (Cal. Ct. App. 1992), and obscenity, *Variable v. Nash*, 190 P.3d 354, 356 (N.M. Ct. App. 2008). Taken to its logical conclusion, the decision below would permit the government to cancel the birth certificate or social security card of a man named Joe Redskins, for any reason or no reason.

## B.    Section 2(a) Fails Intermediate Scrutiny

Petitioners and the government argued below that § 2(a) satisfies the intermediate scrutiny applicable to commercial speech under *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980*)*. The District Court did not apply *Central Hudson*, reasoning that "the federal trademark registration program is not commercial speech" because registered marks "are published in the Official Gazette of the PTO and the Principal Register," and "[t]he Principal Register does not propose a commercial transaction." JA__[Op.18]. But because cancellation burdens private speech, *supra* pp.17-19, and registration is not government speech, *infra* pp.27-29, that

20

analysis is incorrect.  Section 2(a), moreover, involves fully protected speech, not just commercial speech.  Regardless, if *Central Hudson* applies, § 2(a) still fails.

1.  Because § 2(a) facially denies legal protections to trademarks based on content and viewpoint, it is subject to strict scrutiny, *supra* part I.A, not intermediate scrutiny.  *Central Hudson* also is inapplicable because trademarks do not themselves propose commercial transactions.  Trademarks are brand identifiers that are both expressive in their own right and enable mark-owners to associate all of their other speech with their brands.  For example, an individual uses his name both at home, work, and church.  Sports teams, just like ballets, musicals, or improvisational comedies, similarly must have an identity to communicate effectively with audiences.  That they act for a profit is of no moment.  "Some of our most valued forms of fully protected speech are uttered for a profit."  *Bd. of Trustees of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989); *see, e.g.*, *N.Y. Times v. Sullivan*, 376 U.S. 254 (1964).  Also, countless non-profit organizations use registered trademarks, and profit-seeking companies use their registered names to engage in political speech.

In *Friedman v. Rogers*, 440 U.S. 1, 11 (1978), the Court stated that "[t]he use of trade names in connection with optometrical practice … is a form of commercial speech and nothing more."  That may be true if the optometrist "does not wish to editorialize on any subject, cultural, philosophical, or political" and,

instead, "[h]is purpose is strictly business"—to advertise his services to consumers. *Id.* (quotation marks omitted). But the government cancelled the Redskins' registrations for *all* purposes—whether to sell tickets to games or to pursue charitable endeavors. And the sole reason for cancellation is the PTO's disagreement with the "cultural, philosophical, and political" viewpoint the marks supposedly expressed. Further, this case involves a facial challenge, and the government cannot show that commercial marks and purposes outweigh noncommercial marks, commercial marks used for expressive purposes (music, museums, newspapers, etc.), and non-commercial uses of commercial marks. *See United States v. Stevens*, 559 U.S. 460 (2010).[3]

2. Even if *Central Hudson* applied, § 2(a) does not "directly advance" a "substantial" governmental interest and is "more extensive than is necessary to serve that interest." 447 U.S. at 564-66; *see Sorrell*, 131 S. Ct. at 2667. The government must "demonstrate that the harms it recites are real and that the restriction will in fact alleviate them to a material degree"—it cannot rest on "mere speculation and conjecture." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1983); *accord Sorrell*, 131 S. Ct. at 2267.

---

[3] Although this Court cannot overrule *Central Hudson*, the Team agrees with Justices of the Supreme Court who have called for the case's reexamination. *E.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 518 (1996) (Thomas, J., concurring).

Section 2(a) cannot be justified by what the District Court perceived as the government's interest in registering only those marks expressing a government-approved message.  The District Court reasoned that "the public closely associates federal trademark registration with the federal government[,] as the insignia for federal registration, ®, is a manifestation of the federal government's recognition of the mark."  JA__[Op.20] (footnote omitted).  But the government offered no evidence of such association, even mistaken association.  Consumers have no idea whether marks are "registered" or what that legalese means.  "The purchasing public knows no more about trademark registrations than a man walking down the street in a strange city knows about legal title to the land and buildings he passes." *Application of Nat'l Distillers & Chem. Corp.*, 297 F.2d 941, 949 (C.C.P.A 1962) (Rich, J., concurring).

It strains credulity that the public "closely" associates GUN CONTROL MY ASS and DOES THIS GUN MAKE MY BUTT LOOK BIG? with the federal government, which very recently registered these marks.  Nor does anyone think the government's copyright registration of Randall Kennedy's *Nigger: The Strange Career of a Troublesome Word* (Copyright No. TX0005492813), E.L. James' *Fifty Shades of Grey* (Copyright No. TX0007583125), or the song "Hail to the Redskins" (Copyright No. RE0000325231), reflects government association.

Further, mark-owners are not required to use the ®, and many famous marks (including the marks here) do not.

The government thus errs in arguing that "[a] wrongful perception of endorsement is particularly reasonable here given that, once registered, trademarks appear in the government-curated Principal Register."  JA__[D.E.127at16]; *see* JA__[Op.25].  Moreover, this argument turns into a self-fulfilling prophecy.  No one today thinks registration reflects government approval.  But if this Court holds that it does, how will the government explain registrations like MARIJUANA FOR SALE, CAPITALISM SUCKS DONKEY BALLS, LICENSED SERIAL KILLER, YID DISH, DIRTY WHOOORE CLOTHING COMPANY, and MURDER 4 HIRE?[4]  Why are numerous confederate-flag logos and so many lewd sexual depictions on a "government-curated Principal Register"?  Does registration of THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS unconstitutionally endorse religion?  As to the "Principal

---

[4] Other startling examples that would reflect government endorsement under the decision below include: SHANK THE B!T@H board game; CRACKA AZZ SKATEBOARDS; ANAL FANTASY COLLECTION, KLITORIS, and OMAZING SEX TOYS sex toys; HOT OCTOPUSS anti-premature ejaculation creams; OL GEEZER wines; EDIBLE CROTCHLESS GUMMY PANTIES lingerie; WTF WORK? online forum; MILF WEED bags; GRINGO STYLE SALSA; MAKE YOUR OWN DILDO; GRINGO BBQ; CONTEMPORARY NEGRO, F'D UP, WHITE TRASH REBEL, I LOVE VAGINA, WHITE GIRL WITH A BOOTY, PARTY WITH SLUTS, CRIPPLED OLD BIKER BASTARDS, DICK BALLS, and REDNECK ARMY apparel; OH! MY NAPPY HAIR shampoos; REFORMED WHORES and WHORES FROM HELL musical bands; LAUGHING MY VAGINA OFF entertainment; NAPPY ROOTS records; BOOTY CALL sex aids; BOYS ARE STUPID, THROW ROCKS AT THEM wallets; and DUMB BLONDE hair products. Word limits prevent us from listing more.

Register," the government does not say where it is, what it looks like, or how we can get one. As far as we know, there is no government-issued "list" of registrations; one must conduct cumbersome, multi-step searches of PTO's internet database.

Petitioners erroneously rely on the fact that registrations are "issued in the name of the United States of America," "under the seal of the United States Patent and Trademark Office" and must be "signed by the Director" of the PTO. 15 U.S.C. § 1057(a). Patents are exactly the same. 35 U.S.C. § 153. Copyright registrations also issue under the "Seal of the United States Copyright Office" and are signed by the "Register of Copyrights, United States of America." U.S. Copyright Office, Sample Certification of Registration, http://www.copyright.gov/docs/certificate_sample-1-21-05.pdf. But no one thinks the government endorses any (let alone every) copyrighted book or patent.

Further, § 2(a) does not "materially advance" any interest in government disassociation; the Register "is so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate" its case. *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 190 (1999). Regardless, an interest in disassociation makes no sense here. The government cancelled these registrations not because the marks disparage anyone today, but because they supposedly disparaged Native Americans 50 years ago. Section 2(a) would require

cancellation for marks that once were thought disparaging but that the referenced group has reclaimed as a source of pride, like LOVE IS QUEER dating services.

Nor does § 2(a) legitimately advance the government's desire to "convey a message that disparaging others should not be profitable." JA__[D.E.110at15]. Disapproval of speech or desire to prevent offense is "classically not a justification" for burdening speech, much less a substantial interest. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71-72 (1983) (alterations omitted); *see Snyder v. Phelps*, 131 S. Ct. 1207, 1219-20 (2011); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55 (1988). Section 2(a) further does not directly or materially promote "racial harmony and equality." JA__[D.E.110at20] (quotation marks omitted). The "Register" is infested with countless trademarks conveying racist and offensive messages. *See supra* pp.4, 23-24 & n.4. Disparaging speech also abounds on the Internet and in books and songs bearing government-registered copyrights. And if racial harmony justified restricting speech, the First Amendment would be eviscerated.

Finally, § 2(a) excessively burdens speech. The government can accomplish its goals simply by advising the public of its views. *See, e.g.*, T. Vargas, *President Obama Says, "I'd Think About Changing" Name of Washington Redskins*, Wash. Post, Oct. 5, 2013. Our Constitution favors more speech over less. *E.g.*, *League of Women Voters*, 468 U.S. at 395.

26

## C.     Registered Trademarks Are Not "Government Speech"

The District Court erroneously held that trademark registrations are

"government speech." JA__[Op.18]. Registering a trademark—like registering a

copyright or issuing a video poker license or patent—is regulatory in nature and

does not give rise to any proprietary government interest. *Cleveland v. United*

*States*, 531 U.S. 12, 22-24 (2000). In exchange for meeting statutory criteria, the

government confers "legal rights" and "legal advantages" to "protect" marks

against interference from other private parties. *B&B Hardware*, 135 S. Ct. at

1299-1301 (quotation marks omitted). Registration is "designed to facilitate

private speech, not to promote a governmental message." *Legal Servs. Corp. v.*

*Velazquez*, 531 U.S. 533, 542 (2001). The PTO's processing of registration

applications no more transforms private speech into government speech than when

the government issues permits for street parades; grants medical, hunting, fishing,

or drivers' licenses; records property titles or birth certificates; or issues articles of

incorporation.

The District Court erred (JA__[Op.19-22]) in relying on *Walker v. Texas*

*Division, Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015), which held

that Texas's specialty license plates convey government speech. *Walker* reasoned

that "insofar as license plates have conveyed more than state names and vehicle

identification numbers, they long have communicated messages from the States."

*Id.* at 2248. For a century, States "have used license plate slogans to urge action, to promote tourism, and to tout local industries," and "plate designs are often closely identified in the public mind with the State." *Id.* (bracketing and quotation marks omitted).

By contrast, as discussed above, the two million registered trademarks have never "communicated messages" from the government. *See supra* pp.4, 23-24 & n.4. No one thinks about the government when buying NIKE shoes, surfing GOOGLE, or watching NATIONAL FOOTBALL LEAGUE games. Many marks, such as ACLU and NATIONAL RIFLE ASSOCIATION, represent organizations that regularly oppose government regulation.

The District Court reasoned that in publishing the Official Gazette and the "Principal Register," the "government is the literal speaker." JA__[Op.25]. But the government publishes copyright registrations, and thus the court's theory would permit the government to discriminate against books based on content and viewpoint. The government could refuse to provide permits for unpopular rallies if it simply posted all permits on the Internet.

*Walker* observed that "Texas maintains direct control over the messages" on specialty plates, including all design, color, typeface and alphanumeric patterns, 135 S. Ct. at 2249, and that Texas reserved the right to deny a plate for any reason, *id*. at 2245. By contrast, the Lanham Act generally permits registration of any

distinctive mark that would not cause consumer confusion. And the PTO hardly retains direct control over cancellation; it relies exclusively on private citizens to seek cancellation. *Infra* pp.40-41.

### D.    Registration Is Not a Government Subsidy

1.  The District Court alternatively upheld § 2(a) under the principle of *Rust v. Sullivan*, 500 U.S. 173 (1991), that the government "may determine the contents and limits of its programs." JA__[Op.26]. *Rust* is inapposite because it permits viewpoint discrimination only when the government uses private parties to express the government's own message. *Rust* upheld a Title X provision barring clinics receiving federal funds for family planning services from advocating abortion. 500 U.S. at 192-95. "*Rust* did not place explicit reliance on the rationale that the counseling activities of the doctors under Title X amounted to governmental speech; when interpreting the holding in later cases, however, [the Court has] explained *Rust* on this understanding." *Velazquez*, 531 U.S. at 541. "[V]iewpoint-based funding decisions can be sustained in instances … like *Rust*, in which the government used private speakers to transmit specific information pertaining to its own program." *Id.* (citations and quotation marks omitted).

The District Court's reliance on *Rust* is profoundly disturbing. The PTO does not use private speakers like NFL teams "to transmit specific information pertaining to [PTO's] own program." *Id.* Applying *Rust* would permit one

Administration to cancel registrations for NATIONAL ABORTION FEDERATION and NARAL PRO-CHOICE AMERICA as disparaging toward pro-life "beliefs," and another Administration to cancel registrations for ABORTION MUST END NOW and REAL FEMINISTS ARE STILL PRO-LIFE as disparaging to pro-choice "beliefs." 15 U.S.C. § 1052(a).

2.   The District Court also relied on *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540 (1983), which held that "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." JA__[Op.27]. But registration (*i.e.*, a guarantee of legal protection) is not a subsidy as that term has ever been understood. "The Supreme Court has never extended the subsidy doctrine to situations not involving financial benefits." *Autor v. Pritzker*, 740 F.3d 176, 183 (D.C. Cir. 2014); *accord Dep't of Tex., Veterans of Foreign Wars of the U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 436 (5th Cir. 2014); *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 509 (9th Cir. 1988). The Court's subsidy cases involve tax exemptions (*Regan*); funding to fight AIDS (*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321 (2013)); and Medicaid reimbursement for abortion (*e.g.*, *Harris v. McCrae*, 448 U.S. 297 (1980)). Likewise, cases like *Davenport v. Washington Ass'n*, 551 U.S. 177 (2007), involved "the unique context of public-sector agency-shop arrangements," where the government, as employer, "act[s] in a capacity *other*

*than as regulator*." *Id.* at 188, 190 (emphasis added); *accord Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353 (2009).

Trademark registration is just like registration of copyrights and patents, and fundamentally differs from AIDS funding, Medicaid, and tax exemptions. The Lanham Act is Commerce Clause legislation, not Spending Clause legislation. 15 U.S.C. § 1051. Mark-owners are not government employees or grant recipients. And it would be anomalous to label registration a financial subsidy when the PTO charges would-be-registrants for the full amount of that subsidy. In 1991, "the USPTO became fully supported by user fees to fund its operations." PTO, *Performance and Accountability Report* 9 (2014), http://www.uspto.gov/about/ stratplan/ar/USPTOFY2014PAR.pdf. Legal protections for trademarks are less of a subsidy than taxpayer-funded police protection for rallies.

3. Even if registration is a subsidy, § 2(a) imposes impermissible content and viewpoint-discriminatory burdens.

First, the government may not discriminate based on viewpoint in "the Government's provision of financial benefits." *Rosenberger*, 515 U.S. at 834 (citing *Regan*, 461 U.S. at 548); *see, e.g.*, *Velazquez*, 531 U.S. at 548-49; *NEA v. Finley*, 524 U.S. 569 (1998). No case holds to the contrary.

Second, viewpoint discrimination aside, the disparagement clause is invalid because it has nothing to do with a trademark's function, operation, or purpose.

31

"The relevant distinction is between conditions that define the limits of the government's spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *AID*, 133 S. Ct. at 2328. The contours of the program here are defined by the two purposes of registration:

> One is to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.

S. Rep. No. 1333, at 3.

Content-based distinctions that do not further these purposes violate the First Amendment. Otherwise Congress could withhold registration for goods it disfavors (*e.g.*, guns, fast food); services that risk injury (*e.g.*, sports, skydiving); goods that appeal to prurient interests (*e.g.*, sex toys, pornography); or marks that touch upon controversial topics regardless of viewpoint (*e.g.*, abortion, political activities).

The disparagement clause is not a valid content-based restriction. The clause does not further a trademark's purpose but only burdens disfavored expression. "Disparaging" marks prevent consumer confusion and secure to owners the fruits of their investments every bit as much as non-disparaging marks.

32

If anything, § 2(a) undermines these objectives.  By making it harder to police infringement, cancellation makes it harder for consumers to detect the source of goods and for owners to capitalize on their investments.  By contrast, with the exception of § 2(a)'s ban on registering "scandalous" or "immoral" marks, the other criteria for registration further content-neutral goals of preventing consumer confusion.

## II.    Section 2(a) Is Unconstitutionally Vague

Section 2(a) is unconstitutionally vague because it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" and "is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) (quotation marks omitted).  The District Court erroneously applied a "relaxed vagueness review standard," reasoning that § 2(a) does not "prohibit" speech or impose "penalties." JA__[Op.31].  Section 2(a) *chills* speech, *supra* pp.17-19, and thus the "more stringent vagueness test" applies.  *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *accord City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 769-72 (1988).  The most rigorous standard independently applies because § 2(a) is a "regulatory scheme" where the government "is acting as … sovereign."  *Finley*, 525 U.S. at 589; *see Cleveland*,

531 U.S. at 23; *Fox*, 132 S. Ct. at 2317. Regardless, under any standard, the disparagement clause is unconstitutional.

### A.    Section 2(a) Fails To Provide Fair Notice

Statutes fail to provide fair notice if they "delegate[] basic policy matters to [government officials] for resolution on an ad hoc and subjective basis," *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972), or impose "a standard so indefinite that [lawmakers are] free to react to nothing more than their own preferences," *Smith v. Goguen*, 415 U.S. 566, 578 (1974). Licensing regimes that confer "unbridled discretion" on government examiners thus are unconstitutionally vague. *Lakewood*, 486 U.S. at 770.

The term "may disparage" is hopelessly subjective, indefinite, and discretionary. Just as "annoying" is unconstitutionally vague because "[c]onduct that annoys some people does not annoy others," *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971), marks may trigger feelings of disparagement in some but not others. There is no "statutory definition[], narrowing context, or settled legal meaning[]." *Holder v. Humanitarian Law Project* (*HLP*), 561 U.S. 1, 20 (2010) (quotation marks omitted). Nor is there a "knowledge requirement" to "reduce[] any potential for vagueness." *Id.* at 21. The mark-owner's intent and views are irrelevant. JA__[Op.42]; *Harjo*, 284 F. Supp. 2d at 125.

34

The PTO has acknowledged § 2(a)'s vagueness.  The PTO's Assistant Commissioner presciently informed Congress in 1939 that "the word 'disparage' … is going to cause a great deal of difficulty in the Patent Office, because … it is always going to be just a matter of the personal opinion of the individual parties as to whether they think it is disparaging."  *Hearings on H.R. 4744 Before the Subcomm. on Trademarks of the H. Comm. on Patents,* 76th Cong. 21 (1939) (*Hearings*).  In *In re In Over Our Heads*, the PTO explained: "The guidelines for determining whether a mark is scandalous or disparaging are somewhat vague and the determination of whether a mark is scandalous or disparaging is necessarily a highly subjective one."  1990 WL 354546, at *1 (TTAB 1990) (bracketing and quotation marks omitted).  In *Harjo*, the PTO observed that whether a mark is disparaging "is highly subjective and, thus, general rules are difficult to postulate."  *Harjo v. Pro-Football, Inc.*, 1999 WL 375907, at *35 (TTAB 1999).

Numerous courts have found "disparage" or similar terms impermissibly vague.  A university policy barring statements that were "demeaning" of or promoted "negative connotations about" a "racial or ethnic affiliation" was unconstitutionally vague, because "different people find different things offensive."  *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1182, 1184 (6th Cir. 1995); *accord Bullfrog*, 847 F.2d at 513 (invalidating regulation of audio-visual materials that "attack or discredit economic, religious, or political views or

35

practices"); *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 80-81 (2d Cir. 2001) (requiring school to adopt guidelines to "avoid sponsoring or disparaging religious beliefs" was "impermissibly vague"). While a split First Circuit held that "disparaging" was not vague, the majority left open the possibility that it would be vague as part of a "government licensing scheme[]," where "the concern over subjective decision making has most effect." *Ridley*, 390 F.3d at 94. Moreover, *Ridley* involved an agency's initial refusal to sell limited advertising space shown to captive audiences in city subways, not an agency's decision to cancel valuable 50-year old trademark registrations. *Id.* at 69.

The District Court observed that dictionaries define "disparage," JA__[Op.32], but those definitions are themselves vague. Merriam-Webster's defines disparage as, *inter alia*, "to describe (someone or something) as unimportant, weak, bad, etc." JA__[D.E.60-18]. Terms like "bad" do not meaningfully constrain the adjudicator's discretion.

The District Court noted that the Supreme Court uses the term "disparaging" to determine when legislative prayer is constitutional. *E.g.*, *Town of Greece v. Galloway*, 134 S. Ct. 1811, 1823-24 (2014). But that doctrine regulates government conduct, where vagueness rules do not apply. Moreover, the Supreme Court has held the phrase "patently offensive" unconstitutionally vague notwithstanding that it formed part of the Court's obscenity test. *Reno v. Am. Civil*

36

*Liberties Union*, 521 U.S. 844, 872-73 (1997).  And the statutory phrase "credible and reliable" is unconstitutionally vague, *Kolender v. Lawson*, 461 U.S. 352 (1983), even though both terms form parts of constitutional tests, *HLP*, 561 U.S. at 15; *Perry v. New Hampshire*, 132 S. Ct. 716, 720 (2012).

Section 2(a) is vague apart from the word "disparage."  It leaves "grave uncertainty about how to estimate" the perceptions of the referenced group. *Johnson v. United States*, 135 S. Ct. 2551, 2557 (2015).  The PTO requires a "substantial composite" but has not defined that term, except to say it is "not necessarily a majority."  JA__[TTAB71].  The court below held that Petitioners need not meet *any* "specific threshold."  JA__[Op.61].  The district court in *Harjo* held that 36.6% of Native Americans was insufficient.  284 F. Supp. 2d at 133 n.32.  The PTO in this case found that 30% "without doubt" *was* sufficient because "[t]o determine otherwise means it is acceptable to subject to disparagement 1 out of every 3 individuals, or as in this case approximately 626,095 out of 1,878,285 in 1990."  JA__[TTAB71].  That logic has no stopping point—is it "acceptable" to "subject to disparagement" 187,829 people (10%)?  Or 18,783 people (1%)?  Why not 8 people?  This Court has invalidated indistinguishable provisions.  *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 283-85 (4th Cir. 2008) (statute governing communications to "*significant number* of registered voters") (emphasis added);

*see also Johnson*, 135 S. Ct. at 2557-59 (statute criminalizing conduct that presents "*serious* potential risk" of injury) (emphasis added).

Nor has the government explained what qualifies as a "composite." Must that reflect the views of group members of different ages, genders, geographic regions, tribal enrollments? The statute's temporal aspect compounds the vagueness. The PTO must determine whether a term was "disparaging" to a "substantial composite" a particular "group," not as of the present day, but *50 years ago* or more.

Alternatively, § 2(a) is vague as applied, because the "lengthy procedural history … shows that the [Team] did not have fair notice of what was forbidden." *Fox*, 132 S. Ct. at 2317-18. Fair notice was absent in *Fox* because the government at the time of a television broadcast permitted fleeting expletives, then retroactively changed course. *Id.* at 2318. The PTO concluded *six times* from 1967 to 1990 that the Redskins marks were not disparaging, then abruptly reversed course. The Redskins had no notice that the PTO would change its mind, but the PTO nonetheless applied its interpretation retroactively to revoke the registrations.

"[A] regulatory change this abrupt on any subject" would violate fair notice, "but [that] is surely the case when applied to … regulations that touch upon sensitive areas of basic First Amendment freedoms." *Fox*, 132 S. Ct. at 3218 (quotation marks omitted). The Team "had reason to suppose that [its trademark]

would not violate the rule, yet [it] was [found in violation] nonetheless." *HLP*, 561 U.S. at 23 (giving example that lawyer could not be retroactively disciplined under state bar rule for media statements he reasonably thought permissible).

### B.    Section 2(a) Fosters Arbitrary Enforcement

Section 2(a) fosters arbitrary and discriminatory enforcement, driven by the subjective personal views of PTO officials.  According to the PTO, prior registrations that are "similar to the applicant's … do[] not bind the [PTO]." *In re Heeb Media LLC*, 2008 WL 5065114, at *9 (TTAB 2008).  "The often-stated maxim that 'each case must be decided on its own facts' never rings so loudly as it does in Section 2(a) refusals." *In re Hines*, 1994 WL 456841, at *5 (TTAB 1994).

As a result, PTO decisions are arbitrary and unpredictable:

| Registration GRANTED | Registration DENIED as Disparaging |
|---|---|
| **HEEB** (June 29, 2004) | **HEEB**, *Heeb*, 2008 WL 5065114, at *1 |
| **DYKE NIGHT** (May 22, 2012) | **2 DYKE MINIMUM** (Office Action Oct. 11, 2007) |
| **F·A·G FABULOUS AND GAY** (Sept. 20, 2005) | **MARRIAGE IS FOR FAGS** (Office Action Nov. 19, 2008) |
| **DAGO SWAGG**  (June 4, 2013) | **DAGO MARY'S** (Office Action Jan. 17, 2007) |
| **WILD INJUN** (Jan. 28, 1992) | **URBAN INJUN** (Office Action Nov. 19, 2007) |
| **SQUAW**  (Oct. 30, 2007) | **SQUAW**, *In re Squaw Valley Dev. Co.*, 2006 WL 1546500 (TTAB 2006) |

Other examples abound. The PTO concluded that BLACK TAIL for an adult entertainment magazine does not disparage African-American women, *Boswell v. Mavety Media Grp. Ltd.*, 1999 WL 1040108 (TTAB 1999), that JAP does not disparage Japanese Americans, *In re Condas S.A.*, 1975 WL 20869 (TTAB 1975), and that MOONIES does not disparage the Unification Church, *Over our Heads*, 1990 WL 354546. PTO examiners have registered OFF-WHITE TRASH, DANGEROUS NEGRO, CELEBRETARDS, STINKY GRINGO, MIDGET-MAN, and YID DISH, and LITTLE INDIAN GIVER, among countless examples. There is no rhyme or reason to the PTO's approval of some marks and disapproval of others.

The District Court held that the PTO "sets forth sufficient guidelines" because it posts examiners' decisions "on its website," "published instructions" in its Trademark Manual of Examining Procedure, and adopted a dictionary definition of "disparage" in *Harjo*. JA__[Op.33]. But posting arbitrary and inconsistent decisions on the Internet informs the public only that the decisions are arbitrary and inconsistent. The Manual states, circularly, that a mark "may be disparaging to a substantial composite of the referenced group" when the mark may "offend the sensibilities of" the group. *TMEP* § 1203.03(b) (2015). The dictionary definitions are no more clarifying.

The government contends that "procedural limitations" protect registration-holders because the "TTAB itself does not initiate cancellation," JA__[D.E.127at5

40

n.5], and instead waits for anyone who "alleges [he is] disparaged" to seek cancellation, PTO, *TTAB Manual of Procedure* § 309.03(b) (2015). But delegating enforcement discretion to the whim of 300 million citizens renders § 2(a) *more* arbitrary, unpredictable, and discriminatory, not less. As the government has told the Supreme Court, "[t]o arm millions of private citizens with such potent relief … unacceptably chills speech." Brief for United States at 25, *Nike, Inc. v. Kasky*, No. 02-575 (U.S. Feb. 28, 2003).

THE REDSKINS is not the only registered mark touching on the subject of race. AUNT JEMIMA's logo is one example. M.M. Manring, *Slave in a Box: the Strange Career of Aunt Jemima* (1998). There are others, including the registered logos of CHIQUITA, UNCLE BEN's, and CREAM OF WHEAT. A. Taube, *15 Racist Brand Mascots and Logos that Make the Redskins Look Progressive*, Business Insider, June 19, 2014. And many involve Native Americans, like ESKIMO JOE's, RED MAN, and LITTLE INDIAN GIVER. This case sets a dangerous precedent. Because the government outsources enforcement of § 2(a) to anyone alleging offense from a registered mark, affirming the decision below would allow anyone to seek cancellation not only of the registrations above, but also potentially to harass many longstanding non-profit organizations like UNITED NEGRO COLLEGE FUND, NAACP, and ASSOCIATION FOR RETARDED CITIZENS.

## III.   The Government's Delay Violates Due Process

The massive delay between registration and cancellation deprived the Redskins of "[t]he fundamental requirement of due process"—"the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation marks omitted).  By 2006, when Petitioners sought cancellation, the best evidence of what Native Americans thought in 1967 was long gone.

1.   The District Court erroneously held that due process does not apply because trademark registrations are not "property interest[s]."  JA__[Op.35].  If that were true, the government could cancel decades-old registrations at will, without any hearing or even notice.  But when an interest has "been initially recognized and protected by … law," "the procedural guarantees of [due process] apply whenever the State seeks to remove or significantly alter that protected status."  *Paul v. Davis*, 424 U.S. 693, 710-11 (1976).  Thus, for example, "[o]nce licenses are issued," they "are not to be taken away without … procedural due process."  *Bell v. Burson*, 402 U.S. 535, 539 (1971).  Where the law "engendered a clear expectation of continued enjoyment of a license," the license-holder has "asserted a legitimate claim of entitlement … that he may invoke at a hearing."  *Barry v. Barchi*, 443 U.S. 55, 64 n.11 (1979).

The government "initially recognized and protected" the Redskins marks in 1967, giving the Team a "legitimate claim of entitlement" and a "clear expectation of continued enjoyment." Indeed, the Lanham Act "protects" marks "indefinitely." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014). The government cannot "remove or significantly alter that protected status," *Paul*, 424 U.S. at 710-11, without "procedural due process," *Bell*, 402 U.S. at 539.

Further, the Lanham Act authorizes mark-owners to sell their registered marks, 15 U.S.C. § 1060, and to exclude others from infringing them, *id.* § 1114. These are the hallmarks of a protected property interest. *Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673 (1999) (describing Lanham Act "provisions dealing with infringement of trademarks, which are the 'property' of the owner because he can exclude others from using them").

The D.C. and Federal Circuits have held that cancelling trademark registrations triggers due process. *J.C. Eno (U.S.) Ltd. v. Coe*, 106 F.2d 858, 859-60 (D.C. Cir. 1939); *P.A.B. Produits et Appareils de Beaute v. Satinine Societa in Nome Collettivo di S.A.e.M. Usellini*, 570 F.2d 328, 332, 334 (C.C.P.A. 1978). The Federal Circuit later held that a company lacked a "constitutionally protected property interest in *obtaining* federal registration." *In re Int'l Flavors and Fragrances Inc.*, 183 F.3d 1361, 1368 (Fed. Cir. 1999) (emphasis added). Even were that correct, *but see McGinley*, 660 F.2d at 484, cancellation is fundamentally

43

different. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576-78 (1972) (contrasting firing tenured professors with refusing to renew a one-year contract).

Finally, "stigmatizing charges" paired with "damage to tangible interests" trigger due process. *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990) (quotation marks omitted). Here, the charge that "Redskins" disparages Native Americans tarnishes the Team's name and would significantly alter the Team's tangible rights. *Roth*, 408 U.S. at 573; *Paul*, 424 U.S. at 708.

2. The delay between the registrations of the marks and the cancellation petition in 2006 violated due process. That delay was 39 years for the 1967 mark, 32 years for the 1974 marks, 28 years for the 1978 marks, and 16 years for the 1990 mark. To determine whether unreasonable delay violates the Fifth Amendment, courts weigh the "length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, 564 (1983).

*First*, the length of delay is "quite significant." *Id.* at 565 (18 months is "quite significant"). *Second*, no good reason justifies the delay. If the PTO thought the marks violated § 2(a), it could have denied registration. *Third*, the Team has consistently argued that the delay violated it rights. *Fourth*, the delays

44

are seriously prejudicial because they "hampered the [Team] in presenting a

defense on the merits, through, for example, the loss of witnesses or other

important evidence." *Id.* at 569.  For instance, the Redskins could not:

- Take contemporaneous surveys of Native American views in 1967, 1974, 1978, and 1990.  *Harjo*, 565 F.3d at 883; *Harjo*, 567 F. Supp. 2d at 57-58; *Harjo*, 284 F. Supp. 2d at 143 & n.37.  These surveys would have provided the best evidence of the collective views of Native Americans, and it is impossible to overstate the significance of the lost opportunity.

- Procure contemporaneous testimony about prevailing viewpoints of the 1960s and 1970s.  Memories fade, and "what has been forgotten can rarely be shown."  *Barker v. Wingo*, 407 U.S. 514, 532 (1972).

- Procure testimony from Edward Bennett Williams, the Redskins president from 1965-1980, who died in 1988.  Petitioners rely heavily on Williams' 1972 meeting with Native Americans.  *Infra* p.56.  His testimony about that meeting would have been highly relevant, and "Mr. Williams may very well have had other interactions with Native Americans that would have provided contemporaneous evidence of their opinions of the Redskins name."  *Harjo*, 567 F. Supp. 2d at 57.

- Procure testimony about a purported 1973 Redskins-related "resolution" of the National Congress of American Indians (NCAI) on which Petitioners and the District Court relied.  *Infra* p.57.  The Team disputes the existence of the "resolution," and its purported author died in 1993.

## IV.    The Redskins Trademarks Were Properly Registered

First, § 2(a) does not cover disparagement of groups.  Second, § 2(a) sets a

far higher standard for disparagement than the one the District Court applied.

Third, under any standard, Petitioners failed to prove by a preponderance of the

evidence that the marks were disparaging in 1967, 1974, 1978, or 1990, the dates

of registration.

## A.    Section 2(a) Applies Only to Identifiable Persons

Although not raised below, it is "fairly possible" to construe § 2(a) to avoid any constitutional issue in this case. *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998).  Section 2(a)'s prohibition of disparagement of "persons, living or dead" refers only to identifiable individuals or corporations.  15 U.S.C. § 1052(a). The Lanham Act defines "person" as "a juristic person as well as a natural person," and defines "juristic person" as a "firm, corporation, union, association, or other organization capable of suing and being sued in a court of law."  15 U.S.C. § 1127. Those definitions equally apply to the plural term "persons."  *Id.*  The Act accordingly protects specific, identifiable individuals or juristic persons.  It is not concerned with groups as a whole, like blondes, lawyers, vegetarians, women, or racial and ethnic groups.  Indeed, the phrase "living or dead," which modifies "persons," makes little sense as a modifier of an entire group, such as a gender. And interpreting "persons" to mean a group of individuals sharing some quality or affinity would render meaningless § 1127's exclusion of an "association" of individuals from the definition of "person" unless the association can sue or be sued.

Nor does it make sense that Congress intended to prohibit registration of marks that "falsely suggest a connection" with a group, as opposed to an identifiable "person[]."  15 U.S.C. § 1052(a).  And other federal statutes that

46

include "groups" so specify. *E.g.*, 7 U.S.C. § 1906 ("Nothing in this chapter shall be construed to prohibit, abridge, or in any way hinder the religious freedom of any person or group.").

The legislative history shows that Congress worried about "Abraham Lincoln gin" and terms that "disparage[d]" specific "people of eminence" or juristic persons and institutions, like "Harvard" or the "New York Athletic Club." *Hearings* 18-21. The Act thus "embrac[ed] concepts of the right to privacy" and the "right to control the use of one's identity" in commerce. *Univ. of Notre Dame Du Lac v. J.C. Gourmet Food Imports Co.*, 703 F.2d 1372, 1376 (Fed. Cir. 1983). It is not plausible that Congress *sub silentio* intended to bar famous trademarks like AUNT JEMIMA, which was registered well before the Lanham Act, but which "may disparage" African-Americans under the PTO's regime. Marning, *Slave in a Box*, *supra*.

Congress legislated against the legal backdrop that the term "disparagement" addressed statements injuring a business-owner's commercial interests, and not someone's personal "reputation." Restatement (First) of Torts § 573 cmt. g (1938); *id.* § 629. Congress presumptively intended to incorporate this settled principle, which precludes the notion that § 2(a) covers all potentially negative statements about any group's identity. *Morissette v. United States*, 342 U.S. 246,

263 (1952).  And if § 2(a) does not extend to groups, the PTO lacked statutory

authority to cancel the registrations.

### B.     The District Court Applied the Wrong Test for Disparagement

Even assuming § 2(a) protects groups from disparaging marks, the District

Court applied a test that does not adequately capture the group's views and that

does not adequately guard against grave constitutional doubts.

### 1.     The Statute Requires at Least a Majority

This Court should interpret § 2(a) to require that at least a majority of the

referenced group finds the mark disparaging.  *See Harjo*, 284 F. Supp. 2d at 133

n.32 (36.6% not a "substantial composite … in the context of this case").

Substantial means "being *largely* but not wholly that which is specified."

Merriam-Webster's Collegiate Dictionary 1245 (11th ed. 2003) (emphasis added).

The District Court's undefined minority standard creates a "heckler's veto,"

"one of the most persistent and insidious threats to first amendment rights."

*Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985).  And a majority

requirement reduces (but by no means eliminates) the vagueness inherent in the

statute.  *See supra* pp.37-38.  No one has identified how many Native Americans

constitute a "substantial" composite, an omission that precludes a meaningful

defense.  Because the District Court applied a minority test, the court held that *all*

of the team's evidence that Native Americans took pride in the Team's name was

simply irrelevant.  JA__[Op.59-61].  Whether some or even most Native

Americans favored the name did not matter.  *Id.*

The District Court cited Federal Circuit decisions rejecting a "majority"

requirement, JA__[Op.36], but none of those cases involved cancellation.  The

Federal Circuit has held only that a minority suffices to show a "prima facie case"

that a mark violates § 2(a), at the initial, *ex parte* application stage.  *E.g.*, *In re*

*Boulevard Entm't, Inc.*, 334 F.3d 1336, 1339-41 (Fed. Cir. 2003).  But "in a

cancellation proceeding, as distinguished from an opposition or an ex parte

proceeding, where long established and valuable rights may be involved,

cancellation must be granted with due caution."  *W.D. Byron & Sons, Inc. v. Stein*

*Bros Mfg. Co.*, 377 F.2d 1001, 1003 (C.C.P.A 1967).  That is why a preponderance

standard applies in a cancellation proceeding but not an *ex parte* proceeding, and a

majority standard should too.

If this Court applies a majority requirement, the Team is entitled to summary

judgment.  Petitioners made no attempt to quantify the percentage of Native

Americans who may have found the marks disparaging at any relevant time.

JA__[TTAB84] (Bergsman, J., dissenting).

## 2.    The Statute Requires a Representative Sample

The District Court held that "those with 'non-mainstream' views on whether

a term is disparaging can certainly constitute a substantial composite of a

49

referenced group." JA__[Op.59]. Because that holding at a minimum raises grave constitutional doubts, this Court should apply the "substantial composite" test to require a *representative* sample or *cross-section* of the referenced group. *See In re Mavety Media Grp. Ltd.*, 33 F.3d 1367, 1371 (Fed. Cir. 1994). "Composite" means "combining the typical or essential characteristics of individuals making up a group." *Merriam-Webster's* 255. Courts require a representative cross-section in analogous contexts. Speech may not be proscribed as obscene unless the "average person" would find it so *and* no segment of the community would ascribe "serious literary, artistic, political, or scientific value" to it. *Miller v. California*, 413 U.S. 15, 23-25 (1973). Likewise, a "fair-cross-section requirement" ensures that juries reflect the "judgment of the community," which is absent "if the jury pool is made up of only special segments." *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975).

### 3.    The Statute Requires Actual Disparagement

The District Court incorrectly read § 2(a)'s "*may* disparage" language to bar registration of marks that are capable of being viewed as disparaging, regardless of whether they actually disparage. JA__, __[Op.44-45,63]. Congress used the term "may" to eliminate an intent requirement, *Harjo*, 284 F. Supp. 2d at 124-25, not to eliminate an actual disparagement requirement. The PTO has repeatedly held, including in this case, that the question is whether the mark *is* disparaging, not whether it hypothetically might be. "Board decisions require proof of

50

disparagement, not merely capacity to disparage." JA__[A291]; *In re Lebanese Arak Corp.*, 2010 WL 766488, at *8 (TTAB 2010) (test is whether "the mark does, in fact, disparage").

Just about everything is potentially disparaging to someone, and Congress could not have intended to write a statute that broad and indeterminate. And barring trademarks that are "potentially" disparaging to a "substantial composite" of a group independently renders the statute unconstitutionally vague. *Johnson*, 135 S. Ct. at 2557-58 ("serious *potential* risk" is unconstitutionally vague) (emphasis added). Divining whether a mark may potentially disparage groups 50—or 500—years ago is a bankrupt exercise.

## C. Petitioners Failed to Show That the Redskins Marks Disparaged a Substantial Composite of Native Americans

Even under the standard applied below, a preponderance of the evidence did not show that the marks "may disparage" a "substantial composite" of Native Americans at the times of registration. In an exhaustive, 50-page opinion, the D.C. district court concluded in *Harjo* that "[t]here is no evidence in the record that addresses whether the use of the term 'redskin(s)' in the context of a football team and related entertainment services would be viewed by a substantial composite of Native Americans, in the relevant time frame, as disparaging." *Harjo*, 284 F. Supp. 2d at 144.

That is again true.  Virtually all the evidence the District Court cited is legally *irrelevant* under § 2(a) because it: (1) pertains to the use of the term "redskin" in contexts *other* than football; (2) represents the views of non-Native Americans; (3) post-dates the relevant time periods; or (4) represents the opinions of individual Native Americans, not a "substantial" number.  *See Harjo*, 284 F. Supp. 2d at 127-36.  The court disregarded significant, unrebutted evidence that many Native Americans took pride in the Team's name in 1967 and thereafter. The Team was entitled to summary judgment.  But at a minimum, Petitioners were not.  At every turn, the court ignored the summary judgment standard, resolving conflicting evidence against the Redskins and drawing inferences in the light most favorable to Petitioners.

### 1.    1967

The three types of evidence the District Court cited failed to show, by a preponderance, that a "substantial composite" of Native Americans in 1967 considered "Redskins" disparaging in the context of a football team.

<u>Dictionary Usage Labels</u>.  The District Court relied on three dictionaries from 1898-1967 that gave negative "usage labels," like "often offensive," to the term "redskin."  JA__[Op.43].  But generic dictionary usage labels do not reflect attitudes towards the term in connection with the services "described in [the] application for registration," *i.e.*, professional football.  *Mavety*, 33 F.3d at 1371.

They reflect opinions of dictionary editors, or a dictionary editor's best guess about how the general public might feel about a word.  No evidence showed that any usage label reflected the views of any Native American.  Although the Federal Circuit has considered dictionary labels in determining whether a term is "offensive" to the "general public" under § 2(a)'s "scandalous" and "immoral" clause, that court has never considered dictionary labels dispositive of how any specific group might react to a term.  *See Harjo*, 284 F. Supp. 2d at 129-30 ("views of the general populace and the Native American population are distinct").  The Federal Circuit has criticized dictionary labels even as measures of the general public's attitudes.  *Mavety*, 33 F.3d at 1373.  Prior Federal Circuit cases relying upon dictionary evidence, *see* JA__[Op.44-45], arose from *ex parte* proceedings, where a "prima facie" standard applies.

Even if dictionary labels are relevant, they undermine the decision below. Of the 14 dictionary definitions for "redskin" in evidence between 1960 and 1967—the relevant period for the 1967 mark—only two contain the usage label "often offensive."  JA__[D.E.81-2at3].  This suggests the term was not regarded as disparaging in 1967.  *E.g.*, *Mavety*, 33 F.3d at 1374 (dictionaries insufficient to show views of "substantial composite" where other dictionaries did not designate the term as vulgar).

Scholarly, Literary, and Media References. The District Court identified three pre-1967 sources—a 1911 Encyclopedia Britannica article and two journal articles—critical of the term redskin. JA__[Op.47]. Three. It is remarkable that Petitioners came up with so little supporting their position in the hundreds of years between the first use of the term "redskin" and 1967. JA__[R.E.83-1at3-4]. Worse, none of these sources addressed the term in connection with football.

The court relied on a 1963 article stating that "[a]most all the students" at the Haskell Institute, a Native American vocational school, "resent being called redskins." JA__[Op.47]. This kind of sourceless hearsay would have no probative value even if it referenced football, which it did not, and even if disputed facts could be resolved against the Redskins, which they cannot. The authors offered no explanation for their assertion. JA__[D.E.73-21at4].

Contrary to the District Court's conclusion (JA__, __[Op.47,51]), a 1911 Encyclopedia Britannica entry noting that the term redskin is "not in such good repute as the corresponding" German and French terms is not an "authoritative source" of what Native Americans thought in 1967 about a football team. Nor is a single sentence in a 1962 article criticizing the term "redskin" in isolation. JA__, __[Op.47, 51].

Statements of Individuals or Group Leaders. The District Court relied on declarations created for this litigation from "four prominent Native Americans."

54

JA__[Op.54-57].  Their self-serving, present-day testimony does not reliably reflect the views of a substantial composite of Native Americans decades ago—and certainly not undisputedly so at summary judgment.  Such historical recollections are invariably tainted by subsequent exposure and current views.  Further, Petitioners presented "no evidence that [these statements] are a reasonable proxy for a substantial composite of the entire Native American population."  *Harjo*, 284 F. Supp. 2d at 135.  Extrapolating the views of a broader population from the views of so few is "critically flawed."  JA__[D.E.82-1-2at19-36].

Similarly self-serving is the 1993 NCAI Executive Council resolution—adopted to support the *Harjo* cancellation petition—stating that the Team's name had "always been … disparaging."  JA__[D.E.73-68at2]; JA__[Op.58].  The court found this resolution "probative of NCAI's constituent members' collective opinion" during the entire "relevant time period."  JA__[Op.58-59].  A tribal organization's retroactive declaration by fiat is not evidence that any Native American viewed the Team's name as disparaging in 1967.  *Harjo*, 284 F. Supp. 2d at 135.  Nor does the Executive Council of a tribal organization invariably reflect the views of its members, any more than the U.N. Security Council invariably reflects the views of humankind.  At a minimum, a reasonable fact-finder could disregard this as evidence of Native American attitudes in 1967.  And

again, the NCAI did not oppose the marks before the PTO in 1967 or seek cancellation thereafter.

### 2.    1974, 1978, and 1990

With respect to the five marks registered in 1974, 1978, and 1990, the District Court additionally relied on a 1972 meeting between then-Team President Edward Bennett Williams and eight "Native American leaders" who objected to the Team's name, including then-NCAI President Leon Cook.  JA__[Op.52-53]. The court termed this meeting "strong evidence that the term 'may disparage.'" JA__[Op.53].  But there was no evidence that these eight leaders represented the views of their organizations, much less the views of a substantial composite of Native Americans.  *Harjo*, 284 F. Supp. 2d at 135.  Cook testified that the attendees were "activists" and that the NCAI membership did not "endorse[]" the meeting.  JA__[D.E.88-13at10-12].  And even if Cook spoke for the NCAI, the NCAI's positions are far outside the mainstream—the organization wants to ban *any* Indian-related team names, mascots, and logos.  NCAI, *Ending the Legacy of Racism in Sports & the Era of Harmful "Indian" Sports Mascots* 8, 9 (Oct. 2013). And again, after that meeting, neither Cook nor *anyone else* opposed the registration of additional marks in 1974, 1978, or 1990, or sought their cancellation.  At a minimum, whether the participants in the meeting represented Native Americans more broadly was a disputed issue of fact.

56

The District Court improperly credited Cook's assertion in 2015 testimony that the NCAI General Assembly in 1973 purportedly approved by "voice vote" an oral "resolution" calling for the Team to change its name.  JA__[D.E.88-13at15]; JA__[Op.55].  There is no record of this—nothing in NCAI's files, no newspaper reports.  Nothing.  Petitioners' witnesses, including Cook, testified that the NCAI documented its resolutions, JA__[D.E.88-13at14-17]; JA__[D.E.71-2at4], yet there was no documentation of this "resolution."  Again, the court was supposed to resolve conflicting evidence and draw inferences in the Team's favor, but did the opposite.

Dictionary evidence from 1960-1990 is non-probative for the reasons discussed.  *See supra* pp.52-53.  In any event, only a minority of dictionaries for that period attached negative usage labels to the word redskin.  JA__[D.E.81-2at3-5]; *see Harjo*, 284 F. Supp. 2d at 130-31; JA__[TTAB89-92] (Bergsman, J., dissenting).

The post-1967 newspaper articles reporting certain Native Americans' efforts to change the Team's name or describing individual objections to the name are not probative either.  *Cf.* JA__[Op.47-51].  "[I]t is impossible to determine if [these articles] would represent a substantial composite of Native Americans." *Harjo*, 284 F. Supp. 2d at 135.  The District Court credited these articles as probative of whether the Team name is disparaging "based on the evidence

57

presented in *Geller*, *Heeb Media*, and *Squaw Valley*." JA__[Op.51]. But those cases involved the *prima facie* evidence standard applicable to refusals to register, not the preponderance standard applicable to cancellations. *Squaw Valley*, 2006 WL 1546500, at *15; *Heeb*, 2008 WL 5065114, at *7; *see In re Geller*, 751 F.3d 1355, 1357 (Fed. Cir. 2014). And all but 12 articles were published after 1978, yet the court inappropriately considered all the articles retroactively probative of what Native Americans thought in 1974 and 1978.

This evidence did not support cancellation of the 1974, 1978, or 1990 marks, and certainly not on summary judgment.

### 3. "Supplemental Evidence" Does Not Justify Departing from *Harjo*

Defendants offered no "supplemental evidence" justifying a departure from the D.C. district court's decision in *Harjo*, which granted summary judgment to the Team because, among other reasons, the evidence did not prove disparagement. *Cf.* JA__[Op.64-65]. *Harjo* considered most of the evidence the District Court cited as "new," including the 1972 meeting, 284 F. Supp. 2d at 135, testimony from individual Native Americans, and efforts by Native American advocacy organizations, *id.* The Haskell article is irrelevant, *supra* p.54, and the fact that the University of Utah changed the name of its mascot is not probative of the views of a Native Americans—especially given that at least 20 Native American sports teams simultaneously retained the name Redskins, *infra* p.60. And Dr. Nunberg's

58

"[a]dditional data analysis," JA__[Op.65], "filter[ed] out" all use of the term

"redskins" in the professional football context, JA__[TTAB36].  That is why *Harjo*

rejected Nunberg's original analysis.  284 F. Supp. 2d at 127.  Filtering out sports

references renders Nunberg's analysis "incomplete and scientifically unsound."

JA__[D.E.84-1at7-8].

### 4.    Native Americans Supported the Team's Name

The District Court disregarded extensive evidence that many Native

Americans did not regard the term Redskins, in connection with sports, as

disparaging in 1967 and thereafter.  Most significant is the telling, "undisputed"

fact that the "six marks at issue were published and registered without opposition

from Native Americans or anyone else on *twelve* different occasions."  *Harjo*, 284

F. Supp. 2d at 136 n.34.  That not a *single* Native American asked the PTO to

refuse to register or cancel the marks as disparaging in 1967, 1974, 1978, or 1990

overwhelmingly shows that a "substantial composite" of Native Americans did not

consider them disparaging at those times.

As *Harjo* recognized, the Team adopted the name to associate itself with and

honor Native Americans, including its four Native American players and Native

American head coach.  284 F. Supp. 2d at 104; JA__[D.E.94-3at2]; JA__[D.E.98-

3].  This is common in sports.  It is simply a historical accident that the Team is the

Washington Redskins rather than any other Native American sports mascot.  The

word "red" alone cannot make the name disparaging.  Oklahoma, the name of a

U.S. State, means Red People in Choctaw.[5]

Indeed, at least 20 Native American schools across the country named their

*own* sports teams the "Redskins" between 1967 and 1990.  JA__[D.E.84-1at32-

33]; JA__[D.E.84-4]; JA__-__[D.E.89-14to89-16;D.E.90-1to90-16;D.E.91-1to91-

16;D.E.92-1to92-16]; *e.g.*, I. Shapira, *In Arizona, a  Navajo High School Emerges*

*as a Defender of the Washington Redskins*, Washington Post, Oct. 26, 2014

(describing Red Mesa Redskins high school football team).  In 1977, hundreds of

Native Americans representing 80 tribes competed for and participated in an All-

Indian Half-Time Marching Band and Pageant at a Redskins-Cowboys game in

Washington, D.C.  JA__[D.E.93-2.to.93-14]; JA__[D.E.98-7.to.98-10];

JA__[D.E.98-13.to.98-15]; JA__[D.E.99-8.to.99-13]; JA__[D.E.80at2].  The event

was coordinated by the federal Bureau of Indian Affairs, widely covered in tribal

newspapers, and broadly supported by prominent Native American organizations,

such as the National Tribal Chairmen's Association, which represented the

country's 750,000 Indians on reservations,[6] and the National Indian Education

Association.  *Id.*

---

[5] Muriel H. Wright, Oklahoma Historical Society, *Contributions of the Indian People to Oklahoma* (1936), http://digital.library.okstate.edu/Chronicles/v014/ v014p156.html.

[6] As of 1972.  JA__[D.E.129-4at5].

Haskell students and faculty were enthusiastic participants; the campus paper described the event as a "highlight" of the year, JA__[D.E.98-14]; JA__[D.E.93-13]—a key point the District Court ignored in crediting Petitioners' evidence about Haskell. No evidence showed that any Native American organization or individual opposed this event. JA__[D.E.89-8at14-18]. In light of the event's prominence, the absence of *any opposition* is strong evidence that a "substantial composite" of Native Americans did not view the Team's name as disparaging between 1967 and 1978, when five of the six marks were registered.

Prominent Native American tribal leaders have expressed support for the Team's name over the years. JA__, __, __[A9364;A9381-83;A9386-93]. In 1988, former U.S. Senator Ben Nighthorse Campbell said the name conveyed "dignity and respect." JA__[D.E.88-16]. And if later evidence is relevant, a survey conducted in 2003-2004 by the University of Pennsylvania's independent National Annenberg Election Survey questioned 768 Native Americans in 48 States, and found that *90%* did not consider the Team's name offensive. JA__[D.E.88-2]; JA__[D.E.82-1at19-20].

The District Court discounted all this because it purportedly "does not show that [] there is *not* a substantial composite of Native Americans who find the matter was one that 'may disparage.'" JA__[Op.60]. But this evidence is the most compelling proof of the collective Native American view toward the name

Redskins in the context of sports.  At a minimum, there are genuine issues of

material fact.  More broadly, it is unclear how a registrant could ever defend its

mark on the District Court's theory.  Apparently nothing beyond conclusive

evidence that every single member of a group viewed the marks as non-

disparaging would suffice.

## V.    Laches Bars the Petition

Petitioners unreasonably delayed in seeking cancellation, and that delay

prejudiced the Redskins.  Laches thus bars their claims.  *Nat'l R.R. Passenger*

*Corp. v. Morgan*, 536 U.S. 101, 121-22 (2002); *Harjo*, 565 F.3d at 882.

It is undisputed that (1) all Petitioners were "aware of the Redskins marks

for many years before [their] eighteenth birthday," and that (2) "nothing

prevent[ed] them from filing the Petition immediately after turning

eighteen."  JA__[D.E.100at10]; JA__[D.E.118at4]; JA__[D.E.88-8at22-23].  The

oldest Petitioner waited six years; the youngest Petitioner, 11 months, 20

days.  That was unreasonable.  *Norris v. United States*, 257 U.S. 77, 80 (1921) (11

months); *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir.

1995) (13 months).  Petitioners were recruited by Harjo and represented by *Harjo*

counsel.  They did not need a year to prepare this petition.

The delay prejudiced the Team because the Team "continued to invest in

developing enormous goodwill in 2000-2006," including specifically in 2005-

2006, the year of the youngest defendant's delay. JA__[D.E.100at10-11];

JA__[D.E.118at4]. Precise figures are in the millions. JA__[D.E.98-4(sealed)].

*Forbes* estimated that the value of the Team's brand management grew $18 million

in 2006 to $130 million. JA__[D.E.98-4at6]. That economic prejudice establishes

laches. "[L]aches requires only general evidence of prejudice, which may arise

from mere proof of continued investment in the late-attacked mark alone." *Harjo*,

565 F.3d at 884.

The District Court erred in excusing all delay based on the pendency of

*Harjo*. JA__[Op.66-67]. The pendency of litigation by *other people* does not toll

a statute of limitations, and is likewise irrelevant for laches. In the patent context,

for example, "other litigation" excuses delay only if the claimant is herself

involved in the pending litigation, and the claimant notifies her prospective

opponent that she intends to sue once the pending litigation is concluded. *Vaupel*

*Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 877 (Fed. Cir.

1991). Petitioners did not so notify the Redskins. No Petitioner offered *Harjo* as a

reason for the delay, and indeed Petitioners sued while *Harjo* was pending. It

would be perverse to allow *Harjo* to excuse this delay when Harjo organized this

suit to avoid the consequences of her own years-long delay.

In conflict with the D.C. Circuit, the District Court alternatively held that the

"public interest" precludes a laches defense. JA__[Op.67]. But the Lanham Act

provides for laches "[i]n all inter partes proceedings." 15 U.S.C. § 1069. The District Court's theory "would make section 1069 … meaningless as to cancellation petitions." *Harjo*, 415 F.3d at 48. The prevailing public interest here is in repose for the Redskins and other mark-owners who have spent decades building their brand in reliance on registrations issued long ago.

## CONCLUSION

The District Court's judgment should be reversed and summary judgment should be entered in favor of the Redskins.

Dated: October 30, 2015

Respectfully submitted,

/s/ Lisa S. Blatt
Lisa S. Blatt
Robert Alan Garrett
ARNOLD & PORTER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
lisa.blatt@aporter.com

Robert L. Raskopf
Todd Anten
Jessica A. Rose
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
(212) 849-7000
robertraskopf@quinnemanuel.com

*Counsel for Appellant*
*Pro-Football, Inc.*

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

The Redskins request oral argument.  This lawsuit challenges the PTO's cancellation of decades-old registrations for valuable Redskins trademarks.  Oral argument will materially assist the Court in resolving the substantial constitutional and statutory claims at issue.

# CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), that the attached Brief of Appellant contains 13,997 words and complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2007, in 14-point Times New Roman font.

Dated:  October 30, 2015          /s/  Lisa S. Blatt_____
                                  Lisa S. Blatt

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2015, I electronically filed the foregoing document with the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  October 30, 2015    /s/  Lisa S. Blatt
           Lisa S. Blatt