NO. _____

In The

# United States Court of Appeals

For The Fourth Circuit

v.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE                                                 AT

_____

_____

Counsel for

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____    Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____

(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    YES    NO


2.    Does party/amicus have any parent corporations?                    YES    NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                        YES    NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    YES    NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    YES    NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    YES    NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____        _____
       (signature)                             (date)

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................... i

TABLE OF AUTHORITIES ........................................................... iii

INTEREST OF *AMICUS CURIAE* ............................................. vi

INTRODUCTION ........................................................................... 1

ARGUMENT .................................................................................. 1

  I.  Judge Lee's *Blackhorse* Opinion Misinterprets *Walker* .................................. 1

    A.  *Overview* ............................................................................ 1

    B.  *Walker's Legal Principles* ............................................... 3

    C.  *Differences Between Texas's Specialty License Plate Program And Federal Trademark Registration Show Trademark Registration Is Not Government Speech* ........................................................ 4

  II.  Commercial Speech Analysis Shows That § 2(a) Violates The First Amendment ................................................................ 11

    A.  *Trademarks As Commercial Speech and Central Hudson* ......................... 12

    B.  *Lawful & Non-Misleading Activity* ............................. 14

    C.  *Substantial Government Interest* ................................... 15

    D.  *Direct Advancement, Narrowly Tailored* ..................... 16

CONCLUSION ............................................................................. 21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) ......................................14

*Anderson v. Yungkau*, 329 U.S. 482 (1947).............................................................17

*Central Hudson Gas & Elec. Corp. v. Public Service Comm'n*, 447 U.S. 557
  (1980)……………………………………………………………………………..14

*Farmers' & Merchants' Bank of Monroe, N.C. v. Federal Reserve Bank of
  Richmond, VA*, 262 U.S. 649 (1923) ...................................................................17

*Friedman v. Rogers*, 440 U.S. 1 (1979)..................................................................12

*Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173
  (1999)......................................................................................................................15

*Greyhound v. Both Worlds, Inc.*, 6 U.S.P.Q.2d (BNA) 1635 (TTAB 1988)...........20

*Jama v. Immigration And Customs Enforcement*, 125 U.S. 694 (2005) ................17

*Levers v. Anderson*, 326 U.S. 219 (1945)...............................................................17

*Moore v. Illinois Central R. Co*., 312 U.S. 630 (1941) ..........................................17

*Pro Football, Inc. v. Blackhorse*, 2015 WL 4096277, No. 1:14–cv–01043–GBL–
  IDD (E.D. Va. July 8, 2015)................................................................. 1, 2, 5, 6, 8

*United States v. Rodgers,* 461 U.S. 677 (1983) ......................................................17

*Unites States v. Thoman,* 156 U.S. 353 (1895)........................................................17

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239

(2015)……………………………………………………..2, 3, 4, 5, 6, 7, 8, 11

## STATUTES

15 U.S.C. § 1052 (2012) ..................................................... 10, 12, 14, 15

15 U.S.C. § 1127 (2012) .........................................................12

## OTHER AUTHORITIES

Amanda E. Compton, *N.I.G.G.A., Slumdog, Dyke, Jap, and Heeb: Reconsidering Disparaging Trademarks in a Post-Racial Era*, 15 WAKE FOREST J. BUS. & INTELL. PROP. L. 1 (2014) ....................................................19

FUNK & WAGNALLS NEW STANDARD DICTIONARY OF THE ENGLISH LANGUAGE 728 (1937)...............................................................................19

*Hearings on 4744 Before the Subcomm. on Trademarks of the House Comm. on Patents,* 76th Cong. 18, 18 (1939)............................................... 18, 19

Jeffrey Lefstin, *Does the First Amendment Bar Cancellation of REDSKINS?*, 52 STAN. L. REV. 665 (2000) .......................................................... 12, 14

Kimberly A. Pace, *The Washington Redskins Case and the Doctrine of Disparagement: How Politically Correct Must a Trademark Be?*, 22 PEPP. L. REV. 7 (1995) ...................................................................... 13, 15

OXFORD ENGLISH DICTIONARY 476 (1961)............................................18

**TREATISES**

Ann K. Wooster, *Protection of Commercial Speech Under the First Amendment –*

   *Supreme Court Cases*, 164 A.L.R. Fed. 1 § 20 (2000) ................................. 12, 16

DANIEL A. FARBER, THE FIRST AMENDMENT 16 (4th Ed. 2014)..............................13

J. THOMAS MCCARTHY, 1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION

   § 11:2 (4th Ed. 2015). .............................................................. 9, 13, 15

JOHN E. NOWAK AND RONALD D. ROTUNDA, CONSTITUTIONAL LAW § 16.11 (2010)

   .............................................................. 3, 4, 8, 12, 14, 15, 16

## INTEREST OF *AMICUS CURIAE*

Professor Russ VerSteeg is a Professor of Law at New England Law | Boston.  Professor VerSteeg has written extensively in the field of Intellectual Property, Trademark Law, and Sports Law, and has taught on the subjects for over 25 years.  Professor VerSteeg submits this brief out of concern for the effect the Lanham Act has on First Amendment commercial speech principles.  Lastly, Professor VerSteeg has no financial interest or involvement (except for his brief) in this or any other pending action raising the issues discussed here.

## INTRODUCTION

Judge Lee held that the First Amendment does not apply to § 2(a) of the Lanham Act, because, the federal trademark registration program is *government* speech not private speech.[1] *Pro Football, Inc. v. Blackhorse*, 2015 WL 4096277, No. 1:14–cv–01043–GBL–IDD, at 14, 29 (E.D. Va. July 8, 2015) (reasoning that "the federal trademark registration program is government speech and is therefore exempt from First Amendment scrutiny."). He also held "that the federal trademark registration program is not commercial speech." *Id.* at 18. This brief argues that both of these legal conclusions are incorrect. The federal trademark registration program is private speech *not* government speech, and thus it is subject to First Amendment scrutiny, and trademarks are commercial speech.

## ARGUMENT

## I.    **Judge Lee's *Blackhorse* Opinion Misinterprets *Walker***

### A.    *Overview*

Judge Lee based his conclusion that registered trademarks are government speech on the Supreme Court's decision, *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, wherein Justice Breyer held that the specialty license

---

[1] Judge Lee's opinion also considered several additional legal issues and arguments, including the Fifth Amendment takings clause *Id.* at 35, the substantive provisions of § 2(a) *Id.* at 35–65, and laches *Id.* at 66–67. This brief does not address those issues.

plate designs issued by the Texas Department of Motor Vehicles were government speech, and, therefore, likewise, not protected by the First Amendment.[2]

Judge Lee misconstrues *Walker*. A careful reading of *Walker* reveals that the *reasons* why Justice Breyer held that the designs of the license plates were government speech are absent in *Blackhorse*. Justice Breyer describes the Texas specialty plates as typically displaying both slogans and graphics. He notes that the Texas DMV Board decides whether to approve designs suggested by others.[3] The word "Texas" appears on all specialty plates and the State requires that all cars registered have a government-issued plate for identification purposes (although specialty plates cost extra). *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2244 (2015).

"The relevant statute says that the Board 'may refuse to create a new specialty license plate' for a number of reasons, for example 'if the design might be offensive to any member of the public…'" *Id.* at 2244-2255. The SCV proposed a specialty license plate design that included "a faint Confederate battle flag in the lower portion of the plate," but after receiving public comments, "the board voted

---

[2] 135 S. Ct. 2239, 2246 (2015) ("In our view, specialty license plates issued pursuant to Texas's statutory scheme convey government speech."). *See Blackhorse*, *supra* at 19 *et seq.*

[3] For example, the Board has approved specialty plates with slogans such as "Keep Texas Beautiful" and "Mothers Against Drunk Driving." In fact, the Board has approved over 350 such specialty plate designs. *Walker*, *supra* at 21 (Alito, J., dissenting).

unanimously against issuing the plate." *Walker, supra* at 2245. The Board explained that, "many members of the general public find the design offensive" and also said that "a significant portion of the public associate the confederate flag with organizations advocating expressions of hate directed toward people or groups that is demeaning to those people or groups." *Id.* (citations omitted); *see also id.* at 2258 (Alito, J., dissenting) (quoting this language).

B.    *Walker's Legal Principles*

Justice Breyer articulates the controlling law as follows: "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."[4] This rule is necessary because the government must have the 'freedom' "to select the messages it wishes to convey."[5] The Court repeatedly states that it is basing its decision on *Pleasant Grove City v. Summam*, where the Court held that a city government's decision regarding the approval of monument

---

[4] *Walker, supra* at 2245 (citing *Pleasant Grove City* v. *Summum*, 555 U. S. 460, 467–468 (2009)); *see also id.* at 2245-2246 ("Thus, government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas.") (citing *Johanns* v. *Livestock Marketing Assn.*, 544 U. S. 550, 559 (2005)). *See also* JOHN E. NOWAK AND RONALD D. ROTUNDA, CONSTITUTIONAL LAW § 16.11 (2010) ("Generally, when a government entity speaks, it may say what it wishes, and select the views it wants to promote.").

[5] *Walker, supra* at 2246 (citing *Summam*, 555 U.S., at 468). He emphasizes that the First Amendment does not apply when the government is the speaker, because, "when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position. In doing so, it represents its citizens and it carries out its duties on their behalf." *Id.*

placements (*e.g.,* statues) in a city-owned public park was "government speech." *See* JOHN E. NOWAK AND RONALD D. ROTUNDA, CONSTITUTIONAL LAW § 16.11 (2010) ("The placement of a permanent monument in a park is government speech and therefore not subject to scrutiny under the Free Speech clause."). The decision in *Walker* analogizes the Texas specialty license plate program to monument displays in a public park. The *Walker* Court emphasizes these similarities: 1) the historical tradition that "[g]overnments have long used monuments to speak to the public"; 2) "persons who observe donated monuments routinely – and reasonably – interpret them as conveying some message on the property owner's behalf." *Walker*, *supra* at 2248 (quoting *Summam*, 555 U.S. 460, 470). And "observers" of such monuments, as a consequence, ordinarily "appreciate the identity of the speaker"; and 3) "throughout our Nation's history, the general government practice with respect to donated monuments has been one of selective receptivity. And we observed that the city government in *Summum* 'effectively controlled' the messages sent by the monuments in the [p]ark by exercising 'final approval authority' over their selection." *Id.* at 2247 (quoting *Summam*, 555 U.S., at 471, 473) (internal citation omitted).

C.    *Differences Between Texas's Specialty License Plate Program And Federal Trademark Registration Show Trademark Registration Is Not Government Speech*

Judge Lee purportedly applies these same three factors. *Blackhorse*, *supra* at 20. But the analogies are incongruent with respect to the USPTO's federal registration of trademarks. First, as regards historical tradition, the *Walker* Court notes that license plates, like monuments in a public park, "long have communicated messages from the States." *Walker*, *supra* at 2248 (citing *Summam*, 555 U.S., at 470) ("Governments have long used monuments to speak to the public."). Breyer remarks, "Texas, too, has selected various messages to communicate through its license plate designs." *Id.* The federal trademark registration system is very different. Other than trademarks owned by federal, state, or municipal governments, the majority of registered trademarks are selected and communicated by the private owners of those marks. The government does not select phrases or images for trademark applicants. There is no history or tradition of governments communicating by means of trademarks owned by non-government entities. Judge Lee asserts that the federal trademark registration program "communicates the message that the federal government has approved the trademark." *Blackhorse, supra* at 20 (citing 15 U.S.C. §§ 1072, 1127 (2012)). But a message of approval is not what either *Walker* or *Summam* is about. Those cases are about the actual message that the government speaker was communicating – not mere countenance.

Secondly, Justice Breyer emphasizes that, like the monuments in *Summam*, people who see Texas license plates on vehicles reasonably interpret the plates "as conveying some message on…behalf [of the Texas government]." *Walker*, *supra* at 2249 (citing *Summan*, 555 U.S., at 471). In support of this proposition, he says, "a license plate is a government article serving the governmental purposes of vehicle registration and identification" and that "Texas also owns the designs on its license plates." *Id.* at 2248.  Judge Lee notes that federally registered trademarks use "the insignia for federal trademark registration ®," which, he asserts "is a manifestation of the federal government's recognition of the mark." *Blackhorse*, *supra* at 20. He thus presumes that this shows that "the public closely associates federal trademark registration with the federal government…." *Id.* But in fact none of the sub-factors that Justice Breyer articulates to explain this point apply to federal trademark registration. First, trademark owners own the designs of the marks, not the government. Also trademark registration does not serve to register the entity that owns the trademark like a license plate serves as evidence of vehicle ownership. Nor does trademark registration function to identify its owner in the same way a license plate identifies both the vehicle itself and its owner. Justice Breyer concludes that license plates function "essentially…[as] government ID's." *Walker*, *supra* at 2249. But a registered trademark does not function as a

government-issued form of identification for its owner.[6] Justice Breyer also states that both the vehicle owner and the government intend to express the government's endorsement of the messages on license plates. *Id.* ("Indeed, a person who displays a message on a Texas license plate likely intends to convey to the public that the State has endorsed that message. *** Texas's license plate designs convey government agreement with the message displayed."). Federal trademark registration, on the other hand, does not indicate either the owner's desire to have the government's blessing of the message nor does it express the government's agreement with the mark's message. Trademark owners apply for federal registration to secure the benefits afforded by registration. The government's goal is primarily to provide notice of the proprietary claims of trademark owners, not to express agreement or endorsement of the messages conveyed by trademarks.

The third factor that Justice Breyer relies on to support his analogy between the monuments in *Summam* and the specialty license plates in *Walker* is what he refers to as "selective receptivity." *Walker, supra* at 2247. The concept is simple. For example, when a city government makes a decision about which statues to erect in a public park, it acts as arbiter of both the medium and the message.

---

[6] Trademark registration provides added protections for a trademark owner and serves an important notice-function by alerting both competitors and the public that the owner asserts property rights in the mark. *See* J. THOMAS MCCARTHY, 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 19:9 "Advantages of registration on Principal Register" (4th Ed. 2015).

Decision makers are responsible for aesthetic judgments about the displays and also for the ideas and ideals conveyed by those displays. For example, parks commissioners commonly erect statues of statesmen, leaders, and soldiers, or monuments with names of individuals who served in government offices and/or the military, frequently commemorating those who died while serving their country. "The city in *Summam* simply selected monuments that presented the image that the city wanted to project to visitors in the park." NOWAK & ROTUNDA, *supra* at § 16.11. Justice Breyer asserts that, similarly, "Texas maintains direct control over the messages conveyed on its specialty plates. Texas law provides that the State 'has sole control over the design, typeface, color, and alphanumeric pattern for all license plates.'" *Walker*, *supra*, at 2249 (citing the relevant Texas statute).  Judge Lee refers to this *Walker* factor as "editorial control." *Blackhorse*, *supra* at 21. He quotes §§ 2(b), (c), (d), and (e) of the Lanham Act in an effort to demonstrate the PTO's power "to deny or cancel a mark's registration, and thus control what appears on the Principal Register." *Id.* at 20. But Judge Lee misunderstands the nature of the control granted by these subsections of § 2 and also the process used to apply them. These subsections articulate the criteria used by examining attorneys to determine whether an applicant's mark meets the legal definition of a trademark, and to ensure that it does not convey false and/or misleading (*i.e.*, confusing) information. To be sure, the process of federal trademark registration

8

entails a completely different kind and degree of editorial control from that exercised by the city in *Summam* and the state in *Walker*.

First, *the nature of the reasons for denial* of registration found in subsections (b), (c), (d), and (e) of § 2 are materially different from the nature of the reasons for denial found in subsection (a). Those subsections all provide means to deny marks that are false and/or misleading. Section 2(b) prohibits the use of government images such as flags or coats of arms, which would falsely mislead consumers to think that a government endorses the product. Section 2(c) prohibits the use of names, portraits, or signatures of individuals and deceased presidents, which likewise could falsely mislead consumers to think that those individuals endorse the products. Section 2(d) prohibits marks that are misleading, because they are likely to cause confusion and therefore could be deceptive. Section 2(e) prohibits marks that are merely descriptive or false in the sense that they are deceptively misdescriptive. A "merely descriptive" mark is a mark that lacks a secondary meaning. *See* J. THOMAS MCCARTHY, 1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:2 (4th Ed. 2015).  Without secondary meaning, a descriptive mark is unable to "identify" an applicant's goods, because, without the cognitive link of secondary meaning, descriptive terms simply convey to consumers the contents, qualities, or characteristics of goods. *See id.* at § 11:16. In addition, § 2(e) prohibits registration of marks that are functional, which serves to

prevent registration of a mark that is likely to conflict with the purposes of patent law. 15 U.S.C. § 1052(e) (prohibiting registration of marks that are "as a whole . . . functional"). Consequently, the nature of the "editorial control" of the PTO to which Judge Lee refers is not "editorial" in the same sense of park monument selection or license plate design selection. Subsections (b), (c), (d), and (e) grant the authority to deny registration on grounds that a mark is false and/or misleading – grounds that are categorically outside the scope of First Amendment protection. Subsection (a) is completely different.

Secondly, *the "editorial" process involved in applying the criteria* of these subsections of § 2 is entirely different from the process involved with monument and license plate design selection. It is the applicant – not the government – who selects the design of her mark. The PTO's examining attorney does not have control over the mark. At most an examining attorney carries on a dialogue with an applicant via office actions. But office action dialogue bears no meaningful similarity to the kind of input nor degree of input that a city government imposes when selecting and approving park statues and monuments; nor does it bear any meaningful similarity to the kind or degree of input that the State of Texas imposes when selecting and approving specialty license plates.

In concluding the portion of his opinion in *Walker*, explaining the three factors, Justice Breyer summarizes several of his main points:

And other features of the designs on Texas's specialty license plates indicate that the message conveyed by those designs is conveyed on behalf of the government. Texas, through its Board, selects each design featured on the State's specialty license plates. Texas presents these designs on government-mandated, government-controlled, and government-issued IDs that have traditionally been used as a medium for government speech. And it places the designs directly below the large letters identifying "TEXAS" as the issuer of the IDs. "The [designs] that are accepted, therefore, are meant to convey and have the effect of conveying a government message, and they thus constitute government speech.

*Walker*, *supra* at 2250 (quoting *Summam*, 555 U.S., at 472). Registered trademarks share none of these characteristics, evincing messages conveyed on behalf of the government. The PTO does not: 1) select trademark designs; 2) present trademarks as a form of government-mandated, government-controlled, or government-issued IDs, having even remotely, much less "traditionally," been used as a medium of government speech; 3) require placement of registered trademarks to be displayed graphically below large letters identifying government ownership, such as "USA Registered."[7] Therefore registered trademarks, unlike the Texas specialty plates, can neither be considered "accepted" nor "meant to convey and have the effect of conveying a government message."

## II.    Commercial Speech Analysis Shows That § 2(a) Violates The First Amendment

---

[7] The only government identifier is the relatively small symbol ®, which merely indicates that the mark has met the registration criteria established by the Lanham Act. It does not indicate government agreement or endorsement of the mark's message.

A.    *Trademarks As Commercial Speech and Central Hudson*

"Commercial speech may be understood as speech of any form that advertises a product or service for profit or for other business purpose." NOWAK & ROTUNDA, *supra* at § 16.26. In *Friedman v. Rogers*, 440 U.S. 1 (1979), the Supreme Court considered a Texas statute relating to trade names as a law about commercial speech. *See* Ann K. Wooster, *Protection of Commercial Speech Under the First Amendment – Supreme Court Cases*, 164 A.L.R. Fed. 1 § 20 (2000) (discussing *Friedman*); Jeffrey Lefstin, *Does the First Amendment Bar Cancellation of REDSKINS?*, 52 STAN. L. REV. 665, 673–676 (2000) (discussing *Friedman*). *See also* NOWAK & ROTUNDA, *supra* at § 16.31(c)(xviii). In fact, Justice Powell's opinion assumes trade names are a kind of commercial speech. The Lanham Act defines a trademark to include "any word, name, symbol, or device, or any combination thereof" that functions "to identify and distinguish" the goods or services of a mark's owner. 15 U.S.C. § 1127 (2012). The "distinguish" function requires that marks be sufficiently different from one another so that consumers can differentiate between goods and services of one trademark owner from the goods and services of others.[8] The "identification" function describes a psychological phenomenon of cognitive association. Consumers who perceive a mark mentally associate it with a specific product or service. *See*  MCCARTHY,

---

[8] This function is the reason why a mark is refused registration if it is likely to cause confusion with another's mark. *See* 15 U.S.C. § 1052(d) (2012).

*supra* at § 3:2 ("To identify one seller's goods and distinguish them from goods sold by others") (footnote omitted). These functions of trademarks and Justice Powell's interpretation in *Friedman* recommend that trademarks should be classified as a form of advertising and, therefore, as commercial speech.[9] *See* Kimberly A. Pace, *The Washington Redskins Case and the Doctrine of Disparagement: How Politically Correct Must a Trademark Be?*, 22 PEPP. L. REV. 7, 35 (1995) ("As commercial speech, a trademark is entitled to protection under the First Amendment.").

The First Amendment shields truthful advertising, but its protection is not as strong as in the case of political speech. *See* DANIEL A. FARBER, THE FIRST AMENDMENT 16 (4th Ed. 2014) ("Truthful advertising, however, clearly receives some constitutional protection, though not as much as political speech – some might call it 'less protected' speech."). *Central Hudson Gas and Electric Corp. v. Public Service Commission of New York*, established the First Amendment analysis that applies to commercial speech.

> In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern a lawful activity and not be

---

[9] If trademarks are held not to be "commercial speech," then the "may disparage" prohibition of § 2(a) will be subject to a strict scrutiny standard, more exacting than the *Central Hudson* test. In that case, since it is either a content-based or viewpoint-based restriction on speech, § 2(a) violates the First Amendment because it is both overbroad and vague.

misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than necessary to serve that interest.

*Central Hudson Gas & Elec. Corp. v. Public Service Comm'n*, 447 U.S. 557, 566 (1980). This *Central Hudson* test is now the standard for analyzing commercial speech and the First Amendment,[10] and thus, to appropriately assess the constitutionality of the "may disparage" prohibition of § 2(a), courts must use the *Central Hudson* test. *See* NOWAK & ROTUNDA, *supra* at § 16.31(b); *see also* Lefstin, *supra* at 682–690.

B.    *Lawful & Non-Misleading Activity*

Section 2 of the Lanham Act articulates reasons why an examining attorney may refuse registration. 15 U.S.C. § 1052(a)–(f) (2012). The majority of reasons articulated relate to a mark being either false or misleading. *Id.* For example, §§ 2(a) and 2(e) prohibit registration if a mark falsely claims that the goods that it represents are made from materials that they are not. *Id.* § 1052(a) (prohibiting "deceptive" marks); § 1052(e) (prohibiting "deceptively misdescriptive marks). Similarly § 2(e) prohibits registration of a mark that conveys a false impression regarding the geographical origin of the goods or services. *Id.* § 1052(e)

---

[10] *See e.g., 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 499–517 (1996) (Applying the *Central Hudson* test in a case involving advertising of prices for alcoholic beverages).

(prohibiting "primarily geographically deceptively misdescriptive" marks); *see also* MCCARTHY, *supra* at §§ 14:1-14:45. Section 2(d) prohibits registration if a mark is confusingly similar to another's mark – in other words if it is misleading. 15 U.S.C. § 1052(d) (2012) (prohibiting marks "likely . . . to cause confusion, or to cause mistake, or to deceive"). That the majority of reasons for refusal to register in § 2 have the effect of preventing registration of false and/or misleading advertising is important, because the *Central Hudson* test expressly supports the suppression of false and misleading advertising. *See* NOWAK & ROTUNDA, *supra* at § 16.31(b) ("First a court must determine whether the speech is truthful, nonmisleading speech concerning a lawful commercial activity."). A mark that "may disparage," however, is not necessarily either false or misleading. The trademark, Redskins, for example, is neither misleading nor related to illegal activities. *See* Pace, *supra* at 39 ("[I]mmoral, scandalous or disparaging marks are neither misleading nor fraudulent, and, therefore, the restraints on these marks do not fall outside the scope of First Amendment inquiries.") (footnotes omitted).

### C.    *Substantial Government Interest*

Presumably the government's interest in prohibiting registration of marks that disparage persons, institutions or beliefs is important but whether it can be classified "substantial" is a different question. *See Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 186–187 (1999)

(reasoning that the government's desire to decrease the social problems associated with gambling was a substantial interest);  NOWAK & ROTUNDA, *supra* § 16.31(b) (stating that the *Central Hudson* Court considered the state's interest in energy conservation to be "substantial."); Wooster, *supra* at § 20. Preventing some kinds of disparagement may be categorized as "substantial." For example, the desire to curb disparagement related to gender, race, or sexual orientation might be "substantial." Nevertheless, the "may disparage" prohibition of § 2(a) is not specific to any particular type of invective; it casts a wide net. Without greater specificity, the government's interest in prohibiting registration of marks that "may disparage" cannot be considered "substantial."

   D. *Direct Advancement, Narrowly Tailored*

   Since trademarks are commercial speech, technically the overbreadth and vagueness doctrines (essential to traditional First Amendment analysis) do not apply. *See generally* NOWAK & ROTUNDA, *supra* at §§ 16.8–16.9.  But *Central Hudson*'s "narrowly tailored" requirement is very similar. *Id.* at § 16.8(e) ("[I]t is not entirely clear to what extent the overbreadth doctrine applies to so-called commercial speech . . . . [I]f speech is deemed to be commercial speech, then the overbreadth analysis is probably inapplicable . . . . Although the Court will not employ overbreadth analysis to invalidate a regulation of commercial speech that is designed to stop false or misleading commercial practices, the Court will require

the government to regulate commercial speech in a manner that is 'not more extensive than necessary' to serve a substantial government interest.") (footnotes omitted). Both the words "may" and "disparage," render the "may disparage" language overly broad and vague, and therefore not narrowly tailored to directly achieve any government goal.

The word "may" opens the door widely to include literally *any* probability whatsoever. The word "may" is a lower threshold than "is likely" or "probable" or "foreseeable." The Supreme Court has on a few occasions construed the word "may" in statutes. Unfortunately, the cases do not solve the riddle.[11] But the Supreme Court precedents illustrate the malleable nature of the word "may." It

---

[11] For example, the Court recently stated that, "[t]he word 'may' customarily connotes discretion" and that "that connotation is particularly apt where…'may' is used in contraposition to the word 'shall' . . . ." *Jama v. Immigration And Customs Enforcement*, 125 U.S. 694, 703 (2005); *see also United States v. Rodgers,* 461 U.S. 677, 706 (1983) ("[t]he word 'may,' when used in a statute, usually implies some degree of discretion" but "legislative intent to the contrary or . . . obvious inferences from the structure and purpose of the statute could necessitate a different conclusion."); *Anderson v. Yungkau*, 329 U.S. 482, 484 (1947) (construing "may" as "permissive"); *Levers v. Anderson*, 326 U.S. 219, 223 (1945) ("may" does not mean "must" nor does it imply that something is mandatory); *Moore v. Illinois Central R. Co*., 312 U.S. 630, 635 (1941) (interpreting "may" to indicate nothing stronger than mere possibility); *Farmers' & Merchants' Bank of Monroe, N.C. v. Federal Reserve Bank of Richmond, VA*, 262 U.S. 649, 656 (1923) ("[I]n statutes the word 'may' is sometimes construed as 'shall.' But that is where the context, or the subject-matter, compels such construction.") (citation and footnote omitted); *Unites States v. Thoman,* 156 U.S. 353, 359 (1895) (explaining that the meaning of the word "may" "depends on the context of the statute and on whether it is fairly to be presumed that it was the intent of the legislature to confer discretionary power or to impose an imperative duty" ) (citations omitted).

spans a continuum from mere possibility, to probability, to mandate – depending on the circumstances.

The Lanham Act, itself, does not define the term "disparage." In the legislative hearings regarding the bill, the Assistant Commissioner of Patents, Leslie Frazer acknowledged that the word "disparage" was likely "to cause a great deal of difficulty in the Patent Office, because…it is always going to be just a matter of personal opinion of the individual parties as to whether they think it [*i.e.,* an applicant's mark] is disparaging." *Hearings on 4744 Before the Subcomm. on Trademarks of the House Comm. on Patents,* 76th Cong. 18, 18 (1939) (statement of Leslie Frazer).

Indeed, during the 1930s when the "may disparage" language was added to the bill, the Oxford English Dictionary provided several definitions of "disparage." OXFORD ENGLISH DICTIONARY 476 (1961) ("To match unequally; to degrade or dishonour by marrying to one of inferior rank;" "To bring discredit or reproach upon; to dishonour, discredit; to lower in credit or esteem;" "To lower in position or dignity; to degrade;" To lower in one's own estimation; to cast down;" "To speak of or treat slightingly; to treat as something lower than it is; to undervalue; to vilify"). The 1937 *Funk & Wagnalls New Standard Dictionary of the English Language* defines "disparage," in part, as follows:

> 1. To regard or speak slightingly. *** 2. To affect or injure by unjust comparison, as with that which is unworthy, inferior, or of less value

or importance; as, I do not say this to *disparage* your country. 3.
[Rare] To degrade in estimation by detractive language or by
dishonoring treatment; lower; dishonor; as, such conduct *disparages*
religion. 4. To degrade by marrying below one's station.

FUNK & WAGNALLS NEW STANDARD DICTIONARY OF THE ENGLISH LANGUAGE 728

(1937) (emphasis in original) (illustration after definition number one omitted).

These definitions range from very slight or minor negativity – "discredit," "lower

in position," "speak slightingly," "affect…by unjust comparison," – to rather harsh

– "vilify." As such, § 2(a)'s "may disparage" prohibition has the potential to

prevent registration of marks that have a wide range of interpretations, even marks

that possess a faint possibility of discrediting persons, institutions or beliefs.

One thing that is apparent in the legislative history is that none of the

concerns discussed during the hearings related to scenarios like those present in

this case (*i.e.,* a scenario involving the disparagement of groups of persons). *See*

Amanda E. Compton, *N.I.G.G.A., Slumdog, Dyke, Jap, and Heeb: Reconsidering*

*Disparaging Trademarks in a Post-Racial Era*, 15 WAKE FOREST J. BUS. & INTELL.

PROP. L. 1, 13–15 (2014). Rather, the scenarios discussed concerned the potential

disparagement of former Presidents (*e.g.,* Benjamin Harrison, George Washington

and Abraham Lincoln). *Hearings on 4744 Before the Subcomm. on Trademarks of*

*the House Comm. on Patents*, 76th Cong., 18, 18 (1939). In this regard, the drafters

seem to have been worried about cases like *Greyhound v. Both Worlds, Inc.*, 6

U.S.P.Q.2d (BNA) 1635 (TTAB 1988), where one mark might disparage another's mark.

The highly subjective nature of the word "disparage" serves as additional proof of just how vague § 2(a) really is. And the greater the degree of vagueness, the less it appears to be "narrowly tailored" in a manner that comports with *Central Hudson*. In order to be "narrowly tailored," the language would need greater precision.

Because the Supreme Court has acknowledged that "may" implies varying degrees of discretion and has recognized that it has many shades of meaning (depending on context and circumstances), and because of the vagueness of the word "disparage," the "may disparage" prohibition of § 2(a) cannot meet the *Central Hudson* requirement of directly advancing the government's interest in a manner not more extensive than necessary.

In sum, it the "may disparage" prohibition of § 2(a) cannot pass the *Central Hudson* test. The Redskins is a trademark which is legitimate, and neither misleading nor related to illegal activities. Secondly, although the government's interest may be *important*, it is not "substantial." In addition § 2(a) fails to directly advance a governmental interest, and the phrase "may disparage" is too broad and vague to be considered "narrowly tailored."

## CONCLUSION

The "may disparage" prohibition of § 2(a) conflicts with the First Amendment for at least two reasons. First, a careful reading of *Walker* demonstrates that federal trademark registration is not government speech, and thus is not exempt from First Amendment scrutiny. Second, as a kind of commercial speech, § 2(a) fails the *Central Hudson* test.

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _____        Caption: _____

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ ]     this brief contains _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ]     this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ ]     this brief has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

[ ]     this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s)_____

Attorney for_____

Dated:_____

# CERTIFICATE OF SERVICE

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:


_____          _____
        Signature                                      Date