No. 15-1874

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

PRO-FOOTBALL, INC.,

*Appellant*,

v.

AMANDA BLACKHORSE, *et al*.,

*Appellees*.
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA IN 1:14-CV-01043-GBL-IDD
_____

JOINT BRIEF OF CATO INSTITUTE AND THE RUTHERFORD INSTITUTE
AS *AMICI CURIAE* IN SUPPORT OF APPELLANT
_____

Ilya Shapiro
CATO INSTITUTE
1000 Mass. Ave. NW
Washington, DC 20001
(202) 842-2000
ishapiro@cato.org

John W. Whitehead
Douglas R. McKusick
THE RUTHERFORD
INSTITUTE
1440 Sachem Place
Charlottesville, VA 22901
(434) 987-3888

Megan L. Brown
    *Counsel of Record*
Joshua S. Turner
Christopher J. Kelly
Jennifer L. Elgin
Dwayne D. Sam
WILEY REIN LLP
1776 K Street NW
Washington, DC 20006
(202) 719-7000
mbrown@wileyrein.com

*Counsel for Amici Curiae*

November 6, 2015

## CORPORATE DISCLOSURE STATEMENT
## OF THE CATO INSTITUTE

Pursuant to Fed. R. App. P. 26.1 and Local Rule 26.1, amicus curiae the Cato Institute makes the following disclosure:

1. Is party/amicus a publicly held corporation or other publicly held entity?

   [ ] YES       [X] NO

2. Does party/amicus have any parent corporations? If yes, identify all parent corporations, including grandparent and great-grandparent corporations.

   [ ] YES       [X] NO

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? If yes, identify all such owners.

   [ ] YES       [X] NO

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?

   [ ] YES       [X] NO

5.     Is party a trade association? (amici curiae do not complete this question). If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

[ ] YES     [ ] NO

6.     Does this case arise out of a bankruptcy proceeding?

[ ] YES     [X] NO

Respectfully submitted,

Ilya Shapiro
**CATO INSTITUTE**
1000 Mass. Ave. NW
Washington, DC 20001
(202) 842-2000
ishapiro@cato.org

John W. Whitehead
Douglas R. McKusick
**THE RUTHERFORD INSTITUTE**
1440 Sachem Place
Charlottesville, VA 22901
(434) 987-3888

Megan L. Brown
*Counsel of Record*
Joshua S. Turner
Christopher J. Kelly
Jennifer L. Elgin
Dwayne D. Sam
**WILEY REIN LLP**
1776 K Street NW
Washington, DC 20006
(202) 719-7000
mbrown@wileyrein.com
*Counsel for Amici Curiae*

November 6, 2015

## <u>CORPORATE DISCLOSURE STATEMENT</u>
### <u>OF THE RUTHERFORD INSTITUTE</u>

Pursuant to Fed. R. App. P. 26.1 and Local Rule 26.1, amicus curiae the Rutherford Institute makes the following disclosure:

1.   Is party/amicus a publicly held corporation or other publicly held entity?

     [ ] YES      [X] NO

2.   Does party/amicus have any parent corporations?  If yes, identify all parent corporations, including grandparent and great-grandparent corporations.

     [ ] YES      [X] NO

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  If yes, identify all such owners.

     [ ] YES      [X] NO

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?

     [ ] YES      [X] NO

5.     Is party a trade association? (amici curiae do not complete this question).  If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

[ ] YES        [ ] NO

6.     Does this case arise out of a bankruptcy proceeding?

[ ] YES        [X] NO

Respectfully submitted,

Ilya Shapiro
**CATO INSTITUTE**
1000 Mass. Ave. NW
Washington, DC 20001
(202) 842-2000
ishapiro@cato.org

John W. Whitehead
Douglas R. McKusick
**THE RUTHERFORD
INSTITUTE**
1440 Sachem Place
Charlottesville,VA  22901
(434) 987-3888

Megan L. Brown
        *Counsel of Record*
Joshua S. Turner
Christopher J. Kelly
Jennifer L. Elgin
Dwayne D. Sam
**WILEY REIN LLP**
1776 K Street NW
Washington, DC 20006
(202) 719-7000
mbrown@wileyrein.com
*Counsel for Amici Curiae*

November 6, 2015

- iv -

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................................i

INTEREST OF AMICI CURIAE ........................................................1

STATEMENT OF THE CASE ..........................................................2

SUMMARY OF THE ARGUMENT .....................................................3

I.   THE FIRST AMENDMENT APPLIES TO THE FEDERAL TRADEMARK REGISTRATION REGIME ...............................................8

     A.   Trademarks Are Speech. ...................................................8

     B.   Trademark Registration Confers Substantial Benefits That Cannot Be Denied Based On Ideas or Views....................................................11

     C.   Trademark Registration Is Not "Government Speech" and Cannot Be Exempted from the First Amendment ...............................................12

II.   THE FIRST AMENDMENT DOOMS THE LANHAM ACT'S DISPARAGEMENT BAR..........................................................17

     A.   Disparagement Review Is Incompatible with the First Amendment, as Shown by Inconsistent Treatment of Marks Like THE YIDZ, SQUAW, SAMBO'S, and FAGDOG ...............................................17

     B.   The Disparagement Bar Enshrines the Heckler's Veto and Strikes at the Core of What the First Amendment Protects. ...............................21

     C.   The Disparagement Bar Is Doomed Under Strict Scrutiny. ...............24

     D.   The Disparagement Bar Even Fails Intermediate Scrutiny. ...............26

CONCLUSION..........................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*44 Liquormart, Inc. v. Rhode Island,*
  517 U.S. 484 (1996) ........................................................................ 8, 26

*Agency for International Development v. Alliance for Open Society
  International, Inc.,*
  133 S. Ct. 2321 (2013) .......................................................... 2, 7, 11

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004) ...................................................................... 25

*Bartnicki v. Vopper,*
  532 U.S. 514 (2001) ...................................................................... 25

*Bishop v. Tyson Foods, Inc.,*
  660 F. Supp. 2d 1004 (W.D. Ark. 2009),
  *aff'd*, 373 F. App'x 649 (8th Cir. 2010) ........................................ 10

*Board of Education v. Mergens,*
  496 U.S. 226 (1990) ...................................................................... 15

*Bongrain Int'l (American) Corp. v. Delice de France, Inc.,*
  811 F.2d 1479 (Fed. Cir. 1987) ..................................................... 17

*Boos v Barry,*
  485 U.S. 312 (1988) ...................................................................... 23

*Brandenburg v. Ohio,*
  395 U.S. 444 (1969) ...................................................................... 23

*Brown v. Entertainment Merchants,*
  131 S. Ct. 2729 (2011) .................................................................. 24

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New
  York,*
  447 U.S. 557 (1980) .......................................................... 8, 26, 27 28

*City of Cincinnati v. Discovery Network, Inc.*,
507 U.S. 410 (1993) ................................................................8

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994) ................................................................30

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
472 U.S. 749 (1985) ............................................................23

*Edenfield v. Fane*,
507 U.S. 761 (1993) ............................................................29

*Edwards v. District of Columbia*,
755 F.3d 996 (D.C. Cir. 2014) ...........................................29

*Forsyth County, Georgia v. Antionalist Movement*,
505 U.S. 123 (1992) ............................................................23

*In re Geller*,
751 F.3d 1355 (Fed. Cir. 2014),
*cert. denied*, 135 S. Ct. 944 (2015) .................................21

*Glickman v. Wileman Brothers & Elliott, Inc.*,
521 U.S. 457 (1997) ............................................................30

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ............................................................30

*Greater New Orleans Broadcasting Association, Inc. v. United States*,
527 U.S. 173 (1999) ..............................................................8

*In re Gyulay*,
820 F.2d 1216, 3 U.S.P.Q.2d 1009 (Fed. Cir. 1987) .........19

*In re Heeb Media, LLC*,
89 U.S.P.Q.2d 1071 (T.T.A.B. 2008) .................................18

*International Society for Krishna Consciousness, Inc. v. Lee*,
505 U.S. 672 (1992) ..............................................................4

*In re Lebanese Arak Corp.*,
    94 U.S.P.Q.2d 1215, No. 77072261, 2010 WL 766488 (T.T.A.B. Mar. 4, 2010).................................................................................................18

*Lederman v. United States*,
    291 F.3d 36 (D.C. Cir. 2002) ...........................................................28

*In re McGinley*,
    660 F.2d 481 (C.C.P.A. 1981)......................................................6, 28

*Members of City Council v. Taxpayers for Vincent*,
    466 U.S. 789 (1984)..........................................................................25

*Miller v. California*,
    413 U.S. 15 (1973)............................................................................23

*Near v. Minnesota ex rel. Olson*,
    283 U.S. 697 (1931)..........................................................................23

*In re Old Glory Condom Corp*,
    26 U.S.P.Q.2d 1216 (T.T.A.B. 1993) .........................................7, 16

*Pacific Gas & Electric Co. v. Public Utilities Commission*,
    475 U.S. 1 (1986)................................................................................8

*Perry v. Sindermann*,
    408 U.S. 593 (1972)........................................................................5, 11

*Pleasant Grove City, Utah v. Summum*,
    555 U. S. 460 (2009) ..............................................................6, 13, 16

*Pro-Football, Inc. v. Blackhorse*, No. 1:14-cv-01043-GBL-IDD, 2015 WL
    4096277 (E.D. Va. July 8, 2015)...............................................*passim*

*Reed v. Town of Gilbert*,
    135 S. Ct. 2218 (2015) ...................................................................7, 26

*Reno v. ALLU*,
    521 U.S. 844 (1997)..........................................................................21

*Riley v. National Federation of Blindof North Carolina, Inc.*,
   487 U.S. 781 (1988) ....................................................................8

*Rumsfeld v. Forum For Academic & Institutional Rights, Inc.*,
   547 U.S. 47 (2006) ....................................................................11

*Sambo's of Ohio, Inc. v. City Council of Toledo*,
   466 F. Supp. 177 (N.D. Ohio 1979) ...........................................20

*Sambo's Restaurants, Inc. v. City of Ann Arbor*,
   663 F.2d 686 (6th Cir. 1981) .....................................................20

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Board*,
   502 U.S. 105 (1991) ..............................................................24, 28

*In re Simon Shiao Tam*,
   600 F. App'x 775 (Fed. Cir. 2015) ...............................................6

*Snyder v. Phelps*,
   562 U.S. 443 (2011) .....................................................2, 7, 22, 24

*Sorrell v. IMS Health Inc.*,
   131 S. Ct. 2653 (2011) ......................................................*passim*

*In re Squaw Valley Development Co.*,
   80 U.S.P.Q.2d 1264 (T.T.A.B. 2006) ......................................18, 19

*Street v. New York*,
   394 U.S. 576 (1969) ..................................................................22

*In re Tam*,
   785 F.3d 567 (Fed. Cir. 2015) .................................................27, 28

*Texas v. Johnson*,
   491 U.S. 397 (1989) ..................................................................22

*Thomas v. Collins*,
   323 U.S. 516 (1945) ..................................................................25

*Tinker v. Des Moines Independent Community School District*,
   393 U.S. 503 (1969) ....................................................................5

- ix -

*Turner Broadcasting System, Inc. v. FCC*,
    512 U.S. 622 (1994) ..................................................................... 25

*United States v. Playboy Entertainment Group, Inc.*,
    529 U.S. 803 (2000) ....................................................................... 4

*United States v. Stevens*,
    559 U.S. 460 (2010) ..................................................................... 23

*Virginia v. Hicks*,
    539 U.S. 113 (2003) ..................................................................... 29

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
    135 S. Ct. 2239 (2015) ........................................................... *passim*

*Washington State Grange v. Washington State Republican Party*,
    552 U.S. 442 (2008) ..................................................................... 29

*Whitney v. California*,
    274 U.S. 357 (1927) ..................................................................... 23

*Wooley v. Maynard*,
    430 U.S. 705 (1977) ..................................................................... 14

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*,
    471 U.S. 626 (1985) ....................................................................... 8

**FEDERAL STATUTES**

15 U.S.C. § 1052(a) ......................................................................... 4

15 U.S.C. § 1057(b) ....................................................................... 12

15 U.S.C. § 1057(c) ....................................................................... 11

15 U.S.C. § 1065 ............................................................................. 12

15 U.S.C. § 1072 ............................................................................. 12

15 U.S.C. § 1115(a) ....................................................................... 12

15 U.S.C. § 1115(b) ...........................................................................................12

15 U.S.C. § 1117 ...............................................................................................12

15 U.S.C. § 1121 ...............................................................................................12

15 U.S.C. § 1124 ...............................................................................................12

15 U.S.C. § 1127 .................................................................................................8

15 U.S.C. § 1141 ...............................................................................................11

**RULES**

Federal Circuit Rule 29(c)(5)(A) ........................................................................2

**OTHER AUTHORITIES**

*ABOUT US*, Catholics for Choice,
http://www.catholicsforchoice.org/about/default.asp (last visited Nov. 4, 2015) ...10

http://www.changethemascot.org/ ........................................................................9

T. Vargas, *President Obama says, 'I'd think about changing' name of Washington
Redskins*, Washington Post (Oct, 5 2013),
https://www.washingtonpost.com/local/president-obama-says-id-think-about-
changing-name-of-washington-redskins/2013/10/05/e170b914-2b70-11e3-8ade-
a1f23cda135e_story.html ......................................................................................9

**TRADEMARK REGISTRATIONS AND APPLICATIONS**

ACLU, Registration No. 1,876,597 ......................................................................9

AMERICAN CIVIL LIBERTIES UNION, Registration No. 1,902,649 ................9

CATHOLICS FOR CHOICE, Registration No. 2,796,790 ................................3, 10

COCAINE, Registration No. 1,340,874 ..............................................................16

DYKEDOLLS, Registration No. 3,254,737 ........................................................19

DYKE NIGHT, Registration No. 4,146,588 ........................................................19

DYKES ON BIKES, Registration No. 3,323,803 .................................................. 19

FAGDOG, Registration No. 2,828,396 ............................................................. 20

FAGDOG, Registration No. 3,174,475 ............................................................. 20

FAGDOG, Registration No. 2,926,775 ............................................................. 20

GANJA UNIVERSITY, Registration No. 4,070,160 ......................................... 16

HONKEY KONG, Registration No. 4,388,702 ..................................................... 3

LEGALIZE ACID, Registration No. 4,395,633 .................................................... 3

NAACP, Registration No. 1,188,182 .................................................................. 10

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF HISPANIC PEOPLE, Registration No. 2,523,711 .................................................................. 9

PARENTS AND KIDS AGREE-IT'S SAMBO'S FOR DINNER, Registration No. 1,107,590 ............................................................................... 20

PHAG, Registration No. 4,135,694 .................................................................. 20

QUEER PAL FOR THE STRAIGHT GAL, Registration. No. 4,699,581 ............. 19

QUEER FOLK, Registration No. 4,742,269 ...................................................... 19

REDSKINETTES, Registration No. 1,606,810 ..................................................... 3

REDSKINS, Registration No. 0836122 ............................................................... 3

REDSKINS, Registration No. 0987127 ............................................................... 3

REDSKINS, Registration No. 1,085,092 ............................................................. 3

SAMBO'S Regitration No. 0860232 .................................................................. 20

SAMBO'S Registration No. 0927492 ................................................................ 20

SAMBO'S, Registration No. 1,061,886 ............................................................. 20

SAMBO'S & Design, Registration No. 1,102,379 .............................................. 20

SAMBO'S GOOD TURN PROGRAM, Registration No. 1,118,937 ....................20

SAMBO'S FAMILY TABLE, Registration No. 1,133,357..................................20

SAMBO'S & Design, Registration No. 1,247,362 .................................................20

TEA PARTY PATRIOTS, Registration No. 4,296,739.........................................3

THAT'S SO GAY, Registration No. 4,555,924 .....................................................3

THINK ISLAM, U.S. Reg. No. 4,719,002 ............................................................16

WASHINGTON REDSKINS, Registration No. 0978824 ......................................3

WASHINGTON REDSKINS, Registration No. 0986668 ......................................3

FAGDOG, U.S. Trademark Application Serial No. 76/454,927 (filed Sept. 25, 2002)....................................................................................................................20

FAGDOG, U.S. Trademark Application Serial No. 75/950,535 (filed Mar. 1, 2000)........................................................................................................................20

FAGOUT!,.U.S. Trademark Application Serial No. 86/107,041 (filed Oct. 2013).......................................................................................................................20

FAG FOREVER A GENIUS!, U.S. Trademark Application Serial No. 86/089,512 (filed Oct. 11, 2013) .....................................................................20

SAMBO'S, U.S. Trademark Application Serial No. 77/915,048 (filed Jan. 19, 2010)........................................................................................................................20

THE YIDZ, U.S. Trademark Application Serial No. 77/784,282 (filed July 18, 2009)........................................................................................................................21

## INTEREST OF AMICI CURIAE

Pursuant to Federal Circuit Rule 29(a), Cato Institute and the Rutherford Institute respectfully submit this brief in support of the Appellant.[1]

The Cato Institute was established in 1977 as a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Center for Constitutional Studies was established in 1989 to help restore the principles of limited constitutional government that are the foundation of liberty. Toward those ends, the Cato Institute promotes respect for fundamental liberties, including through books, studies, conferences, and amicus briefs with courts across the country.

The Rutherford Institute is an international civil liberties organization headquartered in Charlottesville, Virginia. Founded in 1982 by its President, John W. Whitehead, the Institute specializes in providing legal representation without charge to individuals whose civil liberties are threatened and in educating the public about constitutional and human rights issues. Attorneys affiliated with the Institute have represented parties and filed numerous amicus curiae briefs in the

---

[1]    All parties have consented to the filing of this brief under Rule 29(a) of the Federal Rules of Appellate Procedure. Pursuant to Federal Rule of Appellate Procedure 29(c)(5)(A), *amici* affirm that no counsel for any party authored this brief in whole or in part, and that no person other than *amici*, their members, or their counsel made a monetary contribution to its preparation or submission.

- 1 -

federal Courts of Appeals and Supreme Court. The Rutherford Institute works to preserve the most basic freedoms of our Republic, including the limits placed on government power by the First Amendment. The Rutherford Institute opposes governmental action to restrain or censor speech for the purpose of protecting the subjective sensibilities of part of the audience.

Amici have helped develop key First Amendment principles limiting government power. *See, e.g.*, *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321 (2013); *Sorrell v. IMS Health Inc.* 131 S. Ct. 2653 (2011); *Snyder v. Phelps*, 562 U.S. 443 (2011). This dispute involves the government's power to judge and burden speech based on viewpoint and content. This Court should clarify that the First Amendment applies to trademark registration, and correct the District Court's unwarranted extension of the "government speech" doctrine, ensuring that the First Amendment remains a restraint on government.

## STATEMENT OF THE CASE

Amici adopt by reference the statement included in the Appellant's Brief.

- 2 -

## SUMMARY OF THE ARGUMENT

In sustaining the cancellation of the Redskins trademarks[2], the district court blessed blatant content and viewpoint discrimination by the government and enforced the long-derided "heckler's veto."  Its approach confers sweeping power on the government to police private ideas and is incompatible with the First Amendment.

Trademarks are protected speech.  A trademarked name, word, phrase, logo, or design can do far more than inform and persuade customers.  Such names, phrases, and mottos define religious or ethnic identities, express political opinions, convey artistic ideas, spark controversies or amuse.  As described below, registered trademarks cover the waterfront of expression: from TEA PARTY PATRIOTS[3] political organization and CATHOLICS FOR CHOICE[4] advocacy group, to THAT'S SO GAY[5] news sites, LEGALIZE ACID[6] accessories, and HONKEY KONG[7] band shirts.  These examples belie the government's argument that trademarks have "limited expressive content" and are not intended to "editorialize"

---

[2]     Registration Nos. 0836122, 0978824, 0986668, 0987127, 1,085,092, and 1,606,810 (collectively, "Redskins" marks).

[3]     Registration No. 4,296,739.

[4]     Registration No. 2,796,790; *see infra* at 10.

[5]     Registration No. 4,555,924.

[6]     Registration No. 4,395,633.

[7]     Registration No. 4,388,702.

on culture, politics or philosophy.  United States' Mot. for Summ. J. at 24, 1, (E.D.Va. Mar. 23, 2015) (Dkt. No. 109) ("USMSJ").

The Lanham Act provides that the Patent and Trademark Office (PTO) may refuse to register a trademark that "[c]onsists of . . . matter which may disparage . . . persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute."  15 U.S.C. § 1052(a). The PTO may also cancel registrations when a party claims offense and asks the PTO to find that a mark was disparaging at the time of registration.  Of late, this "disparagement" clause has been turned into a weapon against disfavored ideas.

"The First Amendment is a limitation on government . . . . Its design is to prevent the government from controlling speech."  *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 695 (1992) (Kennedy, J., concurring in judgment).  The Constitution protects unpopular speech from the sensitivities of government, especially when it purports to protect society from "offense."  "Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails."  *United States v. Playboy Entm't. Grp., Inc.*, 529 U.S. 803, 813 (2000).  The First Amendment requires the government to "show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that

- 4 -

always accompany an unpopular viewpoint." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969).

Appellant Pro-Football, Inc. (PFI), owner of the Redskins marks, had registration of its decades-old marks cancelled by the Trademark Trial and Appeal Board (TTAB or the Board). Why? Not because the marks were inaccurate or misleading or violated someone's intellectual property interests. The government cancelled PFI's beneficial trademark status routinely afforded others solely because the government considers Redskins, as used by PFI, to be "disparaging" to a subset of Native Americans.

PFI challenged the TTAB decision, and the district court affirmed the cancellation. *Amici* focus on the court's First Amendment analysis, which suffers from two independent and fatal flaws.

*First*, the district court concluded that "Section 2(a) of the Lanham Act does not implicate the First Amendment" at all because applicants remain free to use the Redskins marks, absent registration. *Pro-Football, Inc. v. Blackhorse*, No. 1:14-cv-01043-GBL-IDD, 2015 WL 4096277, at *8 (E.D. Va. July 8, 2015). This misunderstands the rights at issue. The First Amendment prohibits the government from burdening private expression, directly or by denying access to a benefit based on speech's disfavored content. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

- 5 -

The district court relied on *In re McGinley*, 660 F.2d 481, 484 (C.C.P.A. 1981), a thirty-five year old case holding that the Lanham Act does not implicate the Free Speech Clause because denial of registration does not bar applicants otherwise from using a mark. That case contravenes core First Amendment principles and is being revisited, as the Federal Circuit *sua sponte* decided to reconsider *en banc* the Lanham Act's constitutionality. *In re Simon Shiao Tam*, Case No. 2014-1203, (Fed. Cir. Apr. 27, 2015) (Dkt. No. 54).

*Second*, the district court concluded that "the federal trademark registration program is government speech and is therefore exempt from First Amendment scrutiny." *Pro-Football*, 2015 WL 4096277, at *8. This too is a paradigm error. The district court misapplied and improperly expanded the nascent "government speech" doctrine from *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2241–42 (2015) (citing *Pleasant Grove City v. Summum*, 555 U. S. 460 (2009)), to find that trademark registration is free from First Amendment restraints. This was a mistake. Whatever the ultimate contours of "government speech" as denoted by the new doctrine, trademark registration falls far outside it. Unlike the license plate regime in *Walker*, trademarks are not used by the government "to urge action, to promote tourism, and to tout local industries," and are not "closely identified in the public mind with the [State]." *Id.* at 2248

- 6 -

(citations omitted).   And as the government agrees, "'issuance of a trademark registration' does not 'amount to the awarding of the U.S. Government's imprimatur.'"   USMSJ at 21(quoting *In re Old Glory Condom Co.*, 26 U.S.P.Q.2d 1216, 1219 n.3 (T.T.A.B. 1993)).

Indeed, the district court's decision runs counter to recent Supreme Court jurisprudence emphatically restating the importance of the First Amendment as a check on government power.   *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015) (burdening "speech because of the topic discussed or the idea or message expressed" is subject to "strict scrutiny"); *Agency for Int'l Dev.*, 133 S. Ct. at 2332 (2013) (viewpoint-based spending condition received First Amendment scrutiny); *Snyder*, 562 U.S. at 458 (vile speech was protected from sanction because "speech cannot be restricted simply because it is upsetting"); *Sorrell*, 131 S. Ct. at 2667 (content-based burdens on commercial expression receive heightened scrutiny).

Trademark law is being used to bully those holding disfavored views.   But the Lanham Act is subject to First Amendment scrutiny.   Properly analyzed, its content- and viewpoint-based disparagement bar cannot survive.   This Court should get the PTO out of the business of policing political and social offense.

- 7 -

## ARGUMENT

## I. THE FIRST AMENDMENT APPLIES TO THE FEDERAL TRADEMARK REGISTRATION REGIME

### A. Trademarks Are Speech.

Trademarks are any combination of expression—words, symbols, colors or package designs—used to identify and distinguish a good or service produced by one source from the goods or services of other sources. *See* 15 U.S.C. § 1127. While there can be debate over what level of protection applies, trademarks qualify as "speech" protected by the First Amendment.[8]

This case shows how trademarks can serve more than mere commercial transaction purposes. In 1933, the then-owner of the "Washington Redskins"

---

[8]    The line between commercial and political speech is difficult to draw, *see, e.g.*, *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 10–11 (1986), but "core" commercial speech is characterized by a "proposal of a commercial transaction." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422–23 (1993); *see also Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184 (1999); *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 637 (1985). And where fully protected speech mixes with commercial speech, higher scrutiny should apply, *see 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996), and where "the component parts of a single speech are inextricably intertwined . . . we apply our test for fully protected expression." *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988). Thus, if a trademark simply identifies goods or services for a commercial transaction, it might be appropriate to follow the standard of review established in *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980). Here, the expressive use of trademarks makes them subject to strict scrutiny. But at a bare minimum, intermediate scrutiny applies.

National Football League franchise, selected the name while the team was located in Boston Massachusetts and known as the "Braves." *Pro-Football*, 2015 WL 4096277, at *2. The Redskins name was "chosen to distinguish the football team from the Boston Braves professional baseball team." *Id.* For the past 80 years, the mark has differentiated it from other sports teams in the marketplace and has arguably helped make a statement about the team's heritage.[9] In recent years, the name has become somewhat controversial, and continued use of the Redskins marks is a statement in itself.[10]

Trademarks are used for more than mere commercial transaction purposes. Trademarks have been used to establish gay, Jewish, Muslim, African-American, political, and other identities. Marks routinely serve to establish and convey group identity. For example, AMERICAN CIVIL LIBERTIES UNION,[11] ACLU,[12] NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF HISPANIC

---

[9] "At the time the name 'Redskins' was chosen for the team, four players— Louis Weller, John Orien Crow, David Ward and Larry Johnson—and the team's head coach William "Lone Star" Dietz identified themselves as Native Americans." *Pro-Football*, 2015 WL 4096277, at *2 n.1.

[10] *See generally* http://www.changethemascot.org/; T. Vargas, *President Obama says, 'I'd think about changing' name of Washington Redskins*, Washington Post (Oct, 5, 2013) https://www.washingtonpost.com/local/president-obama-says-id-think-about-changing-name-of-washington-redskins/2013/10/05/e170b914-2b70-11e3-8ade-a1f23cda135e_story.html

[11] Registration No. 1,902,649.

[12] Registration No. 1,876,597.

- 9 -

PEOPLE,[13] and NAACP[14] are registered trademarks that convey a message about the groups' values and identity. Some might take offense, *see, e.g.*, *Bishop v. Tyson Foods, Inc.*, 660 F. Supp. 2d 1004, 1010 (W.D. Ark. 2009) (person considered t-shirt emblazoned with the NAACP as "offensive clothing"), *aff'd*, 373 F. App'x 649 (8th Cir. 2010), but that does not justify refusing or canceling registration.

Political groups trademark logos and slogans. Religious groups—devout and dissenting, orthodox and reformist—also register trademarks. Consider Catholics for Choice, a pro-choice, dissenting Catholic organization whose mission is "to serve as a voice for Catholics who believe that the Catholic tradition supports a woman's moral and legal right to follow her conscience in matters of sexuality and reproductive health."[15] Some Catholics take grave offense at that affiliation with the Church and characterization of its beliefs. Could the PTO—free from First Amendment scrutiny—deny registration to Catholics for Choice on the basis that it might "disparage or falsely suggest a connection with" Catholicism or bring

---

[13] Registration No. 2,523,711 (cancelled Sept. 26, 2008 for failure to file a Declaration of Continued Use).

[14] Registration No. 1,188,182.

[15] *About Us*, CATHOLICS FOR CHOICE, http://www.catholicsforchoice.org/about/default.asp (last visited June 11, 2015). *See* Reg. No. 2,796,790—CATHOLICS FOR CHOICE, for "[p]romoting public awareness of political and ethical issues in the fields of reproductive rights, women's rights, family planning, and sexually transmitted diseases."

Catholic belief "into contempt, or disrepute?"  The answer, most assuredly, is

"no."  But as explained below, the Lanham Act empowers the PTO to evaluate the

group's speech and burden it based on the subjective, potential reaction of third

parties that might take offense.  This is incompatible with the First Amendment.

**B.    Trademark Registration Confers Substantial Benefits That Cannot Be Denied Based On Ideas or Views.**

The district court based its analysis on the notion PFI can continue to use its

name absent registration.  *Pro-Football*, 2015 WL 4096277, at *9.  This analysis

runs headlong into the principle that government may not deny access to a benefit

because of constitutionally protected speech.    *Perry*, 408 U.S. at 597.    The

Supreme Court has emphatically confirmed that the First Amendment imposes

limits on government power, even where the government grants benefits to which

the recipient otherwise "has no entitlement."  *Agency for Int'l Dev.*, 133 S. Ct. at

2328 (citation omitted); *accord Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*,

547 U.S. 47, 59 (2006) ("'[T]he government may not deny a benefit to a person on

a basis that infringes his constitutionally protected . . . freedom of speech even if

he has no entitlement to that benefit.'") (citations and quotations omitted).

Trademark registration offers substantial benefits.    Perhaps the most

important benefit of Principal Register registration arises from a reversal of the

common law use-based presumption.  Under 15 U.S.C. §§1057(c) and 1141, filing

an application for registration on the Principal Trademark Register—including an intent-to-use application—constitutes constructive nationwide use of the mark upon the maturation of the application into a registration.

Some other benefits include: (1) Original federal court jurisdiction for infringement claims, 15 U.S.C. § 1121; (2) recovery of profits, damages, costs, treble damages and attorney's fees for infringement, 15 U.S.C. § 1117; (3) prima facie evidence of the validity, registration, registrant's ownership and exclusive right to use the registered mark, 15 U.S.C. §§ 1115(a), 1057(b); (4) conclusive evidence of the exclusive right to use of the mark, subject to statutory defenses, for "incontestable" marks, 15 U.S.C. §§ 1115(b), 1065; (5) elimination of certain defenses, 15 U.S.C. § 1072; and (6) registration with U.S. Customs to prevent the importation of articles bearing an infringing mark, 15 U.S.C. § 1124. Denial of these meaningful benefits places applicants at a legal and financial disadvantage.

### C.    Trademark Registration Is Not "Government Speech" and Cannot Be Exempted from the First Amendment

The district court relied on the Supreme Court's recent decision in *Walker* to find that trademark registration is government speech, wholly excepted from the First Amendment. This reliance is misplaced.

In *Walker*, the Supreme Court explained that, "[w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it

- 12 -

says." *Walker*, 135 S. Ct. at 2246. This formulation is of recent vintage, and is an expansion of *Pleasant Grove*, 555 U.S. 460. In *Pleasant Grove*, the Supreme Court rebuffed a challenge to a city's rejection of a monument proposed for a public park. The Court determined that the placement of permanent monuments in a public park is a form of government speech and is therefore not subject to scrutiny under the Free Speech Clause. *Id.* at 481.[16]

This year, confronting a First Amendment challenge to the exclusion of a logo bearing the Confederate flag from the Texas specialty-license-plate program, the Supreme Court—over four dissenters—extended the logic of *Pleasant Grove* to insulate Texas' regime from First Amendment review. It adopted a three-part test to determine whether something is government speech: (1) whether the government has historically used the speech at issue to communicate a message, (2) whether the government restricts speech within the forum to that with which it agrees and, relatedly, whether observers interpret the speech as conveying a

---

[16]    Though the "government speech" doctrine recognized in *Pleasant Grove* offered an expedient solution to vexing disputes over monuments and Ten Commandment displays, several Justices expressed trepidation. Justices Stevens and Ginsburg concurred, but wrote separately to note that "our decisions relying on the recently minted government speech doctrine to uphold government action have been few and, in my view, of doubtful merit." *Pleasant Grove*, 555 U.S. at 481. Justice Breyer's concurrence warned of per se rules categorizing "government speech" and preferred to "ask whether a reasonable and fully informed observer would understand the expression to be government speech." *Id.* at 487.

- 13 -

message on the government's behalf, and (3) whether the government maintains control over the speech. *Walker*, 135 S. Ct. at 2247.

Whatever the ultimate reach and wisdom of this "government speech" doctrine, it does not insulate the Lanham Act from First Amendment scrutiny because trademark registration is unlike government messages on defined media like license plates or physically limited places like public parks.

*First*, unlike license plates—which the Supreme Court found are used by governments "to urge action, to promote tourism, and to tout local industries," and which are "closely identified in the public mind with the [State],"—trademarks have never communicated the government's message. *Id.* at 2248 (citations omitted). The *Walker* majority found it important that the "history" of state license plates included decisions to add graphics, slogans, and promote certain interest groups. *Id.* Indeed, the Supreme Court had earlier recognized that license plates communicate government messages, including those with which some drivers did not want to be associated. *See Wooley v. Maynard*, 430 U.S. 705, 715, 717 n.15 (1977) (observing that drivers cannot be forced to "use their private property as a 'mobile billboard' for the State's ideological message").

The Public Register has never served a similar expressive purpose for the government. Were it seen as serving such a purpose, the government would now

- 14 -

be engaged in a variety of controversial, silly or offensive speech. *See, e.g.*, *infra* at 16; Appellant Br. 4. Trademark registration serves to identify the registrant and signal the existence of an intellectual property right in the mark. Unlike license plates, a trademark is not "essentially, government ID[]." *Walker,* 135 S. Ct. at 2249. The district court was of the view that "registry with the federal trademark registration program communicates the message that the federal government has approved the trademark." *Pro-Football*, 2015 WL 4096277, at *12. But awareness of the *fact* of trademark approval is not the same thing as belief that the government endorses the message in the trademark. Nobody would confuse the two. As the Supreme Court explained in a different context, even "secondary school students are mature enough and are likely to understand" that the government does not endorse speech that it simply permits. *Bd. of Educ. v. Mergens*, 496 U.S. 226, 250 (1990). The idea that "government does not endorse everything [it] fail[s] to censor is not complicated." *Id*.

*Second*, no credible argument can be made that trademark registration historically has been a forum thoughtfully restricted to speech with which the government agrees. The Principal Register is full of trademarks advancing all manner of unsound policy positions, hedonistic activity, and politically incorrect

- 15 -

statements. For example, do the marks COCAINE[17] and GANJA UNIVERSITY, U.S.[18] convey the government's position on drug policy? And does anyone really believe the mark THINK ISLAM[19] expresses the government's imprimatur of a religion? Of course not. Unlike license plates, there is no basis upon which to conclude that the public associates registered trademarks and the messages they convey with the government. The Board and the government concede as much. *See* USMSJ at 21 ("'[I]ssuance of a trademark registration' does not 'amount to the awarding of the U.S. Government's imprimatur.'")(quoting *In re Old Glory Condom Corp.*, 26 U.S.P.Q.2d at *5 n.3.[20] Despite the existence of the convenient ®, the message remains the applicant's.

*Third*, trademark registration does not involve the sort of "selective receptivity" found in *Walker*, 135 S. Ct. at 2247, or *Pleasant Grove*, 555 U.S. at 471. Those cases involved programs—plate approval and acceptance of private monuments for public property—in which the government deliberately cultivated a subjective gatekeeping role. Participation was discretionary and the government

---

[17]    Registration No. 1,340,874 (cancelled Dec. 3, 1991 for failure to file a Declaration of Continued Use).
[18]    Registration No. 4,070,160.
[19]    Registration No. 4,719,002.
[20]    The government's concern below about registration creating a "perception" of endorsement and "magnify[ing]" the message conveyed by a trademark, USMSJ at 21, is an attempt to have it both ways. It confirms that trademarks convey private messages—however odious the government may find them.

- 16 -

had a role in "final approval" of design and message, to ensure consistency with the government's goals. Trademark registration is not so selective.[21] The Board does not take care to approve only marks that convey messages the government supports. Instead, it broadly promotes registration of millions of varied marks. *See Bongrain Int'l (Am.) Corp. v. Delice de France, Inc.*, 811 F.2d 1479, 1485 (Fed. Cir. 1987) ("One of the policies sought to be implemented by the [Lanham] Act was to encourage the presence on the register of trademarks of as many as possible of the marks in actual use."). By establishing a generally-available regime for trademarks, § 2(a) permits a variety of viewpoints to be expressed.

Trademark registration has none of the factors that were critical in *Walker*'s determination that specialty license plates constitute government speech.

## II. THE FIRST AMENDMENT DOOMS THE LANHAM ACT'S DISPARAGEMENT BAR.

### A. Disparagement Review Is Incompatible with the First Amendment, as Shown by Inconsistent Treatment of Marks Like THE YIDZ, SQUAW, SAMBO'S, and FAGDOG

The PTO's subjective task under Section 2(a) is unenviable. A government employee must police applications for potential offense and evaluate them in light of the applicant's characteristics, the message being sent, overall context, and the

---

[21] Even where the government reserves power to exclude, such as for scandalousness or disparagement, exceptions are narrow and applied inconsistently. *See infra* at 19–21 (discussing incoherent application of bar).

- 17 -

likely subjective reaction of a subsection of the group to be protected from offense. Not surprisingly, with these flexible and shifting considerations—the evaluating agent apparently has to be an expert in anthropology, sociology, and psychology, among other fields—"disparagement" review has yielded unpredictable approaches, linked by a common denominator: subjective and paternalistic review of the potential for offense from a message conveyed. Such review is hard to square with our system of content-neutral government.

The Board applies a two-part test to determine if a mark is barred from registration as being "disparaging": (1) What is the likely meaning of the matter in question, taking into account dictionary definitions, and the relationship of the matter to other elements in the mark, the nature of the goods or services, and the manner in which the mark is used in the marketplace in connection with the goods or services?; and (2) Is the meaning disparaging to a substantial composite of the referenced group?[22] During examination, the examining attorney sets forth a prima facie case, then the burden shifts to the applicant to rebut the prima facie case with

---

[22]     *In re Squaw Valley Dev. Co.*, 80 U.S.P.Q.2d 1264 (T.T.A.B. 2006) (holding SQUAW for clothing barred from registration as disparaging of Native American women, but not barred as a mark for ski-related goods as it would be understood to refer to a famous ski resort at Squaw Valley, California); *In re Heeb Media, LLC,* 89 U.S.P.Q.2d 1071 (T.T.A.B. 2008). *See In re Lebanese Arak Corp.*, 94 U.S.P.Q.2d 1215 (T.T.A.B. 2010) (dissent argued that focus should be on the term's meaning to the U.S. population and not members of the disparaged group).

"competent evidence."  *See, e.g.*, *In re Gyulay*, 820 F.2d 1216, 1217 (Fed. Cir. 1987); *see also Squaw Valley*, *supra*.

The PTO's record reveals confusion, bordering on incoherence, from the highly subjective application of standards built on shifting attitudes.  PTO records abound with examples of marks once deemed disparaging that now are registered routinely; marks containing words deemed unregistrable despite being legally equivalent to registrable terms; terms defined in dictionaries as disparaging that are not found disparaging by the PTO; and terms that the PTO now finds disparaging despite past findings to the contrary.

For example, Merriam Webster Dictionary notes that DYKE, QUEER and FAG are "often" or "usually" used as disparaging terms for homosexuals.  However, the PTO has registered marks such as DYKE NIGHT,[23] DYKES ON BIKES,[24] DYKEDOLLS,[25] QUEER FOLK,[26] and QUEER PAL FOR THE STRAIGHT GAL.[27]  The PTO seems conflicted on FAG—it recently refused

---

[23]    Registration No. 4,146,588.
[24]    Registration No. 3,323,803.
[25]    Registration No. 3,254,737 (cancelled Jan. 31, 2014 for failure to file a Declaration of Continued Use).
[26]    Registration No. 4,742,269.
[27]    Registration. No. 4,699,581.

registration of FAGOUT! and FAG FOREVER A GENIUS![28] as disparaging, but approved PHAG[29] for registration. Similarly, the Office has registered FAGDOG three times, and has refused it twice—at least once under § 2(a).[30]

SAMBO'S was once apparently treated as non-disparaging but now refused—the Office recently refused registration of the mark for restaurants, contradicting earlier findings that it was registrable for the same services.[31] Two courts, however, have found that conditioning the right to receive government approval of construction permits on an agreement not to use SAMBO'S as the name of a restaurant violated the First Amendment. *Sambo's Rests., Inc. v. City of Ann Arbor*, 663 F.2d 686 (6th Cir. 1981); *Sambo's of Ohio, Inc. v. City Council of Toledo*, 466 F. Supp. 177 (N.D. Ohio 1979).

---

[28]    U.S. Trademark Application Serial Nos. 86/107,041 (filed Oct. 31, 2013), and 86/089,512 (filed Oct. 11, 2013).

[29]    Registration No. 4,135,694.

[30]    *Compare* Registration Nos. 2,926,775 (cancelled Sept. 16, 2011 for failure to file a Declaration of Continued Use) and 2,828,396 (cancelled November 5, 2010 for failure to file a Declaration of Continued Use); Registration No. 3,174,475 (cancelled June 28, 2013 for failure to file a Declaration of Continued Use) *with* US. Trademark Application Serial Nos. 76/454,927 (filed Sept. 25, 2002) (abandoned after section 2(a) refusal) and 75/950,535 (filed Mar. 1, 2000) (abandoned).

[31]    *Compare* Registration Nos. 1,247,362- SAMBO'S; 1,118,937 - SAMBO'S GOOD TURN PROGRAM; 1,133,357 - SAMBO'S FAMILY TABLE; 1,107,590 - PARENTS AND KIDS AGREE-IT'S SAMBO'S FOR DINNER; 1,061,886 - SAMBO'S; 1,102,379 - SAMBO'S; 927,492 - SAMBO'S; 860,232 - SAMBO'S *with* U.S. Trademark Application Serial No. 77/915,048 – SAMBO'S (refused).

The fickleness of disparagement refusals is evident in an application for THE YIDZ for: "Entertainment, namely, live performances by a musical band."[32] The PTO refused the mark, finding it "merely descriptive" because it describes an ingredient, quality, characteristic, function, feature, purpose or use of the goods and/or services and "[t]he applicant's musical band comprises Jewish people."[33] In support, the PTO attached a definition from the online Compact Oxford English Dictionary defining the term YID as "*informal offensive* A Jew." And yet, the PTO raised no objection under § 2(a). Both THE YIDZ and the REDSKINS marks could be seen as pejorative—yet the marks are treated differently.

### B. The Disparagement Bar Enshrines the Heckler's Veto and Strikes at the Core of What the First Amendment Protects.

Rejecting trademarks based on whether "a substantial composite" of a group might be offended, *In re Geller*, 751 F.3d 1355, 1358 (Fed. Cir. 2014), *cert. denied*, 135 S.Ct. 944 (2015), subordinates free speech to the reactions of third parties. But the Supreme Court has emphatically rejected laws that "confer broad powers of censorship, in the form of a 'heckler's veto.'" *Reno v. ACLU*, 521 U.S. 844, 880 (1997).

---

[32] U.S. Trademark Application Serial No. 77/784,282 (filed July 18, 2009) (refused on different grounds). The applicant chose not to respond to the refusal and the application was abandoned.

[33] Yet, there is absolutely no indication in the file wrapper of the applicant's religious background.

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). In its most critical applications, the First Amendment protects speech that others may find offensive. *See Street v. New York*, 394 U.S. 576, 592 (1969) ("It is firmly settled that . . . the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."). It is *precisely* when speech might offend that the First Amendment is most critical, because this type of speech invites regulation in the first instance.

This is why a heckler's veto is prohibited. "Speech remains protected even when it may 'stir people to action,' 'move them to tears,' or 'inflict great pain.'" *Sorrell*, 131 S. Ct. at 2670 (citation omitted). The First Amendment forbids the government from "react[ing] to that pain by punishing the speaker." *Snyder*, 562 U.S. at 461. It is settled that "[l]isteners' reaction to speech is not a content-neutral basis for regulation. . . . Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend . . . ." *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 134–35 (1992).

As a result, "in public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the freedoms

protected by the First Amendment." *Boos v. Barry*, 485 U.S. 312, 322, (1988). Even in economic regulation, "[t]he State may not burden the speech of others in order to tilt the public debate in a preferred direction." *Sorrell*, 131 S. Ct. at 2671. The answer to objectionable speech "is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).

"Disparaging" speech is not a recognized category of unprotected speech. Categories exempt from the First Amendment are few and narrowly defined. These include obscenity, *see Miller v. California*, 413 U.S. 15 (1973), defamation, *see Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985), incitement, *see Brandenburg v. Ohio*, 395 U.S. 444 (1969), or situations of imminent danger the government has the power to prevent, *see Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716 (1931). Other forms of speech—including disparagement—are protected, and the Supreme Court has resisted attempts to create new categories. *See United States v. Stevens*, 559 U.S. 460, 472 (2010).

Courts do not have "freewheeling authority to declare new categories of speech outside the scope of the First Amendment" based on "an ad hoc balancing of relative social costs and benefits." *Id.* at 470, 472. In *Stevens*, the Supreme Court asked whether depictions of unlawful animal cruelty had been historically unprotected and, finding no such history, applied searching First Amendment

scrutiny. *Id.* This approach was reaffirmed in *Brown v. Entertainment Merchants*, which invalidated a ban on the sale or rental of violent video games to minors. 131 S. Ct. 2729, 2734 (2011) ("[N]ew categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated."). The First Amendment has long protected offensive speech from officious government meddling, and it cannot be excepted now.

### C.    The Disparagement Bar Is Doomed Under Strict Scrutiny.

Laws that "impose[] a financial disincentive only on speech of a particular content" are "presumptively inconsistent with the First Amendment." *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 115, 116 (1991). Section 2(a) imposes a financial burden and disincentive (in the form of withheld benefits of registration) on those whose speech the government believes others may find disparaging. The law burdens speech on certain topics of public concern,[34] because of its content. Laws that "distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content

---

[34]    Speech is of public concern, "at the heart of the First Amendment," whenever "it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder*, 562 U.S. at 451–52, 53 (internal quotations and citation omitted). A trademark reflecting a political statement or commentary on racial, ethnic, or other stereotypes, is a paradigmatic example of speech on a matter of public concern.

- 24 -

based." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994). There is perhaps no category of law toward which the Supreme Court has been more hostile. *See Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004).

The disparagement clause of § 2(a) is content-based because it cannot be "justified without reference to the content of the regulated speech." *Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001) (citation omitted). The statute seeks to ensure that only non-offensive marks receive the benefit of trademark registration. The Act is aimed at improving the "quality" of what applicants say—a goal both content-based and anathema to the First Amendment. "The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion." *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring).

Worse, § 2(a) compels viewpoint discrimination—a particularly pernicious form of discrimination. *See Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."). The statute allows registration of trademarks that refer positively to a group, but bars registration of those that (arguably) refer negatively to the same group, based on whether some would consider the mark offensive.

- 25 -

This should end the analysis; "it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory." *Sorrell*, 131 S. Ct. at 2667. Laws allowing the government to discriminate among speakers based on the speech's content are unacceptable. But that is what § 2(a) does, so it is subject to the most stringent judicial review. *See, e.g.*, *Reed*, 135 S. Ct. at 2227 (regulation of "particular speech because of the topic discussed or the idea or message expressed" is subject to "strict scrutiny"). Section 2(a)'s disparagement bar is based on the perceived content and viewpoint of the message, so it is doomed under strict scrutiny.[35]

### D.   The Disparagement Bar Even Fails Intermediate Scrutiny.

Even if § 2(a) were construed merely as a limitation on commercial speech, subject to intermediate scrutiny, the government could not justify it.

Under *Central Hudson*, the government may regulate truthful, non-misleading commercial speech about lawful activity if the regulation serves a substantial government interest, directly advances the government interest, and is no more extensive than necessary. 447 U.S. at 566. Here, the parties do not

---

[35]    Whether labeled commercial speech or otherwise, the disparagement bar should be subject to strict scrutiny. *See Sorrell*, 131 S. Ct. at 2664 ("[H]eightened scrutiny" is required "*whenever* the government creates a regulation of speech because of disagreement with the message it conveys.") (emphasis added) (internal quotations and citation omitted); *44 Liquormart*, 517 U.S. at 501; *Cent. Hudson*, 447 U.S. at 566 n.9.

challenge the veracity of the Redskins marks, and there is nothing misleading about them.

Finding that trademark registration does not implicate the First Amendment, the district court did not engage in *Central Hudson* analysis. But had it, the Lanham Act would have failed at every step. The goals purportedly served by § 2(a)'s bar against disparaging marks are not legitimate, fall far short of substantial, and confirm the regime's incompatibility with the First Amendment. The government below claimed a substantial interest in "maintaining a working trademark system at the state and federal levels and preventing a mistaken perception of official endorsement of insult and calumny." USMJ at 2. In the Federal Circuit the government enumerated interests in: (1) discouraging the use of marks that may be offensive, *In re Tam*, 785 F.3d 567, 583 (Fed. Cir. 2015); (2) not having disparaging marks "occupy the time, services, and use of funds of the federal government," *id.*; (3) "maintaining a well-functioning trademark system that harmonizes state and federal trademark law," *id.* at 584; and (4) the government not being seen as giving its approval, *id.* None of these interests is substantial.

The first interest, in preventing offense, is so contrary to the First Amendment that the Supreme Court has "found it so 'obvious' as to not require

- 27 -

explanation." *Simon & Schuster*, 502 U.S. at 115–16 (citation omitted). The second interest, husbanding resources, fails. The government spends substantial resources conjuring evidence of potential offense, and then defending refusals. *See McGinley*, 660 F.2d at 487 (Rich, J., dissenting). Third, there is no interest in reconciling state and federal trademark law because states did not historically ban disparaging marks. *In re Tam*, 785 F.3d at 584. Fourth, concern over a perceived government imprimatur in a "disparaging" trademark is baseless. Trademarks are *private* speech, not government expression. *See id.* at 584–85 (citing cases); *cf.* USMSJ at 21.

Without any substantial interest for the ban, the Court could stop there. *See Cent. Hudson*, 447 U.S. at 566. But even if claimed interests were substantial, the disparagement bar fails the rest of the analysis.

Under any standard, the government must present evidence that a challenged restriction protects the public from a real harm. *See*, *e.g.*, *Lederman v. United States*, 291 F.3d 36, 44 (D.C. Cir. 2002) (noting that courts "closely scrutinize challenged speech restrictions to determine if they indeed promote[] the Government's purposes in more than a speculative way" (quotation marks and citation omitted)). Courts seek evidence that a law advances an asserted interest

- 28 -

"in a direct and material way." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993). The government does not even come close.

The government's reliance on the fact that PFI remains free to use the Redskins marks without registration shows that the government is not actually preventing "harmful" speech or protecting "the dignity and reputation of those associated with disadvantaged and minority groups," USMSJ at 20. *See Edwards v. District of Columbia*, 755 F.3d 996, 1005 (D.C. Cir. 2014) (holding that the government's interests were not furthered where the offending parties had "carte blanche" to say whatever they wanted).

Furthermore, the bar's overbreadth and underinclusiveness render it fatally incoherent. A law is unconstitutionally overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (internal quotations and citation omitted). The Supreme Court has "provided this expansive remedy out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). "Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case-litigation, will choose simply to abstain from protected speech—

- 29 -

harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Id.* Under the government's approach, a sports franchise, musical band, or advocacy group must think twice before choosing a controversial logo or slogan, and may not have the endurance to fight the PTO.

Finally, the disparagement bar is fatally underinclusive. Two circumstances render a regulation underinclusive. First, if "an exemption from an otherwise permissible regulation of speech may represent a governmental attempt to give one side of a debatable public question an advantage in expressing its views to the people." *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) (internal quotations and citation omitted). The second is where, as here, there is an arbitrary exemption, because "underinclusiveness" suggests that "asserted interests either are not pressing or are not the real objects animating the restriction on speech." *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 493 (1997). Both circumstances are present here. PTO arbitrarily treats as not disparaging some terms defined in dictionaries as disparaging, giving an advantage to certain views it finds benign or inoffensive. Application of § 2(a) reveals it to be incoherent and fatally underinclusive. It also renders the bar unconstitutionally vague, as it lets the PTO exercise a discretionary "chancellor's veto" over speech it dislikes. *See Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

- 30 -

## CONCLUSION

This Court should reverse the district court's decision, and hold that the disparagement clause of § 2(a) of the Lanham Act is facially unconstitutional to the extent it permits the benefits of trademark registration to be denied to a speaker on the ground that the government believes that the communication would offend.

Respectfully submitted,

Ilya Shapiro
CATO INSTITUTE
1000 Mass. Ave. NW
Washington, DC 20001
(202) 842-2000
ishapiro@cato.org

John W. Whitehead
Douglas R. McKusick
THE RUTHERFORD
INSTITUTE
1440 Sachem Place
Charlottesville, VA 22901
(434) 987-3888

Megan L. Brown
    *Counsel of Record*
Joshua S. Turner
Christopher J. Kelly
Jennifer L. Elgin
Dwayne D. Sam
WILEY REIN LLP
1776 K Street NW
Washington, DC 20006
(202) 719-7000
mbrown@wileyrein.com
*Counsel for Amici Curiae*

November 6, 2015

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 29(c)(7), I certify the following:

This brief complies with the type volume limitations of Rule 32(a)(7)(B) because the brief contains 6,916 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) and Local Rule 32(b). This certificate was prepared in reliance on the word count of the word-processing system (Microsoft Word 2010) used to prepare this brief.

The undersigned further certifies that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated:  November 6, 2015          s/  Megan L. Brown
                                  Megan L. Brown
                                  *Counsel for Amici The Rutherford Institute*
                                  *& Cato Institute*

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2015, I electronically filed the original of the foregoing document with the Clerk of this Court by using the CM/ECF system, which will send notice of such filing to the principal counsel for each party.

Dated:  November 6, 2015                    s/  Megan L. Brown
                                            Megan L. Brown
                                            *Counsel for Amici The Rutherford Institute*
                                            *& Cato Institute*