No. 15-1874
_____

### UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT
_____

### PRO-FOOTBALL, INC.,

*Plaintiff and Appellant,*

*v.*

### AMANDA BLACKHORSE,

*Defendant and Appellee.*

_____

Appeal from the United States District Court for the
Eastern District of Virginia at Alexandria,
No. 1:14-cv-01043-GBL-IDD

_____

### BRIEF OF DON BETTELYOUN, FORT MCDERMITT PAIUTE SHOSHONE TRIBE, BOYD GOURNEAU, NATIVE AMERICAN GUARDIANS ASSOCIATION, AND PETER MACDONALD, AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT

_____

**GOLDSTEIN & RUSSELL, P.C.**
Thomas C. Goldstein
7475 Wisconsin Avenue, Suite 850
Bethesda, Maryland 20814

Kimberly N. Brown
3909 Virgilia Street
Chevy Chase, Maryland 20815

*COUNSEL FOR AMICI CURIAE*

## STATEMENT REGARDING CONSENT TO FILE

The parties have consented to the filing of briefs *amicus curiae.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Local Rule 26.1(b)(1), *amici* Fort McDermitt Paiute Shoshone Tribe and Native American Guardians Association each states that it is not a publicly-held corporation, does not issue stock, and does not have a parent corporation.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................... iv

INTEREST OF *AMICI CURIAE* .................................................................. 1

SUMMARY OF ARGUMENT ...................................................................... 2

ARGUMENT .............................................................................................. 2

I.    HISTORICALLY, "REDSKINS" WAS A RESPECTFUL
      TERM CONNOTING A POSITIVE IMAGE WITHIN
      NATIVE AMERICAN TRIBES ...................................................... 4

      A.    Native Americans Were the First to Claim the Term
            "Red" and Use It in Indian-Anglo Diplomacy .................... 5

      B.    The Color Red Has Numerous Positive Historical and
            Cultural Connotations for Specific Native American
            Groups ................................................................................ 7

II.   A MAJORITY OF NATIVE AMERICANS SUPPORT THE
      USE OF "REDSKINS" IN SPORTS-RELATED SERVICES
      AS A SOURCE OF CULTURAL PRIDE ...................................... 9

III.  THE DECISION BELOW THREATENS THE VIABILITY
      OF ALL PUBLIC REFERENCES TO NATIVE AMERICAN
      TERMS AND IMAGERY AND FAVORS THE VIEWS OF
      UNELECTED ADMINISTRATORS OVER THOSE OF
      NATIVE AMERICANS .............................................................. 12

CONCLUSION ......................................................................................... 15

CERTIFICATE OF SERVICE .................................................................. 16

- iii -

# TABLE OF AUTHORITIES

CASES                                                                    Pages

*In re Geller,* 751 F.3d 1355 (Fed. Cir. 2014) ................................................. 3

STATUTES

Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a) ................................... 2

OTHER AUTHORITIES

Glenn Collins, *When Car Names Assume Ethnic Identities,* N.Y. Times
     (June 21, 2013) ....................................................................................... 14

James Fenimore Cooper, The Last of the Mohicans (1826) .......................... 6

Marc Fisher, *American Indians Among Admirers of Redskins Name,* Wash.
     Post (Jan. 26, 2002), at B1 ......................................................................... 6

Kathryn E. Fort, *The Vanishing Indian Returns: Tribes, Popular
     Originalism, and the Supreme Court,* 57 St. Louis U.L.J. 297
     (Winter 2013) ............................................................................................. 9

Ives Goddard, *"I Am a Red-Skin": The Adoption of a Native American
     Expression (1769-1826),* European Rev. of Native Am. Studies 19:2
     (2005) ............................................................................................. 5, 6, 7

J. Gordon Hylton, *Before the Redskins Were the Redskins: The Use of
     Native American Team Names in the Formative Era of American Sports,
     1857-1933,* 86 N.D. L. Rev. 879 (2010) ......................................... 7, 12-13

Keith Jarrett, *What's in a Name? Redskins Offensive or Noble Moniker*,
     Citizen-Times (Aug. 26, 2014) ............................................................. 11

Missouri Gazette, 29 July 1815 ..................................................................... 7

Hayley Munguia, *The 2,218 Native American Mascots People Aren't
     Talking About,* fivethirtyeight.com (Sept. 5, 2014).................................. 12

*Native American Chief Talks About Redskins*, Official Site of the
Washington Redskins (May 3, 2013) ...................................................... 11

Nat'l Cong. of American Indians Res. #MSP-15-047................................. 14

Tracy Sears, *Virginia Tribes Call Out Obama on Redskins' Name
Controversy*, CBS 6 (October 15, 2013) ................................................ 11

Nancy Shoemaker, *How Indians Got to Be Red,* Am. Hist. Rev. 102:3
(June 1997) ....................................................................................... 5, 7-9

Jonathan Turley, *The Patent Office Goes Out of Bounds in Redskins
Trademark Case,* Wash. Post (June 20, 2014) ........................................ 15

Alden T. Vaughan, *From White Man to Redskin: Changing
Anglo-American Perceptions of the American Indian,* Amer. Hist.
Rev. 87:4 (Oct. 1982) ............................................................................... 8

Paul Woody, *Woody: American Indians in Va. Have No Problem with
"Redskins,"* Richmond Times-Dispatch (May 15, 2013) ...................... 11

# INTEREST OF *AMICI CURIAE*[1]

This brief aims to provide a more complete and accurate historical and cultural perspective of the views of Native Americans regarding the meaning and usage of the term "redskins." *Amicus* Don Bettelyoun is the President of the Team Redskins South Dakota Rodeo Team. *Amicus* Fort McDermitt Paiute Shoshone Tribe is a federally recognized Indian tribe located in Nevada and Oregon. *Amicus* Native American Guardians Association (NAGA) is a group comprising over 5000 Native Americans that seeks to preserve the presence of positive Native American imagery, terms, and symbols in American culture. NAGA's President is a member of the Sioux tribe in North Dakota. *Amicus* Boyd Gourneau is former Vice Chairman of the Lower Brule Sioux Tribe. *Amicus* Peter MacDonald is four-time Chairman of the Navajo Nation and President of the Navajo Code Talkers Association. He served in the Marine Corps as an esteemed Code Talker during World War II.

*Amici* supports Plaintiff-Appellant's position that myriad efforts to eliminate the term "redskins" from professional football-related services are misguided. For many Native Americans, the word "redskins" is a positive and respectful reflection of Native American history and culture. By this brief, *amici* seeks to give voice to those Native Americans whose cultural identities are negatively affected by the

---

[1] No party's counsel authored the brief in any part, and no person other than *amici* and their counsel contributed money for the preparation or submission of this brief.

abnegation of positive Native American iconography and terminology in mainstream American culture.

## SUMMARY OF ARGUMENT

The term "redskins" carried uniformly positive connotations for Native Americans at its inception. The word was first used *by* Native Americans to describe themselves. The color red also had positive associations linked to red clay, to warriors' position of social respect within particular tribes, and to the natural powers of the body. Thus, many Native Americans fervently resist the stereotype that "red"-related terminology and iconography are per se negative. Moreover, they are deeply concerned that the District Court's decision puts Native American words and images on a slippery slope towards public extinction. Eradication of the Redskins mark poses serious harm to such individuals' cultural identities and heritage and paternalistically favors the views of mostly non-native administrators over those of Native Americans who identify with the name "Redskins." *Amici* thus respectfully urge this Court to reverse the decision below.

## ARGUMENT

Neither the District Court nor the Trademark Trial and Appeal Board (TTAB) took into proper consideration the etymology of the word "redskins" or the extent to which it is widely celebrated by Native Americans who are harmed by cancellation of the Redskins trademarks. Under § 2(a) of the Lanham Act, 15

U.S.C. § 1052(a), a trademark registration warrants cancellation if it "[c]onsists of . . . *matter which may disparage* . . . persons . . . ." (Emphasis added). In determining if a mark is disparaging, the Federal Circuit considers "whether that meaning *may be disparaging to a substantial composite* of the referenced group." *In re Geller*, 751 F.3d 1355, 1358 (Fed. Cir. 2014) (emphasis added). The District Court relied on statements from individuals and organizations within the Native American community, among other factors, in its disparagement analysis (at 62-63).

*Amici* respectfully submit that the District Court erred by failing to consider the voices of Native Americans who not only find the term "redskins" *in*offensive, but who object to cancellation of the marks for fear it will lead to further eradication of positive Native American imagery and terminology from mainstream American culture. Because a substantial composite of Native Americans actually *dis*favors cancellation and would be harmed by an absence of the mark, the Court should consider their views before making a credible determination of disparagement under § 2(a).

This brief makes four points. *First,* it provides a fuller historical perspective of the term "redskins," which arose organically *within* the Native American community and carried uniformly positive connotations for the first century of its existence. *Second,* it posits that a "substantial composite" of Native Americans in

- 3 -

fact *support* the public retention of words like "redskins" as symbols of Native

American heritage and pride, and would be harmed by cancellation of the Redskins

marks. *Third,* it explains why *amici* are concerned that the movement to erase

Indian references from professional sports will have a ripple effect that, taken to its

logical extreme, will only further silence and render invisible the Native American

voice in popular culture. *Lastly,* it urges the Court to credit the views of Native

Americans over those of non-native regulators and adjudicators in assessing the

positive cultural and historical value of traditional Indian terminology and

iconography.

## II.    HISTORICALLY, "REDSKINS" WAS A RESPECTFUL TERM CONNOTING A POSITIVE IMAGE WITHIN NATIVE AMERICAN TRIBES.

Implicit in the District Court's decision is the erroneous factual premise that

"red"-related terms have been considered pejorative towards Native Americans

from time immemorial. In a 1993 resolution cited by the court, the Executive

Council of the National Council of American Indians (NCAI) declared that "the

term REDSKINS *is not and has never been one of honor or respect,* but instead *it*

*has always been* [a] disparaging and racist designation" (at 58) (emphasis in

original). This statement is historically inaccurate. The term "redskins" in fact

evolved within Native American communities as a respectful means of self-

identification and honor.

**A.     Native Americans Were the First to Claim the Term "Red" and Use It in Indian-Anglo Diplomacy.**

From the mid-1720's, "American Indians, particularly Indians in the Southeast, were calling themselves 'red.'"  Nancy Shoemaker, *How Indians Got to Be Red,* Am. Hist. Rev. 102:3, 627 (June 1997).  In one example, the French approached a group of Indians in Alabama about converting to Christianity; the tribal chief responded, "[t]he red man . . . is the Indian, for they call themselves in their language 'Red Men' . . . ."  *Id.*  In contemporaneous transcripts of peace negotiations between the English and two Native American tribes, "red" appears numerous times, but "only within the speeches of the Indian delegates."  *Id.* at 628 (citation omitted).

By the 1730's, the French adopted the term "redskins" for use in their diplomacy with Native American tribes in Louisiana.[2]  *Id.*  A French interpreter described Native American chiefs as referring to "peaux Rouges"—which translates literally to "red skin" in French.  Ives Goddard, *"I Am a Red-Skin": The Adoption of a Native American Expression (1769-1826),* European Rev. of Native Am. Studies 19:2, 4-5 (2005) (internal quotation omitted).

---

[2]      Defendants' linguistics expert conceded that the word "redskin" was coined by Native Americans to describe themselves to early French explorers and was not regarded as offensive.  Rose Decl. Ex. 39 at 179: 14-181:4; Criss Decl. Ex. 16 at 14-15.

Nearly half a century later, the term "redskins" was used publicly at a reception at the home of James Madison, then-President of the United States. A delegation of numerous western tribes came to discuss the war with the British in 1812. In a speech to the chiefs, Madison repeatedly used the term "red" as part of what one historian called the "conventional Native American diplomatic language and metaphor" of the time. *Id.* at 5. The chiefs replied in kind. The principal chief of the Wahpekute band of Santee Sioux, for example, announced that "I am a red-skin . . . ." *Id.* (internal quotation omitted).

Historical records show that the term "redskins" was publicly employed dozens of additional times between 1812 and 1822. *Id.* at 7-8.[3] In 1815, diplomats appointed by President Madison met with representatives from tribes of the upper Mississippi and lower Missouri rivers to negotiate peace treaties. *Id.* at 6. In response to a complaint that the Meskwaki delegations lacked full authority to negotiate, chief Black Thunder replied, "I turn to all, red skins and white skins, and challenge an accusation against me." *Id.* at 6-7 (internal quotations omitted). This "diplomatically phrased message" was meant to convey uncompromising strength in the face of territorial losses. *See id.* at 7. Big Elk, the principal chief of the Omaha tribe and noted orator, similarly remarked at a treaty signing that "'[w]ho

---

[3]     In novels such as *The Last of the Mohicans* (1826), author James Fenimore Cooper brought the word "redskins" to a much wider audience, "reflecting both the accurate perception of the Indian self-image and the evolving respect among whites for the Indians' distinct cultural perspective . . . ." Goddard, *supra*, at 16.

would not wish to die among you!  That he may be buried with the honors of war, as you buried one of our red skin chiefs . . . . .'"  *Id.* at 7 (quoting Missouri Gazette, 29 July 1815).  Big Elk was referring to the principal chief of the Teton Sioux, who was buried with full military honors.  *Id.*

The historical record thus reveals that "redskin" came into being not as a racial slur, but as an honorable means of self-identification and "an expression of solidarity" amongst Indian tribes.  *Id.* at 16.[4]  For their part, tribal delegates who traveled to Washington, D.C., to discuss the fledgling national government's policy towards Native Americans embraced "redskin" as an "inclusive term" that reflected a "pan-tribal" identity amongst the leaders of various Indian nations.  *Id.* Indeed, virtually "all the speakers and writers known to have used *redskin* down to 1822 were translating the words of a Native American language."  *Id.* at 9.

### B.    The Color Red Has Numerous Positive Historical and Cultural Connotations for Specific Native American Groups.

Because Native Americans adopted color terminology first, early European Americans rarely used the term "red" to depict Native Americans' appearance, describing them instead as "tawny," or yellowish-brown.  *See* Shoemaker, *supra*, at

---

[4]     The claim that the term "redskins" derived from Britain's "practice of paying bounties for the bodies, or skins, of slain Indians . . . has been thoroughly discredited."  J. Gordon Hylton, *Before the Redskins Were the Redskins: The Use of Native American Team Names in the Formative Era of American Sports, 1857-1933,* 86 N.D. L. REV. 879, 884-85 (2010).

628; Alden T. Vaughan, *From White Man to Redskin: Changing Anglo-American Perceptions of the American Indian*, Amer. Hist. Rev. 87:4, 921 (Oct. 1982). Native Americans embraced "red" as a means of distinguishing themselves from "whites," a term that had come to replace "Christian" to differentiate Anglos from "black" or "Negro" slaves who wished to practice Christianity. Shoemaker, *supra*, at 629, 631; Vaughan, *supra*, at 922.

Many tribes also associated deep symbolism with the color red, which may account for why they claimed it as a means of self-identification instead of tawny, brown, or yellow. Shoemaker, *supra*, at 632. In the Southeast, red and white symbols represented "a dualism between war and peace." *Id.* Thus, in diplomatic councils with the English in 1725-1726, southeastern tribes likely spoke of "red people" and "white people" as a way to distinguish between advocates of war and advocates of peace, rather than as short hands for race. *Id.*

Certain tribes ascribed even deeper meanings to the color red, equating it with the "red earth" and so-called "origin stories." The Mesquakies, for example, believed that "the first men and the first women [were made] out of clay that was as red as the reddest blood." *Id.* at 634 (internal quotation marks omitted). Tribes created paint out of red clay in order to "mark[] social positioning," *id.* at 635, or to signify "bravery, health, and passion," Vaughan, *supra*, at 949. For Cherokees, red face paint represented "the blood-red natural powers of the body." Shoemaker,

*supra*, at 638.  One anthropologist even linked red face paint, already "associated

with death," to "the menstrual blood and life-giving powers of women."  *Id.*

(citation omitted).  In naming themselves "red," therefore, the Cherokee

"neutralize[d] the hierarchy Americans thought they had inherited from Britain,"

implying that "they had obviously been made first."  *Id.* at 642.

## II.    A MAJORITY OF NATIVE AMERICANS SUPPORT THE USE OF "REDSKINS" IN SPORTS-RELATED SERVICES AS A SOURCE OF CULTURAL PRIDE.

Just as their ancestors used "'red' to claim a positive identity" and "to build

pan-Indian alliances," many Native Americans today seek to preserve historical

terms like "redskins" in the face of a wider assault on Native American symbols

and terminology in American culture.  *Id.* at 643.[5]  As explained below, the record

reflects that a majority of Native Americans actually *favors* the use of "redskins" in

sports.

The District Court had before it the most comprehensive study ever

conducted of whether people who identified as Native Americans find the

"Redskins" name offensive.  Of 768 respondents surveyed from 2003 to 2004, the

University of Pennsylvania's National Annenberg Survey found that *ninety percent*

---

[5]    Responding to monolithic views of Native American culture, scholars have critiqued the "'vanishing Indian' stereotype" for assuming that "all tribes and tribal people have the same history."  Kathryn E. Fort, *The Vanishing Indian Returns: Tribes, Popular Originalism, and the Supreme Court*, 57 St. Louis U.L.J. 297, 312, 300 (Winter 2013).

were not offended.  Rose Decl. Ex. 18; Blanton Decl. Ex. 1 at 18-19.  A survey conducted in July and August of 2005 by Sports Illustrated magazine similarly found that *eighty-one percent* of Native Americans responded "no" when asked whether high school and college teams should stop using Indian nicknames.  Ex. 11, Pappan Deposition.  When asked whether professional sports teams should stop using Indian nicknames, characters and symbols, *eighty-three percent* said "no." *Id.*

Additionally, numerous tribes and prominent Native Americans have endorsed the Redskins name as culturally affirmative and respectful.  In 1988, former U.S. Senator Ben Nighthorse Campbell described it as a term of "dignity and respect."  Rose Ex. 32.  The five chiefs of the Miami, Ottowa, Medoc, Peoria and Seneca-Cayuga tribes issued a resolution in 1992 that characterized the Redskins name as a "positive depiction[] of people of Native American heritage [that] can only further and better the overall perceptions held by the general public toward Native Americans."  Rose Decl. Exs. 128 & 130.  In 1991, the Tulalip Tribes wrote a letter to Arizona Senator John McCain stating that "we tend to root for teams represented by Native American symbols" because "we feel that [they] will have a power and spirit not shared by other teams."  A9381-82.  "We are not offended by the Washington football team being called the Redskins," they added. *Id.*  "To the contrary, we vociferously root for them to beat the Cowboys." *Id.*  The

Chief of the Choctaw Nation of Oklahoma similarly wrote in 1992 that the Washington Redskins "are winners, leaders, and producers, attributes the Indian people can be proud to be identified with." A9386-87. In 1993, the Plains Indian Museum at the Buffalo Bill Center in Cody, Wyoming, had a Redskins pendant proudly on display. A9705. The record contains letters from the leaders of the Medoc Tribe of Oklahoma, the Soboba Band Mission of Indians, the Seminole Nation of Oklahoma, the Miami Tribe of Oklahoma, the Salt River Pima-Maricopa Indian Community, and the Eastern Band of Cherokee Indians—all stating that the Redskins name is a source of pride, honor, and respect within their tribes—as well as individual letters of support from Native American people. *See* A9364, A9381-82, A9386-410.[6]

In sum, because a substantial composite of Native Americans reject the contention that "redskins" is per se derogatory, *amici* respectfully urge the Court to take a more measured approach to the controversial claim that the term and related imagery should be banned from public use.

---

[6]     Chiefs of the Eastern Band of Cherokee Indians, the Aleutian Tribes of Alaska, and four tribes recognized by the State of Virginia, have also voiced support for the Redskins name. Tracy Sears, *Virginia Tribes Call Out Obama on Redskins' Name Controversy*, CBS 6 (October 15, 2013); Keith Jarrett, *What's in a Name? Redskins Offensive or Noble Moniker*, Citizen-Times (Aug. 26, 2014); *Native American Chief Talks About Redskins*, Official Site of the Washington Redskins (May 3, 2013), http://www.redskins.com/news-and-events/article-1/Native-American-Chief-Talks-About-Redskins/cdb3c94e-f5c6-4d98-9acd-18d7fb768bb7; Paul Woody, *Woody: American Indians in Va. Have No Problem with "Redskins,"* Richmond Times-Dispatch (May 15, 2013).

**III.  THE DECISION BELOW THREATENS THE VIABILITY OF ALL PUBLIC REFERENCES TO NATIVE AMERICAN TERMS AND IMAGERY AND FAVORS THE VIEWS OF UNELECTED ADMINISTRATORS OVER THOSE OF NATIVE AMERICANS.**

If affirmed, the District Court's decision could have severe implications for Native American culture that carry well beyond professional football.  Native American terminology and imagery appears in everything from amateur sports teams to automobiles.  Deeming "red"-related terminology intrinsically derogatory under trademark law—without tethering that finding to a more inclusive approach to quantifying the effect on Native Americans—holds the potential to unduly eradicate Native American influence from local and national discourse altogether.

From 1967-1990, the name "redskins" was routinely used by Native American tribes and organizations for both youth and adult sports teams.  Rose Decl. Exs. 46-91; Butters Ex. 3 at 32-34 & Ex. D.  By July of 2013, there existed as many as 2,129 amateur, high school, college, semi-pro and pro teams with names that reference tribes or Native American terminology.  Hayley Munguia, *The 2,218 Native American Mascots People Aren't Talking About,* fivethirtyeight.com (Sept. 5, 2014).  The vast majority—if not all—of these team names have benign origins.  When first used for sports teams the 1850's, Native American names were "chosen to emphasize the 'Americaness' of the team and its patriotic behavior, not any particular Indian-like characteristics of its players."  J.

Gordon Hylton, *Before the Redskins Were the Redskins: The Use of Native American Team Names in the Formative Era of American Sports, 1857-1933,* 86 N.D. L. Rev. 879, 890 (2010). By the 1920's, teams adopted Native American names either because of their location or "because of a growing association in the public mind between Native Americans and success in athletics . . . ." *Id.* at 890-91. The Redskins logo itself is attributed to a former chairman of the Blackfeet tribe, Walter "Blackie" Wetzel. "'It made us all so proud to have an Indian on a big-name team," he told the Washington Post. Marc Fisher, *American Indians Among Admirers of Redskins Name,* Wash. Post (Jan. 26, 2002), at B1. "'It's only a small group of radicals who oppose those names.'" *Id.*

Today, Native Americans unabashedly retain the term "redskins" in countless contexts. It is the nickname for the Red Mesa High School, a Native American school located on the Navajo Indian Reservation. Rose Decl. Exs. 46-49; Butters Ex. 3 at 32-34 & Ex. D. In Washington State, the Wellpinit High School—which serves the Spokane Indian Reservation and is comprised predominantly of Native American students—has used the nickname "Redskins" for over 100 years. Rose Decl. 91, 134. The term has appeared on the Navajo Reservation on street signs, on a hotel on the Cherokee Indian Reservation, and on a movie theatre named by Native Americans. *Id.* Exs. 117-91, 3 (No. 59); A9424-25. The state of Oklahoma itself is named for "red people" in the Choctaw

language ("okla" meaning people and "humma" meaning red).  A9386-87.

Vehicle manufacturers—like Pontiac, Chrysler's Jeep Cherokee, and Winnebago—

use tribal names, as do other professional sports teams like the Cleveland Indians

and the Chicago Blackhawks.  Glenn Collins, *When Car Names Assume Ethnic

Identities,* N.Y. Times (June 21, 2013).  The implications of cancelling the

Redskins trademark registrations have no obvious termination point in the broader

debate about the symbolic presence of Native American terms and images in

public life.  *See* Nat'l Cong. of American Indians Res. #MSP-15-047,

http://www.ncai.org/resources/resolutions/standing-in-support-of-our-two-spirit-

relatives-in-our-communities-and-nations (NCAI resolution urging the

decolonization of Native American tribes).  The Court should allow that debate to

occur in the public square, where it belongs, and not just in a petition brought by

five individuals before the U.S. Patent and Trademark Office (PTO).

Indeed, by effectively silencing the composite of Native American

individuals who celebrate "red"-based terminology, the District Court's decision

wrongly favors the views of mostly non-native administrators over those of Native

Americans who lack the means to express a voice in the cancellation process.  In

1992, the Chairman of the Soboba Band of Mission Indians made precisely this

point, remarking that, although attacks on the Redskins name are made "in the

name of the Indian people," Native American history is riddled with "outsiders

talking and deciding for the Indian people without being elected to do so."  A9364.

Given that agencies and federal courts are politically unaccountable, the PTO and

the District Court were wrong to inject themselves into this social policy debate.

*See* Jonathan Turley, *The Patent Office Goes Out of Bounds in Redskins*

*Trademark Case,* Wash. Post (June 20, 2014).  *Amici* accordingly request that the

Court reject the Defendant's transparent effort to use the federal courts and

trademark law as a ruse for effectuating a broader political agenda over which the

Native American community is deeply divided.

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that this Court reverse

the decision of the District Court.

Respectfully submitted,

s/Thomas C. Goldstein
Thomas C. Goldstein
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue, Suite 850
Bethesda, Maryland 20814

Kimberly N. Brown
3909 Virgilia Street
Chevy Chase, Maryland 20815

*Counsel for Amici Curiae*

Dated: November 6, 2015

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit through the CM/ECF system on November 6, 2015. I further certify that all parties in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 6th day of November, 2015.

s/Thomas C. Goldstein
Thomas C. Goldstein
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue, Suite 850
Bethesda, Maryland 20814

Kimberly N. Brown
3909 Virgilia Street
Chevy Chase, Maryland 20815

*COUNSEL FOR AMICI CURIAE DON BETTELYOUN, FORT MCDERMITT PAIUTE SHOSHONE TRIBE, BOYD GOURNEAU, NATIVE AMERICAN GUARDIANS ASSOCIATION, AND PETER MACDONALD*