NO. 15-1874

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

PRO-FOOTBALL, INC.,

Plaintiff-Appellant

v.

AMANDA BLACKHORSE: MARCUS BRIGGS-CLOUD; PHILLIP GOVER;
JULLIAN PAPPAN; COURTNEY TSOTIGH,

Defendants-Appellees,

UNITED STATES OF AMERICA,

Intervenor-Appellee.

---

On Appeal from the United States District Court for the Eastern District of Virginia,
Alexandria Division No. 1:14-cv-01043 (Hon. Gerald Bruce Lee)

---

## BRIEF OF FIRST AMENDMENT LAWYERS ASSOCIATION
## AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT
## PRO-FOOTBALL, INC.

---

Marc J. Randazza
Randazza Legal Group, PLLC
3625 S. Town Ctr. Dr., Suite 150
Las Vegas, NV 89135
(702) 420-2001

# CERTIFICATE OF INTEREST

Counsel for First Amendment Lawyers Association certifies the following:

1. The full name of every party or amicus curiae represented by me is:

First Amendment Lawyers Association

2. The name of the real party in interest (if the parties named in the caption are not the real parties in interest) represented by me is:

N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4. The names of all law firms and partners or associates that appeared for the party or amicus curiae now represented by me in the trial court or agency or are expected to appear in this court are:

Marc J. Randazza, Randazza Legal Group, PLLC.

> Marc J. Randazza
> Randazza Legal Group, PLLC
> 3625 S. Town Center Drive
> Suite 150
> Las Vegas, NV 89135
> (702) 420-2001

Dated: November 6, 2015

Respectfully submitted,

/s/ Marc J. Randazza
Marc J. Randazza

Attorney for *Amicus Curiae*
First Amendment Lawyers Association

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ..................................................................II

TABLE OF AUTHORITIES.................................................................. IV

SUMMARY OF ARGUMENT ................................................................2

ARGUMENT...........................................................................................3

  1.0  INTRODUCTION ...........................................................................3

  2.0  SECTION 2(A) IS A VIEWPOINT-BASED RESTRICTION ...........................5

    2.1  Trademarks are protected commercial speech ...........................5

    2.2  Trademark registration confers significant benefits,
    and a Section 2(a) refusal can cause significant harm.........................7

    2.3  Section 2(a) is a viewpoint-based restriction on protected speech....................9

  3.0  SECTION 2(A) FAILS TO PROMOTE ANY SUBSTANTIAL
  GOVERNMENT INTEREST...................................................................12

    3.1  Discouraging the use of "immoral" or "scandalous" marks ...........................12

    3.2  Occupying the "time, services, and use of funds of the
    federal government".........................................................14

    3.3  Stamp of approval—Trademarks are not government speech.........................15

  4.0  SECTION 2(A) IS VOID FOR VAGUENESS. ...............................................16

CONCLUSION ......................................................................................17

# TABLE OF AUTHORITIES

## CASES

*Bad Frog Brewery v. New York State Liquor Authority*,
  134 F.3d 87 (2d Cir. 1998) ............................................................ 4, 12, 15

*Bolger v. Youngs Drug Products Corp*,
  463 U.S. 60 (1983) .............................................................................. 13

*Burwell v. Hobby Lobby*,
  573 U.S.___, 134 S.Ct. 2751 (2014) ..................................................... 7

*Central Hudson Gas & Electric v. Public Service Commission*,
  447 U.S. 557 (1980) .............................................................................. 4

*Cohen v. California*,
  403 U.S. 15 (1971) .......................................................................*passim*

*Doyle v. Continental Ins. Co.*,
  94 U.S. 535, 543 (1876) ......................................................................... 5

*Edenfield v. Fane,*
  507 U.S. 761 (1993) ..................................................................... 4, 10, 12

*FCC v. Pacifica Found.*,
  438 U.S. 729 (1978) ............................................................................ 13

*Florida Bar v. Went for It, Inc.*,
  515 U.S. 618 (1995) ...................................................................... 12, 15

*Friedman v. Rogers*,
  440 U.S. 1 (1979) .................................................................................. 5

*Home Ins. Co. of New York v. Morse*,
  87 U.S. 445 (1871) ................................................................................ 5

*In re Boulevard*,
  334 F.3d 1336 (Fed. Cir. 2003) ...................................................... 11, 17

*In re Fox,*
  702 F.3d 633 (Fed. Cir. 2012) ............................................................ 8, 10, 17

*In re Mavety Media Group,*
  33 F.3d 1367 (Fed. Cir. 1994) ................................................................ 11, 16

*In re McGinley,*
  660 F.2d 481 (1981) ..........................................................................5, 7, 14, 15

*In re Old Glory Condom Corp.,*
  26 U.S.P.Q.2d 1216 ..................................................................................15

*In re RK Netmedia, Inc.,*
  2009 TTAB LEXIS 389 (T.T.A.B. May 21, 2009) ............................................ 6

*In re Tam,*
  No. 85472044 (Fed. Cir. Apr. 20, 2015) ....................................................... 8

*Lawrence v. Texas,*
  539 U.S. 558 (2003) ..................................................................................12

*Miller v. California,*
  413 U.S. 15 (1973) ............................................................................... 14, 16

*Roth v. United States,*
  354 U.S. 476 (1957) ............................................................................... 5, 16

*Rumsfeld v. Forum for Academic & Institutional Rights,*
  547 U.S. 47 (2006) ..................................................................................... 5

*Simon & Schuster v. New York State Crime Victims Bd.,*
  502 U.S. 105 (1991) .................................................................................. 9

*Thrifty Rent-a-Car System v. Thrift Cars, Inc.,*
  831 F.2d 1177 (1987) ................................................................................. 8

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,*
  425 U.S. 748 (1976) ............................................................................ 5, 6, 7

*Weiner King, Inc. v. Weiner King Corp.,*
  615 F.2d 512 (1980) .................................................................................. 8

**STATUTES**

15 U.S.C. § 1052(a)........................................................................*passim*

15 U.S.C. §1057 .................................................................................8

15 U.S.C. §1072 .................................................................................8

15 U.S.C. §1117 .................................................................................8

15 U.S.C. §1121 .................................................................................8

15 U.S.C. §1124 .................................................................................8

## STATEMENT OF INTEREST OF AMICUS CURIAE[1]

Amicus First Amendment Lawyers Association ("FALA") is a national, non-profit organization of approximately 200 members who represent the vanguard of First Amendment lawyers. Its central mission is to uphold and defend the First Amendment. Founded in the late 1960s, *Amicus'* members were involved in many landmark cases upholding significant First Amendment rights, including *United States v. Stevens,* 559 U.S. 460 (2010); *Ashcroft v. Free Speech Coalition,* 535 US. 234 (2002); *United States v. Playboy Entertainment Group*, 529 U.S. 803 (2000); *Toffoloni v. LFP Publishing Group LLC*, 483 Fed. Appx. 561 (11th Cir. 2012); *United States v. Extreme Associates, Incorporated*, 431 F.3d 150 (3d Cir. 2005); *United States v. Stagliano et al.*, 693 F. Supp. 2d 25 (D.D.C. 2010); *United States v. Little*, 2008 WL 2959751 (M.D. Fla. 2008); *Alameda Books v. City of Los Angeles*, 222 F.3d 719 (9th Cir. 2000), *rev'd*, 535 U.S. 425 (2002), and *United States v. Investment Enterprises*, 10 F.3d 263 (5th Cir. 1993).

FALA's members often represent adult entertainment companies' interests in trademark matters, which underlies this suit. The instant dispute concerns the constitutionality of Lanham Act § 2(a) as it represents an infringement upon First Amendment rights. This question is central to the demonstrated interests and activities of FALA's membership. FALA therefore has both a substantial interest in the subject matter and significant knowledge that the Court should find useful in evaluating the future of Section 2(a).

---

[1] The First Amendment Lawyers Association submits this brief as *amicus curiae* pursuant to Fed. R. App. Pro. 29(a). No party or party's counsel authored the brief in whole or in part or contributed money intended to fund preparing or submitting it and no person other than *amicus curiae* contributed money intended to fund its preparation or submission.

## SUMMARY OF ARGUMENT

This appeal concerns the issue of the constitutionality of Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a). This provision of the Lanham Act violates the First Amendment of the United States Constitution in that it is a viewpoint-based restriction on protected commercial speech because it deprives citizens of a federal benefit based on both the content and the viewpoint of their speech. No articulable government interest exists to justify this restriction. Even if such an interest did exist, Section 2(a) is not sufficiently narrowly tailored to materially advance the interest. Section 2(a) is also void for vagueness because it does not warn trademark holders of what marks will be deemed immoral, scandalous, or disparaging and it does not warn trademark holders that their trademark may be revoked if it later becomes immoral, scandalous, or disparaging.

# ARGUMENT

## 1.0     Introduction

The case-in-chief deals with the "disparaging" portion of Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a), and *amicus* sees no reason to engage in a full discussion of that section, which has been well briefed by the parties, and presumably will be well briefed by other *amici*. The First Amendment Lawyers' Association uses this opportunity to educate the Court on the unconstitutionality of the *entirety* of the "morality clause" of Section 2(a).

The unconstitutional restrictions on trademarks containing "immoral . . . or scandalous matter; or matter which may disparage" imposed by Section 2(a) impede trademark applicants and owners from receiving the benefits of federal trademark protection on the sole basis that their marks consist of speech that the government has decided to disfavor.

The general narrative put forth by the government, and fans of Section 2(a) is the somewhat flippant argument that a 2(a) denial does not restrict one's right to *use* the trademark in question, it merely restricts one's right to *register* the trademark – and all the benefits that come from *registration*. First, a rejection or cancellation under Section 2(a) actually does deprive the mark owner of significant rights – and not just a pretty piece of paper from the USPTO. It arguably deprives the owner of the right to enforce the mark and inarguably limits the owner's ability to enforce it, as well as other important statutory rights. The glib view that "well, you can still use it" is insufficient under the First Amendment, lacks a foundation in logic, and is more "immoral and scandalous" than any trademark. Analogies abound, but imagine if the federal government allowed public demonstrations on public land, and provided security and porta potties to all demonstrators – unless the banners at the demonstration used cuss words. Those shouting "I prefer not to be drafted" would get all of these benefits, but those shouting "Fuck the Draft" would not.

3

Though trademarks are limited in their ability to be "distasteful," at least compared to copyrightable works, the ones that are potentially "immoral" or "scandalous" still embody the notion that "one man's vulgarity is another's lyric." *See Cohen v. California*, 403 U.S. 15, 25 (1971). Trademarks convey the kind of speech the First Amendment abides being circulated into the "marketplace of ideas;" trademark holders have financial incentives to make their name acceptable to the public, and the public has the power to reject those trademarks if it doesn't like them. *Edenfield v. Fane,* 507 U.S. 761, 766-67 (1993) (discussing, in general, the incentive for sellers to attract certain buyers by educating them about a product and the buyer's incentive to explore and compare products. "The commercial marketplace . . . provides a forum where ideas and information flourish. . . . the speaker and the audience, not the government, assess the value of the information presented."). By imposing unconstitutional conditions to the registration and enforcement of "immoral and "scandalous" words, Section 2(a) impermissibly infringes upon free speech and commercial expression.

"Minimal information, conveyed in the context of a proposal of commercial transaction suffices to invoke the protection for commercial speech articulated in *Central Hudson*." *Bad Frog Brewery v. New York State Liquor Authority*, 134 F.3d 87, 97 (2d Cir. 1998). The Supreme Court in *Central Hudson* determined that where speech is protected, the court must determine "whether the asserted government interest is substantial . . . whether the regulation directly advances the government interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Central Hudson Gas & Electric v. Public Service Commission*, 447 U.S. 557, 566 (1980). Section 2(a) violates the First Amendment because it is an arbitrary viewpoint-based restriction on protected speech that does not advance any substantial government interest.

**2.0   Section 2(a) Is a Viewpoint-Based Restriction on Receipt of a Government Benefit in Violation of the Unconstitutional Conditions Doctrine Because It Bars Registration (and Enforcement) of Trademarks Based on Their Content and Viewpoint**

Under the unconstitutional conditions doctrine, the government may not condition the availability of a government benefit on an individual's agreement to surrender a constitutional right. *See Home Ins. Co. of New York v. Morse*, 87 U.S. 445, 451 (1871); *Doyle v. Continental Ins. Co.*, 94 U.S. 535, 543 (1876); *Rumsfeld v. Forum for Academic & Institutional Rights*, 547 U.S. 47 (2006). Trademark registration is designed to provide government benefits to trademark registrants. *See In re McGinley*, 660 F.2d 481, 486 n.12 (1981) ("What is denied are the benefits provided by the Lanham Act which enhance the value of a mark."). Not only does the government assert that it may deny these benefits under 2(a) but also that it may take away these benefits if the interpretation of a trademark changes. As a viewpoint-based restriction on protected speech, Section 2(a) violates this doctrine.

### 2.1   Trademarks are protected commercial speech

The First Amendment protects "[a]ll ideas having even the slightest redeeming social importance." *Roth v. United States*, 354 U.S. 476, 484 (1957). This includes commercial speech, which proposes a commercial transaction. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 762 (1976). Trademarks are commercial speech because they convey messages about the type, cost, and quality of the products or services associated with the mark. *See Friedman v. Rogers*, 440 U.S. 1, 11 (1979). Trademarks help consumers identify the quality of a certain good or service so the consumer can choose whether or not to repeat their purchasing experience. "Society [] has a strong interest in the free flow of commercial information, both because the efficient allocation of resources depend upon informed consumer choices," and because such information is of general public interest. *Id.* Thus, protection of trademarks supports not only the speaker, but also the

5

consumer's right to "receive information and ideas." *See Virginia State Bd.*, 425 U.S. at 756.

In *Virginia State Bd.*, the Virginia Consumer Council argued for limiting price advertising for pharmacies because it had an interest in maintaining professionalism in the pharmacy industry. The Court denied this argument, stating that any pharmacist acting against his customers' interest would not only lose his license, but customers would likely stop going to that pharmacist. *Id.* The First Amendment "is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us." *Cohen v. California*, 403 U.S. 16 (1971). Trademarks are one of the simplest places to apply this kind of market-based control. Like consumers who choose a pharmacist who has their interests in mind, consumers who do not approve of the name or message sent by a trademark will refrain from patronizing that company. For example, the pornography-consuming public might be shocked and scandalized at a website called CUMFIESTA. See *In re RK Netmedia, Inc.*, 2009 TTAB LEXIS 389 (T.T.A.B. May 21, 2009) (affirming refusal of CUMFIESTA and CUMGIRLS for adult oriented internet material). If a competitor sold similar goods under the hypothetical mark EFFLUVIA PARTY, and the pornography-consuming public liked the tasteful nature of that name better, then the marked would speak to the former – "change your name if you want our money."

Allowing the market to regulate what speech is favored and what speech is disfavored is the American way. But the government cannot place an unconstitutional condition on the registration and enforcement of otherwise valid trademark rights simply because a trademark examiner applied a vague and outdated standard to deem it too shocking for the public to handle.

Trademarks provide consumers with information concerning the ideals and philosophical underpinnings of a company. "Advertising, however tasteless and

excessive it sometimes may seem, is nonetheless dissemination of information," and this information can be vital to consumers in determining what companies to purchase from. *Virginia State Bd.*, 425 U.S. at 765. In the aforementioned hypothetical, perhaps pornography purchasers would look at the competing publications and say to themselves "you know, CUMFIESTA has just the right level of whimsy and sexuality for me, that's what I want." Why should the government place its finger on the scale simply because someone, somewhere, thinks that someone else might be "shocked?"

Trademark holders and company owners use trade names and businesses to promote their personal views and make those views known to their customers. *See e.g. Burwell v. Hobby Lobby*, 573 U.S.___, 134 S.Ct. 2751 (2014). In the end, it is the mark holder's choice to use a mark that may discourage or even alienate certain consumers. Such a decision may even be made for the purpose of scaring away certain customers; promoting a certain viewpoint; to gain notoriety for having a controversial name; or simply because the name has some significance, personally, historically, or otherwise.

Trademarks are speech protected by the First Amendment. Aside from protecting the public from trademarks that are deceptive or concern unlawful activity, the PTO's refusal or revocation of a mark under Section 2(a) and the impairment of the right to enforce the rights under such marks, amounts to a restraint on protected speech that requires substantial justification. No such justification exists here.

## 2.2   Trademark registration confers significant benefits, and a Section 2(a) refusal or revocation causes significant harm

Trademark registration is not a frivolous act, as suggested by *In re McGinley*, which stated, "refusal to register [an applicant's] mark does not affect his right to use it." *In re McGinley*, 660 F.3d 481, 484 (C.C.P.A. 1981). This statement ignores the many benefits that come with trademark registration and the difficulty in enforcing non-registered marks. The Lanham Act provides numerous statutory benefits to

registered marks not similarly conferred on non-registered or state registered marks. For example, a certificate of federal registration (1) is *prima facie* evidence of validity (15 U.S.C. §1057); (2) provides constructive notice of trademark ownership (*Id.*, § 1072); (3) provides protection from certain state requirements for displaying marks (*Id.*, § 1121); (4) allows recovery of statutory damages and attorney fees (*Id.*, §1117); and (5) provides the ability to prevent importation of infringing goods (*Id.*, § 1124). Aside from the explicit benefits provided by the Lanham Act, registration likely increases income from trademark licensing and helps to generate nation-wide goodwill for the product or service. Revoking a mark has the opposite affect, taking away government benefits, licensing income, and goodwill.

Since many state trademark laws imitate the Lanham Act, an unsuccessful trademark applicant will likely not receive these benefits under state law, either. *See In re Tam*, No. 85472044 at 8 (Fed. Cir. Apr. 20, 2015) (Moore, J.). Using a mark without registration only permits protected use within the owner's geographic area, and thus the unregistered trademark holder is subject to competition avoided by trademark registrants. *See, e.g. Thrifty Rent-a-Car System v. Thrift Cars, Inc.*, 831 F.2d 1177 (1987); *Weiner King, Inc. v. Wiener King Corp.*, 615 F.2d 512 (1980). Even a mark that is widely-known can face protection problems because the government enforcement is non-existent.

Despite the many benefits it provides, the Lanham Act is not, in practice, a purely benevolent statute for trademark applicants. Refusal under Section 2 of the Lanham Act can serve as a scarlet letter that precludes enforceability of the mark even under Section 43(a), which protects unregistered marks. *See Renna v. County of Union,* 88 F.Supp.3d 310, 321 (D.N.J. 2014) (finding that mark found unregistrable due to Lanham Act Section 2(b) was not entitled to protection under Section 43(a)); *and see In re Fox*, 702 F.3d 633, 640 (Fed. Cir. 2012) (subsequent to refusing registration of COCK SUCKER mark on Section 2(a) grounds, stating that the applicant "will be

unable, however, to call upon the resources of the federal government in order to enforce the mark"). Therefore, the Court cannot simply brush aside the notion that registrability is an insignificant benefit.

A 2(a) rejection or revocation has a very significant financial impact upon a rejected or revoked mark owner. "[A] statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." *Simon & Schuster v. New York State Crime Victims Bd.*, 502 U.S. 105, 115 (1991). Refusals increase costs to trademark applicants seeking to register or use allegedly "immoral" or "scandalous" trademarks; they may endure the cost of a federal registration application, state registration application, appeals, cost in changing their logo or business name to comply with Section 2(a), and costs of the complete loss of trademark eligibility. This creates an even greater financial burden if a business's long-standing mark is revoked.

Individuals and businesses refrain from using certain terms as trademarks for fear the PTO might see the terms as immoral, scandalous, or derogatory, in violation of section 2(a). Such self-censorship narrows the spectrum of speech in the public marketplace. The possibility for revocation of a mark strengthens this effect— trademark holders have reason to be even more cautions with choosing certain terms that could at any time be held to violate 2(a). Section 2(a) denies government benefits and places monetary and legal burdens on applicants with allegedly "immoral" or "scandalous" marks, in violation of the First Amendment.

### 2.3    Section 2(a) is a viewpoint-based restriction on protected speech

Section 2(a) is a restriction based on the content of an applicant's trademark. An impossible to quantify "value" to society provided by the mark should not be relevant to the government's circumvention of First Amendment protection, as

> the commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish. Some of the

9

ideas and information are vital, some of slight worth. But the general rule is that the speaker and the audience, not the government, assess the value of the information presented.

*Edenfield v. Fane*, 507 U.S. 761, 767 (1993).

In *Edenfield*, the Court determined that a rule prohibiting CPAs from engaging in in-person solicitation, as applied, violated the First Amendment, finding that the law threatened access to accurate commercial information. *Id.* at 777. Similarly, Section 2(a) restricts consumers' access to accurate commercial information about the business the trademark is affiliated with, as well as to any additional speech conveyed by the trademark itself. As with anyone exercising their First Amendment rights, trademark holders should be permitted to engage in commercial speech with consumers potentially interested in their products or associated ideas. Mark holders should similarly be permitted to continue those relationships after the mark has been established.

*In re Fox* tells us that trademarks are protected by the First Amendment, and that Section 2(a) is a viewpoint-based restriction on such protected speech. In that case, the Federal Circuit determined that the mark "COCK SUCKER" for rooster-shaped chocolate lollipops was "scandalous" under Section 2(a). *In re Fox*, 702 F.3d at 639–40. In its decision, the court determined that in addition to satisfying the definitions of scandalous, if a mark has *any* "vulgar" meaning it is *per se* scandalous. *Id.* at 635. Thus, the court applied Section 2(a) to determine whether the "public will assign" a scandalous meaning to the mark even if the mark is a double entendre. *Id.* at 636. The applicant in *In re Fox* wanted to use the mark "COCK SUCKER as a joke, playing off the multiple definitions of the words and their literal meaning as applied to her actual product, rooster lollipops. *Id.* By using an exact definition, the court removed all possible humor from the name. One does not look at the mark "Cock sucker" and think "that is quite humorous because it is in reference to 'one who performs an act of fellatio,'" as the court suggested. *See id.* at 635. Instead, it is

10

inherently humorous because we live in a society with "taboo" statements that are not inherently unacceptable.

This decision, and the court's reasoning therein, establishes that trademarks possess elements of speech beyond merely identifying the source of goods and services; indeed, how could speech that merely identifies the source of goods or services be "vulgar" at all, such that it could offend the sensibilities of the PTO? The only effect of Section 2(a) is for the PTO to make a determination that certain terms, which express particular viewpoints about particular subjects, are off-limits.

In a similar case, the Federal Circuit determined "jack-off" to be an immoral and scandalous term in *In re Boulevard*, despite evidence showing that the term was neither. 334 F.3d 1336 (Fed. Cir. 2003). The court interpreted *In re Mavety Media Group*, 33 F.3d 1367 (Fed. Cir. 1994), to say that dictionary definitions alone were insufficient to determine whether a mark was "scandalous," except where there is only one pertinent meaning as applied to the trademark at issue. *Boulevard*, 334 F3d at 1340. The applicants had provided evidence "to show that the term . . . is not immoral or scandalous," but the court found that the declarations in the record "consist[ed] mainly of the personal opinions of the declarants as to the offensiveness of the term." *Id.* at 1341. Once it determined that "masturbation" was *the* definition of the term "jack-off," the court found the term to be offensive and ignored all evidence to the contrary as "wholly irrelevant." *Id.* at 1343. The court picked one definition of the term "jack-off," decided it was "offensive," and then withheld a federal benefit to the applicant based on the viewpoint towards a sexual topic expressed by the applicant's trademark. This is not the kind of determination that courts or the PTO make only when feeling especially authoritarian; this is a determination that *any* trademark examiner *must* make when choosing to refuse registration on Section 2(a) grounds. There simply is no viewpoint-neutral, much less content-neutral, way to refuse or revoke registration based on Section 2(a).

11

Because Section 2(a) limits this transfer of information based on the viewpoint expressed by a trademark, it regulates protected speech. In light of this, Section 2(a) must be "narrowly tailored" to serve a substantial government interest. *Florida Bar v. Went for It, Inc.*, 515 U.S. 618, 632 (1995). It is not.

## 3.0   Section 2(a) Fails to Promote Any Substantial Government Interest

Under the First Amendment, the requirement of a substantial government interest "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Florida Bar v. Went for It, Inc.*, 515 U.S. at 628. Instead, trademarks can facilitate societal change by "providing a forum where ideas and information flourish. . . . [where] the audience, not the government, assess[es] the value of the information presented." *Edenfield*, 507 U.S. at 1798. "Laws restricting commercial speech . . . need only be tailored in a reasonable manner to serve a substantial state interest." *Id.*; *see also, Bad Frog* 134 F.3d at 98. The PTO has not historically articulated any interest that can justify the existence of Section 2(a), and no such interest is even conceivable.

### 3.1   Discouraging the use of "immoral" or "scandalous" marks

Section 2(a) is a viewpoint-based restriction on speech that the government finds "immoral." The U.S. Supreme Court has stated in no uncertain terms that "[t]he fact that a State's governing majority has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice." *Lawrence v. Texas*, 539 U.S. 558 (2003). While *Lawrence* dealt with an anti-sodomy law, its reasoning is just as applicable to Section 2(a); the PTO cannot use "morality" to justify the selective restriction and governmental discouragement of protected speech on the basis of its content or message.

12

The registration and operation of trademarks does not implicate more valid concerns such as the privacy or physical safety of consumers, either. The court in *Florida Bar v. Went for It, Inc.* accepted the government's interest in protecting individuals' privacy as a reason to uphold a 30-day solicitation ban for personal injury attorneys because the attorneys had a business incentive to seek out persons who had been in accidents. This interest in privacy was sufficient to sustain a restriction on commercial speech. The general consuming public, however, has a choice to purchase from the trademark holder, and the mere registration of an "offensive" trademark can in no way invade the privacy of individuals, just as a jacket stating "fuck the draft" does not invade the privacy of people in a public space. *See Cohen*, 403 U.S. 15. Rather, consumers have a greater ability to "avoid further bombardment of their sensibilities" by not only "simply averting their eyes," but by denying a certain company their business. *Id.* at 21.

A "short, though regular, journey from mail box to trash can" has been found to be an acceptable burden under the Constitution. *Bolger v. Youngs Drug Products Corp*, 463 U.S. 60, 72 (1983). In *Bolger*, the Court held that the intrusion of mail for contraceptives into one's home was acceptable and could not be constitutionally banned. How, then, could the registration of an "immoral" or "scandalous" display in an advertisement or a storefront be so invasive as to justify a restraint on protected speech? Indeed, today we have an even greater ability to avert our eyes from "offensive" material. For instance, there are numerous television channels and radio stations to choose from, certainly more than in the 1970s. During the time of the *FCC v. Pacifica* case courts may have had a stronger rationale to limit indecent speech, but even that case upheld rights under the First Amendment. *FCC v. Pacifica Found.*, 438 U.S. 729, 745–46 (1978) ("Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection. For it is a central tenet of the First Amendment that the government must remain neutral in the

13

marketplace of ideas."). Avoiding going to an offensive store, searching for them on the Internet, or even having to change the channel is not a significant burden the court need relieve the public of.

### 3.2    Occupying the "time, services, and use of funds of the federal government"

Courts have previously attempted to justify Section 2(a) under the reasoning that this provision reflects "a judgment by the Congress that such marks not occupy the time, services, and use of funds of the federal government." *McGinley*, 660 F.2d at 486. This reasoning, as with much of *McGinley*, collapses under any logical scrutiny. As the dissent in that case pointed out, "[m]ore public funds are being expended in the prosecution of this appeal than would ever result from the registration of the mark." *See McGinley*, 660 F.2d at 487 (Judge Rich, dissenting). In cases where a mark is initially "acceptable," but times change, and the mark becomes "immoral" to "a substantial composite" of the public, then even more government resources would be consumed by a challenge to the mark's registrability.

Even if the supposed rationale of "resource scarcity" happened to be sufficient justification for the restrictions on protected speech created by Section 2(a), the supposed cost-saving purpose of this provision has never been borne out by reality. The time and consideration it takes to determine whether a mark is "immoral" or "scandalous" is burdensome on the PTO, the courts, and mark owners. Opinions on issues of morality change almost daily and also depend on geography, a trait that Section 2(a) shares with determinations on whether speech is "obscene."[2] Thus, a determination of "immorality" or "scandalousness" under Section 2(a) is not one that

---

[2] While obscene speech is not afforded protection under the First Amendment, it is difficult to conceive of a trademark that could be considered legally obscene by today's common community standards. *See Miller v. California*, 413 U.S. 15 (1973).

can easily be made based on "history, consensus, and simple common sense." *Florida Bar*, 515 U.S. at 628.

Further, "a prohibition that makes only a minute contribution to the advancement of a state interest can hardly be considered to have advanced the interest to a material degree." *Bad Frog*, 134 F.3d at 99. Thus, even if Section 2(a) did manage to net the PTO some small savings, this would be insufficient to justify the Section's existence, as the government must show that "the harms it recites are real and that its restriction will in fact alleviate them to a *material degree*." *Id.* (emphasis in original).

### 3.3    Trademarks are not government speech

Another suggested government interest in Section 2(a) is that Section 2(a) prevents the public from assuming that the PTO approves of "immoral" trademarks. *See In re McGinley*, 660 F.2d at 844. The government does not, however, have any issue archiving copyrightable works that many find distasteful. This is not colonial England, where citizens had to receive permits to publish their speech. People do not assume that someone can say something only with the government's consent and approval. The same logic applies to the conferral of government benefits for purposes that are wholly unrelated to the content of the benefited speech. Trademark law exists to improve the experience of customers in the marketplace, not to protect people from "immoral" or "scandalous" speech.

But this is beside the point, as there is no guesswork involved in whether the PTO expresses approval of a trademark's message by granting registration. The PTO explicitly denies any approval of the message conveyed by a trademark. *See In re Old Glory Condom Corp.*, 26 U.S.P.Q.2d 1216, 1219–20 ("the act of registration is not a government imprimatur or pronouncement that the mark is a 'good' one in an aesthetic, or any analogous, sense"). Moreover, just as "the mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense" (*Cohen*, 403 U.S. at 21), the mere presumed presence

of people who erroneously consider trademark registration as a government stamp of approval does not justify curtailing all possibly "immoral" or "scandalous" speech.

## 4.0    Section 2(a) is Void for Vagueness

The multitude of inconsistent Section 2(a) cases show that Section 2(a) does not convey "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices," as required by the Constitution. *Roth v. United State*, 354 U.S. 467, 491 (1957). In applying Section 2(a), "[t]he determination that a mark comprises scandalous matter is a conclusion of law based upon underlying factual inquiries." *In re Mavety Media Group*, 33 F.3d 1367, 1371 (Fed. Cir. 1994). In *In re Mavety*, the court noted that analysis for trademark refusal requires the opinions of a "substantial composite of the general public, the context of the relevant marketplace, or contemporary attitudes." *Id.* at 1373. Additionally, the court stated, "we must be mindful of ever-changing social attitudes and sensitivities." *Id.* at 1371.[3] This standard is similar to the standard for assessing obscenity, but addresses protected speech. *Cf. Miller v. California*, 413 U.S. 15 (1973). Though *McGinley* specifically rejected this comparison, the Supreme Court has used obscenity law to show that speech enjoys full First Amendment protection where it does not fall under

---

[3] This admonishment to "keep up with the times" was offered to argue for a more liberal interpretation of previously "immoral" marks. However, consider the converse (as is at issue in this case). A word that has no non-innocent meaning at all can, through cultural shifts, become one that will at least draw laughter, if not scorn. For example, consider the shifting meaning of the word "tea bag." When used as a noun, as it has been for decades, there is no likely concern. However, the verb has a very different meaning. Would a mark that once contained this term be subject to later revocation? Section 2(a) also fails to give appropriate warning if the standard changes. In the past certain marks like "Redskins" was not seen as offensive, or at least there was no action that could correct the issue. Now we see that the TM office can revoke a mark after it has been issued with no 2(a) objection. The TM holder thus has to worry both that the mark will be denied under 2(a) during initial filing and that the mark could be revoked at any later date for a 2(a) conflict.

16

unprotected or significantly less protected categories of speech.  *See Cohen v. California*, 403 U.S. at 20.

To prove that a mark is scandalous, one "must demonstrate that the mark is 'shocking to the sense of truth, decency, or propriety; disgraceful; offensive; disreputable; giving offense to the conscience or moral feelings; or calling out for condemnation," but "a showing that a mark is vulgar is sufficient to establish that it consists of or comprises immoral or scandalous matter within the meaning of section 1052(a)." *In re Fox*, 702 F.3d 633, 635 (Fed. Cir. 2012).  This standard is said to be "determined from the standpoint of a substantial composite of the general public, and in the context of contemporary attitudes." *Id.*; *In re Boulevard*, 334 F.3d 1336 (Fed. Cir. 2003).  However, in reality it is very often determined by the personal sensibilities of a single examining attorney or a few objecting persons.  *See*, *e.g.*, *In re Tam*, Brief of ACLU, Appeal No. 2014-1293 at 4 (June 19, 2015) (comparing the denial of "Uppity Negro" Application No. 86,053,392 with registration of Application No. 78,312,525); *In re Boulevard*, 334 F.3d at 1341 ("[A] number of declarations from academics and business persons . . . attested that the term was not offensive. Those declarations, however, consist mainly of the personal opinions of the declarants.").  Courts' recognition that the offensive character of marks changes with time in itself declares Section 2(a) void for vagueness.

## CONCLUSION

The Court cannot suppress trademarks without also suppressing the ideas they convey.  *See Cohen*, 403 U.S. at 26.  Trademarks provide information to potential and current consumers, ranging from information about goods and services to company values, beliefs, and ideas.  Therefore, the government cannot use Section 2(a)'s restriction on "immoral . . . or scandalous matter; or matter which may disparage" to suppress the protected speech encompassed by trademarks without adequate justification.  While an unsuccessful trademark applicant may indeed continue to use a

17

mark refused or revoked on Section 2(a) grounds, the value of that mark is hobbled and unenforceable, thereby making it less attractive and causing applicants to self-censor their use of potentially "immoral" or "scandalous" marks. This discourages such speech from the marketplace of ideas, favoring only speech that the PTO and less than a substantial majority of individuals find appropriate and refuses significant enforcement rights. The First Amendment will not abide such arbitrary standards for the burdening of speech with unconstitutional conditions. It does not advance any substantial government interest, and is not narrowly tailored to serve any interest the government ever has, or ever could, put forth to justify it. Courts have allowed Section 2(a) to stand unquestioned for far too long. It is unconstitutional and has done great harm to the marketplace of ideas for decades. That time should end now. Section 2(a) delendum est!

DATED:      November 6, 2015                RANDAZZA LEGAL GROUP

                                            By: /s/ Marc J. Randazza
                                            Marc J. Randazza
                                            Randazza Legal Group, PLLC
                                            3625 S. Town Ctr. Dr., Ste. 150
                                            Las Vegas, NV 89135
                                            (702) 420-2001

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 5,890 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface in 14-point Garamond font.

By: /s/ Marc J. Randazza
Marc J. Randazza
Randazza Legal Group, PLLC
3625 S. Town Ctr. Dr., Ste. 150
Las Vegas, NV 89135
(702)420-2001

November 6, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of November, 2015, I filed the foregoing Brief of *Amicus Curiae* First Amendment Lawyers Association using the Court's CM/ECF system, which will provide notification to all registered users.


/s/ Marc J. Randazza
Marc J. Randazza
Attorney for *Amicus Curiae*
First Amendment Lawyers Association